# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CAESARS ENTERTAINMENT OPERATING
COMPANY, INC.; CAESARS LICENSE COMPANY,
LLC; OCTAVIUS LINQ HOLDING CO., LLC; PHW
LAS VEGAS, LLC; CAESARS BALTIMORE
ACQUISITION COMPANY, LLC; PHW MANAGER,
LLC; CAESARS BALTIMORE MANAGEMENT
COMPANY, LLC; 3535 LV CORP; 3535 LV
PARENT, LLC; CORNER INVESTMENT COMPANY
NEWCO, LLC; JCC HOLDING COMPANY II
NEWCO, LLC; PARBALL CORPORATION;
PARBALL PARENT, LLC; CROMWELL
MANAGER, LLC; BALLY'S LAS VEGAS
MANAGER, LLC; THE QUAD MANAGER, LLC;
FHR CORPORATION; FHR PARENT, LLC; LVH
CORPORATION; LVH PARENT, LLC; FLAMINGO-
LAUGHLIN, INC; FLAMINGO-LAUGHLIN
PARENT, LLC; DCH EXCHANGE LLC; LAS
VEGAS RESORT DEVELOPMENT INC.; WINNICK
HOLDINGS LLC; and TRB FLAMINGO LLC,

        Plaintiffs,

   vs.

CAESARS ENTERTAINMENT CORPORATION;
CAESARS ACQUISITION COMPANY; CAESARS
GROWTH PARTNERS, LLC; CAESARS
ENTERTAINMENT RESORT PROPERTIES, LLC;
CAESARS ENTERPRISE SERVICES, LLC;
CAESARS INTERACTIVE ENTERTAINMENT,
INC.; APOLLO GLOBAL MANAGEMENT, LLC;
TPG CAPITAL, LP; HAMLET HOLDINGS LLC;
TPG HAMLET HOLDINGS, LLC; TPG HAMLET
HOLDINGS B, LLC; APOLLO HAMLET
HOLDINGS, LLC; APOLLO HAMLET HOLDINGS
B, LLC; CO-INVEST HAMLET HOLDINGS, SERIES
LLC; CO-INVEST HAMLET HOLDINGS B, LLC;
JEFFREY BENJAMIN; DAVID BONDERMAN;
KELVIN L. DAVIS; JEFFREY HOUSENBOLD;
FRED J. KLEISNER; GARY W. LOVEMAN; KARL
PETERSON; ERIC PRESS; MARC C. ROWAN;
DAVID B. SAMBUR; LYNN SWANN;
CHRISTOPHER WILLIAMS; CHATHAM ASSET
MANAGEMENT LLC; 3535 LV NEWCO, LLC;

Adv. Proc. No. 16-____

BALLY'S LV, LLC; CAESARS GROWTH BALLY'S
LV, LLC; CAESARS GROWTH BALTIMORE FEE,
LLC; CAESARS GROWTH CROMWELL, LLC;
CAESARS GROWTH HARRAH'S NEW ORLEANS,
LLC; CAESARS GROWTH LAUNDRY, LLC;
CAESARS GROWTH PH, LLC; CAESARS GROWTH
PH FEE, LLC; CAESARS GROWTH QUAD, LLC;
CAESARS LINQ, LLC; CAESARS TOURNAMENT,
LLC; CORNER INVESTMENT COMPANY, LLC;
FLAMINGO CERP MANAGER, LLC; FLAMINGO
LAS VEGAS OPERATING COMPANY, LLC;
FLAMINGO LAS VEGAS PROPCO, LLC; HAC
CERP MANAGER, LLC; HARRAH'S ATLANTIC
CITY OPERATING COMPANY LLC; HARRAH'S
ATLANTIC CITY PROPCO, LLC; HARRAH'S LAS
VEGAS, LLC; HARRAH'S LAS VEGAS PROPCO,
LLC; HARRAH'S LAUGHLIN PROPCO, LLC;
HARRAH'S LAUGHLIN, LLC; HIE HOLDINGS,
INC.; HIE HOLDINGS TOPCO, INC.; HLV CERP
MANAGER, LLC; LAUGHLIN CERP MANAGER,
LLC; PARBALL NEWCO, LLC; PARIS CERP
MANAGER, LLC; PARIS LAS VEGAS OPERATING
COMPANY, LLC; PARIS LAS VEGAS PROPCO,
LLC; PHWLV, LLC; RIO CERP MANAGER, LLC;
RIO PROPCO, LLC; RIO PROPERTIES, LLC; JAZZ
CASINO COMPANY, LLC; LAUNDRY NEWCO,
LLC; LVH NEWCO, LLC; FLAMINGO-LAUGHLIN
NEWCO, LLC; AND FHR NEWCO, LLC,

Defendants.

## ADVERSARY COMPLAINT

Plaintiffs Caesars Entertainment Operating Company, Inc. ("CEOC") and certain of its

debtor subsidiaries bring this Adversary Complaint, on information and belief where applicable,

against CEOC's controlling shareholder, Caesars Entertainment Corporation ("CEC"); several of

CEOC's present and past directors and officers; several of CEC's present and past directors and

officers; Caesars Acquisition Company; Caesars Growth Partners, LLC; Caesars Entertainment

Resort Properties, LLC; Caesars Enterprise Services, LLC; Caesars Interactive Entertainment,

Inc.; Apollo Global Management, LLC; TPG Capital, LP; Hamlet Holdings LLC and certain of

its affiliates; Chatham Asset Management LLC; and affiliates of CEC that were transferees of assets fraudulently transferred from CEOC for (a) recovery of fraudulent transfers and the return to CEOC and its subsidiaries of valuable assets that were wrongly taken from them by the actions of CEOC's directors, its controlling shareholder, and others, (b) monetary damages and/or rescission for breaches of fiduciary duties, unjust enrichment, aiding and abetting breaches of fiduciary duties, civil conspiracy, misappropriation of corporate opportunity, and waste of corporate assets, and (c) imposition of a constructive trust or equitable lien over the transferred assets.

## INTRODUCTION

1.      This action arises from a series of self-dealing transactions between CEOC and its debtor subsidiaries (collectively, the "Debtors") and entities controlled by or under common control with CEC. Each of these transactions involved transfers that were made for inadequate consideration and less than reasonably equivalent value at a time when the transferor was insolvent, and that were made with the intent to hinder or delay CEOC's creditors. These transactions were conceived, crafted, and implemented by Apollo Global Management, TPG Capital, CEC, and individuals and agents connected with these entities. The transactions were effectuated through a series of complex agreements that enabled Apollo, TPG and CEC to gain control of CEOC's high-growth assets, unencumbered by CEOC debt, and to remove those assets beyond the reach of CEOC's creditors. Later, CEC and defendants who were also CEOC directors filed a lawsuit seeking declaratory relief sanctioning these asset transfers and insulating CEC, Apollo, TPG, and their affiliates from fraudulent transfer claims and other legal liabilities.

2.      In January 2008, Apollo and TPG, using a vehicle called Hamlet Holdings LLC and affiliated entities (collectively, "Hamlet"), acquired the company then known as Harrah's Entertainment Inc.—and now known as CEC—in a highly leveraged $30.7 billion buyout (the

"LBO").  Through Hamlet, Apollo and TPG (with Hamlet, the "Sponsors") continue to own 60%

of the common stock of CEC and controlled all aspects of CEOC's governance and operations

prior to June 2014.

3.      At the time of the LBO, Harrah's operated primarily through a wholly-owned

subsidiary then known as Harrah's Operating Company, Inc.—now known as CEOC—and it

was this operating company that incurred most of the debt used to fund the LBO.[1]  Harrah's

owned and operated a network of casinos in regional markets throughout the country.  It also

owned a significant number of casinos in destination markets—at that time, primarily Las Vegas

and New Orleans.

4.      Harrah's used its customer loyalty program to encourage customers in its regional

markets to give Harrah's a greater share of their local gaming "spend" to earn more reward

credits to use at other Harrah's properties, particularly Harrah's destination properties in

Las Vegas and New Orleans.  Many of these regional casinos were only modestly profitable in

their own right, but they provided Harrah's with the critical ability to interact and deepen

relationships with customers in their home markets.  Harrah's portfolio of regional and

destination properties created a hub-and-spoke business model that let the company capture

customers on a regional basis and feed them to its destination properties.

5.      Harrah's also developed synergies within Las Vegas.  Through various

acquisitions preceding the LBO, Harrah's developed a dominant and concentrated presence in

the center of the Las Vegas Strip, including properties such as Caesars Palace, Paris Las Vegas,

Bally's Las Vegas, The Flamingo Las Vegas, Rio Las Vegas, The Cromwell (formerly Bill's

---

[1]     For purposes of simplicity, Plaintiffs sometimes refer to the collective operations of CEC and
its subsidiaries as "Caesars" and, where appropriate, refer to the two Harrah's entities by
their Caesars names.

Gambling Hall & Saloon), Harrah's Las Vegas, and The Quad Resort & Casino (then known as the Imperial Palace), as well as parcels of undeveloped land near the Las Vegas Strip. Control of these contiguous casinos, hotels, restaurants, and entertainment locations was intended to ensure that, once brought to Las Vegas, Harrah's customers would remain within the Harrah's system.

6.      In 1998, Harrah's hired Harvard Business School professor Gary Loveman to refine, develop, and expand Harrah's customer loyalty program. That program, known as Total Rewards, pioneered the use of data analytics and behavioral tracking to maximize play and profitability throughout the Harrah's casino network. As a result of Loveman's innovative approach and the success of Total Rewards, Harrah's became one of the premier operators of casino properties in the world. Loveman was promoted to Harrah's Chief Executive Officer in 2003.

7.      Within months of the LBO, the global financial crisis and ensuing recession crippled the gaming industry. CEOC was especially hard hit as the revenues needed to service its massive debt fell short. At first, CEOC and the Sponsors responded to CEOC's unsustainable capital structure with exchange offers for CEOC's distressed debt and with credit facility amendments, which reduced some of CEOC's indebtedness and extended the maturity of much of the rest.

8.      Soon, though, the Sponsors and CEC realized that CEOC would never be able to repay its enormous debt and embarked upon a new strategy. Beginning in 2009, the Sponsors and CEC devised a plan to salvage their multibillion-dollar investment in CEC by stripping CEOC of valuable assets and moving them to affiliates of CEC that the Sponsors and CEC controlled and which were not liable for CEOC's massive debts. In implementing this plan, the Sponsors' role went beyond mere governance and supervision of CEC and CEOC. Instead,

5

partners and officers from those firms—in particular, Apollo—played an active role in the

day-to-day management of CEOC, in determining the specifics of CEOC's corporate strategy, in

choosing which assets would be transferred, in deciding which CEC affiliates would receive the

assets, in selecting CEOC's financial and legal advisors prior to June 2014, in negotiating for

(and, simultaneously, against) CEOC, and in determining the prices to be paid for assets.  Often

this was done with little evident input from the management of CEOC itself, who were relegated

to staffing the strategic initiatives the Sponsors, CEC, and their advisors devised.

9.      In the course of these transfers, the Sponsors, CEC, and their advisors created a

profusion of affiliates, holding companies, intermediate entities, and special purpose vehicles.  In

2009, they created an affiliate named Harrah's Interactive Entertainment—now known as

Caesars Interactive Entertainment ("CIE")—which was owned by two layers of holding

companies, each with multiple classes of stock.  In 2013, they created Caesars Entertainment

Resort Properties, LLC ("CERP") which, with various affiliated entities, took ownership of six

existing properties indirectly owned by CEC (the "CMBS Properties") and two CEOC

properties.  Also in 2013, the Sponsors, CEC, and their advisors created an entity called Caesars

Acquisition Company and a subsidiary, Caesars Growth Partners, to receive the transfer of

properties from CEOC.  In 2014, they created a "services company" called Caesars Enterprise

Services, which, among other things, took control of CEOC's Total Rewards program, its

enterprise services (including most of its employee workforce built over many years, and

predating the LBO), and its property management business.  Each of these affiliates was directly

or indirectly controlled by CEC and the Sponsors, and each was created for the purpose of or in

connection with transferring assets beyond the reach of CEOC's creditors.  In fact, in some

cases, the Sponsors and CEC openly characterized these affiliates as "bankruptcy remote"; that is, remote from the CEOC bankruptcy they knew was coming.

10.     In May 2009, the Sponsors and CEC engineered the transfer of CEOC's online gaming business, including CEOC's World Series of Poker trademarks and intellectual property rights, to Caesars Interactive Entertainment.  In August 2010, the Sponsors and CEC ordered CEOC to transfer its intellectual property rights in the CMBS Properties to CEC affiliates that managed those properties and, later, to transfer those rights to CERP.  In September 2011, CEC and the Sponsors forced CEOC to sell CIE its rights to hold World Series of Poker tournaments. In October 2013, CEC and the Sponsors caused CEOC to convey two of CEOC's significant Las Vegas properties to CERP.  The next month, CEOC was instructed to transfer two other valuable properties to Growth Partners, along with valuable management fee streams.  In March 2014, the Sponsors and CEC engineered CEOC's sale of four of its most important remaining properties to Growth Partners, along with valuable management fee streams and 31 acres of undeveloped land.  As part of that same transaction, CEOC transferred its rights in Total Rewards to a CES—a vehicle controlled by CERP and Growth Partners.

11.     In mid-2014, the Sponsors and CEC announced a number of further initiatives designed to enrich CEC and the Sponsors at the expense of CEOC and its creditors.  In May 2014, the Sponsors orchestrated what they described as a sale of 5% of CEOC's common stock in an attempt to extricate CEC from its guarantee of CEOC's bond debt.  Also in May 2014, the Sponsors and CEC launched a tender offer for CEOC's 5.625% Senior Notes due June 2015 and 10% Second Priority Notes due 2015.  Although those notes had been trading at a significant discount to their face value, the Sponsors and CEC had CEOC spend over $1 billion to redeem them at par, plus a premium, plus accrued interest, largely from Growth Partners and a hedge

fund that on information and belief had been cooperating with Apollo.  A few weeks later, the

Sponsors ordered CEOC to repay all amounts remaining under an intercompany revolver facility

between CEC and CEOC, exhausting another $261.8 million of CEOC's dwindling cash.  In

June 2014, the Sponsors and CEC caused CEOC to announce the closure of its modestly

profitable Showboat Atlantic City property and to direct its VIP customers to a casino owned by

CERP.  In August 2014, the Sponsors, CEC, and CEOC filed a lawsuit in New York seeking a

declaratory judgment that none of their fraudulent transfers and other acts had been illegal.

12.     The Sponsors and CEC's strategy had several purposes.  The first was to move

CEOC's most valuable assets into new entities that would be insulated from CEOC's inevitable

bankruptcy and improve the otherwise dismal prospects for the Sponsors' investment in CEC.

The net effect was to divide Caesars' business into two segments: one a "Good Caesars,"

consisting of CIE, Growth Partners, CERP, and CES, that owned and controlled the prime assets

formerly belonging to CEOC; the other, a "Bad Caesars," consisting of CEOC, which remains

burdened by substantial debt and whose remaining properties consist primarily of regional

casinos.  Only the "Bad Caesars" remains liable for the vast majority of the debts incurred in the

2008 LBO.

13.     But there also was a second, and equally crucial, objective: once the principal

benefits of the synergies of the Caesars' network of properties and control of the Total Rewards

customer loyalty program had been transferred to the Sponsors and CEC, CEOC's remaining

regional assets would have greatly reduced value to any potential third-party purchaser.  And by

severing CEOC from its assets and from the core enterprise functions that it previously

performed, the Sponsors and CEC were able to create certain risks to CEOC's ability to

formulate a plan of reorganization (in addition to structural issues that already existed) that

would allow CEOC to emerge from chapter 11 as a standalone entity. Thus, when the

long-expected bankruptcy came, the Sponsors and CEC hoped to acquire cheaply the assets that

remained in CEOC and recreate the synergistic Caesars network without CEOC's troublesome

debt.[2]

14.     This second objective was, in essence, the willful destruction of CEOC's value.

Ordinarily, such efforts would have been prevented by CEOC's board, which owed fiduciary

duties to the company. Because CEOC was insolvent, these duties required CEOC's board to

maximize the value of CEOC. CEOC's board, however, at the time was completely dominated

by CEC and the Sponsors. At most times, it consisted of only two directors, both of whom were

officers or directors of CEC and neither of whom was independent. In fact, CEOC had no

independent directors until June 2014. In addition, CEOC did not have, and was not afforded,

separate legal counsel or financial advisors to advise it on the transfers; CEOC's board did not

create special committees of disinterested directors to assess the proposed transfers; there was no

market process to ensure that CEOC received reasonably equivalent value for the assets it

transferred; and, in virtually all cases, the board did not ask for or receive independent fairness

opinions.

15.     A third objective—admitted by the Sponsors—was to strengthen the Sponsors'

hand in restructuring negotiations with CEOC's creditors. With CEOC's valuable assets stripped

from CEOC and now firmly under the Sponsors' control, the Sponsors would enjoy leverage in

their negotiations with creditors with respect to a CEOC restructuring. If creditors balked at a

---

[2]     CEC subsequently agreed to a new-value bankruptcy plan where it proposed to buy CEOC's assets for a
contribution of at least $1.5 billion. *See* CEOC 8-K filed on Dec. 31, 2014. Almost simultaneously, CEC
announced its plans to merge with Caesars Acquisition Corporation, thus recapturing the properties CEOC had
transferred to Growth Partners. *See* CEC 8-K filed on December 22, 2014. As part of the proposed plan, the
Sponsors proposed that CEOC would grant all persons and entities involved in the transfers general releases
from any claims CEOC might have against them.

restructuring, the Sponsors would have nonetheless created—in their words—a "war chest" to use against the creditors in CEOC's inevitable bankruptcy.

*　　　　　*　　　　　*

16.     Because the consideration received by CEOC for these transfers was wholly inadequate and because the transfers were intended to enrich CEC and the Sponsors at the expense of CEOC and its creditors, the transfers were unlawful and avoidable.

17.     In addition, the transfers were made with actual intent to hinder, delay or defraud CEOC's creditors and thus the transfers should be avoided or the value of the property transferred must be returned to CEOC.  Defendants also are liable for monetary damages for their role in these transactions.

18.     CEC, as CEOC's controlling shareholder, CEC's directors (by virtue of their domination over CEOC and its board), and CEOC's directors and officers owed fiduciary duties to CEOC.  Because CEOC was insolvent at all relevant times, these defendants had a duty to maximize CEOC's value.  Defendants breached their fiduciary duties or aided and abetted others in breaching fiduciary duties, and are therefore liable for damages to CEOC.

19.     The conduct of the defendants named in this lawsuit has already been the subject of a comprehensive investigation conducted by a court-appointed examiner, Richard Davis (the "Examiner").  As summarized by the Examiner at the outset of his 930-page report:

> The principal question being investigated was whether in structuring and implementing these transactions assets were removed from CEOC to the detriment of CEOC and its creditors.

> The simple answer to this question is "yes."  As a result, claims of varying strength arise out of these transactions for constructive fraudulent transfers, actual fraudulent transfers (based on intent to hinder or delay creditors) and breaches of fiduciary duty by CEOC directors and officers and CEC.  Aiding and abetting breach of fiduciary duty claims, again of varying strength, exist against the Sponsors and certain of CEC's directors.

10

The Examiner concluded that "[t]he potential damages from those claims considered reasonable or strong range from $3.6 billion to $5.1 billion." The Examiner defined "strong" claims as those "having a high likelihood of success" and "reasonable" claims as those "having a reasonable, or better than 50/50, chance of success." That range of potential damages excluded other claims that were characterized by the Examiner as viable, albeit with a less than 50/50 chance of success. Nor did the Examiner's range include certain types of damages that the Examiner determined may be available on strong and reasonable claims, but that the Examiner did not quantify. Many of the allegations and claims set forth in this Complaint are based on the Examiner's comprehensive investigation.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over the claims for relief in this adversary proceeding pursuant to 28 U.S.C. § 1334(b).

21.    Venue for this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409.

## PARTIES

### A.    Plaintiffs

22.    Plaintiff Caesars Entertainment Operating Company, Inc. ("CEOC") is a Delaware corporation that owns, operates, and manages casinos and other entertainment properties in Las Vegas and elsewhere in the United States. CEOC's headquarters are located at One Caesars Palace Drive, Las Vegas, Nevada 89109.

23.    Plaintiff Caesars License Company, LLC ("CLC") (f/k/a Harrah's License Company, LLC) is a wholly owned subsidiary of CEOC that owned certain intellectual property that was transferred or licensed through the transactions set forth in this Complaint.

24.     Plaintiff Octavius Linq Holding Co., LLC is a wholly owned subsidiary of CEOC that owned the equity of Octavius Linq Intermediate Holding Co., which in turn owned Octavius Tower, Linq Retail, RDE Casino and the Observation Wheel, and certain undeveloped land, which were transferred through the transactions set forth in this Complaint.

25.     Plaintiff PHW Las Vegas, LLC is a wholly owned subsidiary of CEOC that owned the equity of Planet Hollywood Las Vegas, which was transferred through the transactions set forth in this Complaint.

26.     Plaintiff Caesars Baltimore Acquisition Company, LLC is a wholly owned subsidiary of CEOC that owned CEOC's interests in Caesars Baltimore Investment Co., LLC, which were transferred through the transactions set forth in this Complaint.

27.     Plaintiff PHW Manager, LLC is a wholly owned subsidiary of CEOC that owned CEOC's interests in management fees generated from Planet Hollywood Las Vegas, a portion of which were transferred through the transactions set forth in this Complaint.

28.     Plaintiff Caesars Baltimore Management Company, LLC is a wholly owned subsidiary of CEOC that owned CEOC's interests in management fees generated from Horseshoe Baltimore, a portion of which were transferred through the transactions set forth in this Complaint.

29.     Plaintiff 3535 LV Corp. is a wholly owned subsidiary of CEOC that owned certain undeveloped land, which was transferred through the transactions set forth in this Complaint.

30.     Plaintiff 3535 LV Parent, LLC is a wholly owned subsidiary of CEOC that owned CEOC's interests in 3535 LV NewCo, LLC and certain undeveloped land, which were transferred through the transactions set forth in this Complaint.

31.     Plaintiff Corner Investment Company Newco, LLC is a wholly owned subsidiary of CEOC that owned CEOC's interests in Corner Investment Company, LLC, which were transferred through the transactions set forth in this Complaint.

32.     Plaintiff JCC Holding Company II NewCo, LLC is a wholly owned subsidiary of CEOC that owned CEOC's interests in JCC Holding Company III, LLC, which were transferred through the transactions set forth in this Complaint.

33.     Plaintiff Parball Parent, LLC (together with its subsidiaries) is a wholly owned subsidiary of CEOC that owned CEOC's interests in Parball NewCo, LLC and certain undeveloped land, which were transferred through the transactions set forth in this Complaint.

34.     Plaintiff Parball Corporation (together with its subsidiaries) is a wholly owned subsidiary of CEOC that owned certain undeveloped land, which was transferred through the transactions set forth in this Complaint.

35.     Plaintiff Cromwell Manager, LLC is a wholly owned subsidiary of CEOC that owned CEOC's interests in certain management fees, a portion of which were transferred through the transactions set forth in this Complaint.

36.     Plaintiff Bally's Las Vegas Manager, LLC is a wholly owned subsidiary of CEOC that owned CEOC's interests in certain management fees, a portion of which were transferred through the transactions set forth in this Complaint.

37.     Plaintiff The Quad Manager, LLC is a wholly owned subsidiary of CEOC that owned CEOC's interests in certain management fees, a portion of which were transferred through the transactions set forth in this Complaint.

38.     Plaintiff FHR Corporation is a wholly owned subsidiary of CEOC that owned certain CEOC assets that were transferred through the transactions set forth in this Complaint.

39.     Plaintiff FHR Parent, LLC is a wholly owned subsidiary of CEOC that owned certain CEOC assets that were transferred through the transactions set forth in this Complaint.

40.     Plaintiff LVH Corporation is a wholly owned subsidiary of CEOC that owned certain CEOC assets that were transferred through the transactions set forth in this Complaint.

41.     Plaintiff LVH Parent, LLC is a wholly owned subsidiary of CEOC that owned certain CEOC assets that were transferred through the transactions set forth in this Complaint.

42.     Plaintiff Flamingo-Laughlin, Inc. is a wholly owned subsidiary of CEOC that owned certain CEOC assets that were transferred through the transactions set forth in this Complaint.

43.     Plaintiff Flamingo-Laughlin Parent, LLC is a wholly owned subsidiary of CEOC that owned certain CEOC assets that were transferred through the transactions set forth in this Complaint.

44.     Plaintiff DCH Exchange LLC is a wholly owned subsidiary of CEOC that provided easements on certain parcels of land as set forth in this Complaint.

45.     Plaintiff Las Vegas Resort Development Inc. is a wholly owned subsidiary of CEOC that provided easements on certain parcels of land as set forth in this Complaint.

46.     Plaintiff Winnick Holdings LLC is a wholly owned subsidiary of CEOC that provided easements on certain parcels of land as set forth in this Complaint.

47.     Plaintiff TRB Flamingo LLC is a wholly owned subsidiary of CEOC that provided easements on certain parcels of land as set forth in this Complaint.

**B.      Corporate Defendants**

48.     Defendant Caesars Entertainment Corporation ("CEC") is a Delaware corporation that, through subsidiaries, joint ventures, and other arrangements, owns, operates, and manages gambling casinos and properties in the United States and foreign countries.  CEC's offices are

14

located at One Caesars Palace Drive, Las Vegas, Nevada.  The Sponsors own approximately

60% of the voting stock of CEC and have the right to appoint CEC's entire board of directors.

49.     Defendant Caesars Acquisition Company ("CAC") is a Delaware corporation

CEC formed in 2013 to make an equity investment in Growth Partners.  CAC is a public

company whose stock is listed and traded on NASDAQ.  66% of the voting stock of CAC is

owned by affiliates of the Sponsors.  The Sponsors also control CAC pursuant to an Omnibus

Voting Agreement that gives them the right to appoint CAC's entire board of directors.  CAC's

offices are located at One Caesars Palace Drive, Las Vegas, Nevada.

50.     Defendant Caesars Growth Partners, LLC ("Growth Partners") is a Delaware

limited liability company that was formed in 2013 as a joint venture between CEC and CAC to

acquire assets from CEOC and CEC.  All of the voting units of Growth Partners are owned by

CAC.  All of the non-voting units of Growth Partners are owned by CEC or its subsidiaries and

affiliates.  Upon information and belief, Growth Partners' offices are located at

One Caesars Palace Drive, Las Vegas, Nevada.[3]

51.     Defendant Caesars Entertainment Resort Properties, LLC ("CERP") is a Delaware

limited liability company that was formed in October 2013 as a wholly-owned subsidiary of CEC

for the purpose of acquiring, holding, and operating certain Caesars properties.  CERP's offices

are located at One Caesars Palace Drive, Las Vegas, Nevada.[4]

---

[3]    For purposes of this Complaint, Growth Partners is defined to include all of the direct and
indirect subsidiaries, affiliates, holding companies, and other entities owned by, controlled
by, or under common ownership or control with Growth Partners that received assets or
ownership interests in conjunction with any of the relevant transfers.

[4]    For purposes of this Complaint, CERP is defined to include all of the direct and indirect
subsidiaries, affiliates, holding companies, and other entities owned by, controlled by, or
under common ownership or control with CERP that received assets or ownership interests in
conjunction with any of the relevant transfers.

52.    Defendant Caesars Enterprise Services, LLC ("CES") is a Delaware limited liability company that was formed on April 4, 2014, for the purpose of acquiring and managing the enterprise-wide assets of CEOC for the benefit of CEC, CEOC, Growth Partners, and CERP. Upon information and belief, CEC's offices are located at One Caesars Palace Drive, Las Vegas, Nevada.

53.    Defendant Caesars Interactive Entertainment, Inc. ("CIE") is a Delaware corporation formed in April 2009 by CEC. CIE operates an online gaming business that includes so-called "play for fun" games as well as "real money" games in certain jurisdictions. In addition, CIE owns the World Series of Poker tournaments and brand. The majority of the voting stock of CIE is owned by Growth Partners. Upon information and belief, CIE's offices are located at 1411 Peel, Montreal, Canada.

54.    The following chart illustrates the Caesars organizational structure following the creation of Growth Partners and CERP in 2013, the transfer by CEC of 11% of its equity stake in CEOC beginning in May 2014, and the creation of CES:



55.    CEC, CEOC, CERP, CAC, and Growth Partners have created and do business through dozens of direct and indirect subsidiaries, affiliates, holding companies, and other entities, all of which are owned or controlled by these companies or by the Sponsors. CEC,

CEOC, CERP, CAC, and Growth Partners frequently create new such entities, or abandon older

ones, to conceal the nature or details of transfers or other improper purposes.  Because these

entities are owned, controlled, and dominated by the Sponsors, CEC, CEOC, CERP, CAC, or

Growth Partners, and have been used for improper purposes, their independent identities should

be disregarded and they should be treated as alter egos of their ultimate owners.

56.    Defendant Apollo Global Management, LLC is a Delaware limited liability

company formed on July 3, 2007.  Apollo's global headquarters are located at

9 West 57th Street, New York, New York.  For purposes of this Complaint, Apollo is defined to

include all of its funds, subsidiaries, or vehicles that have invested in CEC or any of its affiliates.

57.    Defendant TPG Capital, LP is a Delaware limited partnership formed on

November 15, 2011.  Upon information and belief, TPG's global headquarters are located at

345 California Street, San Francisco, California.  For purposes of this Complaint, TPG is defined

to include all of its funds and/or subsidiaries that invested in CEC or any of its affiliates.

58.    Defendant Hamlet Holdings LLC is a Delaware limited liability company.  Upon

information and belief, Hamlet Holdings LLC was formed in 2002 and is headquartered in Fort

Worth, Texas.  Hamlet Holdings LLC and its affiliates, including Defendants Apollo Hamlet

Holdings, LLC, Apollo Hamlet Holdings B, LLC, TPG Hamlet Holdings, LLC, TPG Hamlet

Holdings B, LLC, Co-Invest Hamlet Holdings, Series LLC, and Co-Invest Hamlet Holdings B,

LLC (collectively with Hamlet Holdings LLC, "Hamlet"), are the vehicles by which the

Sponsors raised money to invest in and execute the LBO, control CEC, and invest in and control

CAC.  According to SEC filings, Hamlet Holdings LLC's members consist of five persons from

Apollo and TPG.  The Sponsors, together with investment vehicles they created, at all relevant

times owned approximately 60% of the voting common stock of CEC and 66% of the voting

common stock of CAC.  According to SEC filings, Apollo and TPG gave an irrevocable proxy to

defendant Hamlet Holdings LLC under which Hamlet Holdings LLC has sole voting and sole

dispositive power with respect to these shares of CEC and CAC.

### C.     Individual Defendants

59.     Defendant Jeffrey Benjamin was at all relevant times a director of CEC and a

senior advisor to Apollo.  Upon information and belief, Benjamin stood to benefit personally

from some or all of the transactions described in this Complaint.

60.     Defendant David Bonderman was at all relevant times a director of CEC and is

currently a director of CEOC.  Bonderman is a founding partner of TPG and, upon information

and belief, stood to benefit personally from some or all of the transactions described in this

Complaint.

61.     Defendant Kelvin L. Davis was at all relevant times a director of CEC and is

currently a director of CEOC.  Davis is a senior partner of TPG and, upon information and belief,

stood to benefit personally from some or all of the transactions described in this Complaint.

62.     Defendant Jeffrey Housenbold was a CEC director from December 2011 to

March 2014 and, upon information and belief, stood to benefit personally from some or all of the

transactions described in this Complaint.

63.     Defendant Fred J. Kleisner became a CEC director in July 2013.  Upon

information and belief, Kleisner stood to benefit personally from some or all of the transactions

described in this Complaint.

64.     Defendant Gary Loveman was at all relevant times the Chairman and a director of

CEC and CEOC.  Loveman also was the Chief Executive Officer and President of CEC and

CEOC until June 30, 2015.  Upon information and belief, Loveman stood to benefit personally

from some or all of the transactions described in this Complaint.

65.     Defendant Karl Peterson was at all relevant times a partner at TPG and from 2008 until July 2013 a director of CEC.  Upon information and belief, Peterson stood to benefit personally from some or all of the transactions described in this Complaint.

66.     Defendant Eric Press was at all relevant times a director of CEC and a partner at Apollo.  Upon information and belief, Press stood to benefit personally from some or all of the transactions described in this Complaint.

67.     Defendant Marc C. Rowan was at all relevant times a director of CEC and from June 2014 to March 2016 was a director of CEOC.  Rowan is a founding partner of Apollo and, upon information and belief, stood to benefit personally from some or all of the transactions described in this Complaint.

68.     Defendant David B. Sambur has been a director of CEC since 2010 and a director of CEOC since June 2014.  Sambur is a partner of Apollo and, upon information and belief, stood to benefit personally from some or all of the transactions described in this Complaint.

69.     Defendant Lynn Swann was at all relevant times a director of CEC and, upon information and belief, stood to benefit personally from some or all of the transactions described in this Complaint.

70.     Defendant Christopher Williams was at all relevant times a director of CEC and, upon information and belief, stood to benefit personally from some or all of the transactions described in this Complaint.

71.     According to CEC's proxy statements, CEC does not consider Messrs. Loveman, Bonderman, Davis, Rowan, Sambur, Benjamin, Peterson, and Press to be independent directors because of their relationships with affiliates of the Sponsors or other relationships with CEC.

**D.    Other Defendants**

72.    Defendant Chatham Asset Management LLC is an asset management company with its principal place of business at 26 Main Street, Chatham Township, New Jersey.  Chatham is a limited liability company organized under the laws of Delaware.

**E.    Transferee Defendants**

73.    In addition to CIE, CEC, CERP, CAC, and Growth Partners, the Sponsors and CEC formed numerous entities that received transfers of real property, tangible and personal property, intellectual property, and other assets from CEOC and from affiliates of CEOC.  Upon information and belief and unless otherwise indicated, the offices and premises of each of these defendants are located at the same Las Vegas address as CEC.

74.    The "2009 Transferees" are the entities that received assets and the business that CEOC transferred from its online gaming business.  These include the following defendants:

a.    CEC and CIE;

b.    HIE Holdings Topco, Inc., a Delaware corporation;

c.    HIE Holdings, Inc., a Delaware corporation;

d.    Caesars Tournament, LLC, a Delaware limited liability company; and

e.    Rio Properties, LLC, a Nevada limited liability company.

75.    The "CMBS PropCos" are the entities that received assets that CEOC transferred in 2010 as a result of the CMBS Loan Agreement Amendment and Trademarks Transfer.  These include the following defendants:

a.    CEC;

b.    Rio PropCo, LLC, a Delaware limited liability company;

c.    Harrah's Las Vegas PropCo, LLC, a Delaware limited liability company;

d.      Harrah's Atlantic City PropCo, LLC, a Delaware limited liability

company;

e.      Harrah's Laughlin PropCo, LLC, a Delaware limited liability company;

f.      Flamingo Las Vegas Propco, LLC, a Delaware limited liability company;

and

g.      Paris Las Vegas PropCo, LLC, a Delaware limited liability company.

76.      The "WSOP Transaction Transferees" are the entities that received assets that

CEOC transferred in 2011 as a result of the WSOP Transaction.  These include the following

defendants:

a.      CEC;

b.      CIE;

c.      Caesars Tournament, LLC; and

d.      Rio Properties, LLC.

77.      The "Linq/Octavius Transferees" are the entities that received assets that CEOC

transferred in 2013 as a result of the Linq and Octavius transfers.  These include defendants CEC

and Rio Properties, LLC.

78.      The "2013 Transferees" are the entities that received assets CEOC transferred in

2013 as a result of the 2013 Transaction Agreement.  These include the following defendants:

a.      CEC, CAC, and Growth Partners;

b.      Caesars Growth PH Fee, LLC, a Delaware limited liability company;

c.      Caesars Growth Baltimore Fee, LLC, a Delaware limited liability

company;

d.      PHWLV, LLC, a Nevada limited liability company; and

      e.      Caesars Growth PH, LLC, a Delaware limited liability company.

79.    The "Services Transferees" are the entities that received management services from CEOC and access to CEOC's Total Rewards program pursuant to the 2010 Shared Services Agreement, the 2013 Shared Services Agreement, and the Management Services Agreements. These include the following defendants:

      a.      CMBS PropCos, CEC, CERP, and Growth Partners;

      b.      Flamingo Las Vegas Operating Company, LLC, a Nevada limited liability company;

      c.      Paris Las Vegas Operating Company, LLC, a Nevada limited liability company;

      d.      Harrah's Laughlin, LLC, a Nevada limited liability company;

      e.      Rio CERP Manager, LLC, a Nevada limited liability company;

      f.      Paris CERP Manager, LLC, a Nevada limited liability company;

      g.      Laughlin CERP Manager, LLC, a Nevada limited liability company;

      h.      HLV CERP Manager, LLC, a Nevada limited liability company;

      i.      HAC CERP Manager, LLC, a New Jersey limited liability company;

      j.      Harrah's Las Vegas, LLC, a Nevada limited liability company;

      k.      Flamingo CERP Manager, LLC, a Nevada limited liability company;

      l.      3535 LV Newco, LLC, a Delaware limited liability company;

      m.      Parball NewCo, LLC, a Delaware limited liability company;

      n.      Corner Investment Company, LLC, a Nevada limited liability company; and

      o.      Jazz Casino Company, LLC, a Louisiana limited liability company.

80.    The "2014 Transferees" are the entities that received properties from CEOC as a result of the 2014 Transaction Agreement.  These include the following defendants:

a.    CEC, CAC, Growth Partners, 3535 LV Newco, LLC, Parball NewCo, LLC, and Corner Investment Company, LLC;

b.    Caesars Growth Bally's LV, LLC, a Delaware limited liability company;

c.    Caesars Growth Quad, LLC, a Delaware limited liability company;

d.    Caesars Growth Cromwell, LLC, a Delaware limited liability company;

e.    Caesars Growth Harrah's New Orleans, LLC, a Delaware limited liability company;

f.    Caesars Linq, LLC, a Delaware limited liability company;

g.    Caesars Growth Laundry, LLC, a Delaware limited liability company;

h.    FHR NewCo, LLC, a Delaware limited liability company;

i.    Flamingo-Laughlin NewCo, LLC, a Delaware limited liability company;

j.    LVH NewCo, LLC, a Delaware limited liability company; and

k.    Laundry NewCo, LLC, a Delaware limited liability company.

81.    The "Easement Transferees" are the entities that were granted easements in 2011 on four lots of unimproved real estate, comprising approximately 25.8 acres, directly east of various Caesars properties.  These include the following defendants:

a.    Flamingo Las Vegas Propco, LLC and Caesars Linq, LLC, each of whom is identified above; and

b.    3535 LV Corp. (formerly known as Harrah's Imperial Palace Corporation), a Nevada corporation (which is not named as a defendant as it subsequently transferred its interests in the Quad to Growth Partners).

82.     The "Total Rewards Transferees" are the entities that received access to or rights in Total Rewards as a result of the 2014 Transaction Agreement and the formation of CES. These include the following defendants:

a.     CEC, CERP, Growth Partners, and CES;

b.     Caesars Growth Bally's LV LLC, a Delaware company;

c.     Flamingo Las Vegas Operating Company, LLC;

d.     Harrah's Las Vegas, LLC;

e.     Harrah's Laughlin, LLC;

f.     Paris Las Vegas Operating Company, LLC;

g.     Rio CERP Manager, LLC;

h.     Paris CERP Manager, LLC;

i.     Laughlin CERP Manager, LLC;

j.     HLV CERP Manager, LLC;

k.     HAC CERP Manager, LLC; and

l.     Flamingo CERP Manager, LLC.

## BACKGROUND

**A.     THE CAESARS ENTITIES**

83.     In January 2008, the Sponsors acquired CEC in a $30.7 billion leveraged buyout. The acquisition was financed with approximately $24 billion of new debt.  More than two thirds of this new debt was issued by CEOC (at the time, Harrah's Entertainment Operating Company). Most of the debt issued by CEOC was also guaranteed by CEC.  The Sponsors and other investors also contributed approximately $6.1 billion in cash, and the balance of the LBO was funded through other borrowings.

84.     From 2008 until at least 2013, CEOC was CEC's principal operating subsidiary. At all relevant times, CEOC has been completely dominated and controlled by CEC.  Until May 2014, CEC owned all of CEOC's stock.  It continues to own at least 89% of CEOC's stock today.  CEOC also did not have any independent directors until June 2014.

85.     Before the transfers described in this Complaint, CEOC owned and operated five of Caesars' nine highly profitable casinos in Las Vegas,[5] five casinos on the east coast and 17 casinos elsewhere in the United States.  In addition, CEOC owned or managed 20 other casinos in the United States and in other countries.

86.     The Sponsors' leveraged buyout of CEC closed approximately six months before the onset of the financial crisis in 2008.  The financial crisis and ensuing recession seriously damaged CEOC's business, especially among its regional casinos.  From year-end 2007 to year-end 2009, enterprise-wide net revenues decreased from $12.7 billion to $10.3 billion and adjusted EBITDA decreased from $2.1 billion to $1.7 billion.  Indeed, the only properties that have generated material positive operating income and operating margins in recent years have been CEOC's five casinos in Las Vegas and its casino in New Orleans, all but one of which have since been transferred to entities under CEC's control.  The following chart shows, by region, CEOC's net revenues:

| Net Revenue | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| Las Vegas | $3,254.2 | $2,698.0 | $2,834.8 | $3,013.1 | $3,029.9 | $3,070.4 | $3,072.2 | $3,194.1 |
| Atlantic Coast | 2,316.8 | 2,025.9 | 1,899.9 | 1,839.1 | 1,681.3 | 1,520.9 | 1,321.7 | 1,359.4 |
| Other U.S. | 3,986.8 | 3,646.7 | 3,274.0 | 3,080.6 | 3,048.8 | 2,924.0 | 2,794.1 | 2,713.0 |

---

[5]   CEOC also has owned a tenth Caesars property, named Hot Spot, in Las Vegas that offers limited gaming.  However, Hot Spot is so small (1,000 square feet containing fifteen slot machines, and no table games) that Caesars has not considered it to be a "casino."

The "Other U.S." region includes Harrah's New Orleans, which is considered a "super regional" and has been transferred to Growth.

### B.      CEOC WAS INSOLVENT AT ALL RELEVANT TIMES

87.      CEOC has been insolvent for a number of years dating back to at least December 31, 2008, and possibly earlier.  CEOC fails every test of solvency.  First, the fair market value of CEOC's assets has been substantially less than its liabilities.  Since 2008, the face amount of CEOC's interest-bearing debt (excluding intercompany debt) has not been less than $17.3 billion.  During this same period, the value of CEOC's enterprise was substantially less, resulting in a negative equity value.

88.      Throughout the 2008 to 2014 time period, CEOC's balance sheet consistently reflected negative equity, meaning the book value of its liabilities exceeded the book value of its assets.  This deficit increased substantially if goodwill were excluded from the calculation of CEOC's assets.  In addition, over this period, CEOC took financial reporting impairment charges on various assets, which reduced the carrying value of CEOC's assets by over $4.8 billion.

89.      Second, CEOC fails both the cash flow and capital adequacy tests for solvency.  CEOC has had a cash flow deficit each year since 2008.  During this time, CEOC failed to generate sufficient operating cash flow to pay its operating expenses.  One reason for CEOC's cash flow deficit—although by no means the only reason—has been its debt service obligations from the 2008 LBO.  CEOC is the issuer of $19.7 billion of CEC's overall debt, and it had debt service obligations in 2014 of just under $2 billion.

90.      CEOC's statements of cash flows throughout this time period also consistently reported a cash flow deficit from operations, steadily deteriorating from negative $98 million in 2009 to negative $841 million in 2014.  CEOC was unable to generate sufficient EBITDA to service the interest on its funded debt—much less accumulate sufficient cash to pay debt

principal upon maturity—and was able to pay its operating expenses only through a combination

of asset sales and additional borrowing.  For the years 2008 through 2014, CEOC's EBITDA

was sufficient to fund only an average of 62 cents of every dollar of interest expense.

91.    CEC's financial disclosures admitted the insufficiency of CEOC's cash flow to

service its outstanding debt.  Starting with its year-end 2008 10-K, CEC's yearly filings

conceded that CEC "may not be able to generate sufficient cash to service all of our

indebtedness, and may be forced to take other actions to satisfy our obligations under our

indebtedness that may not be successful."  As noted below, in 2011 and thereafter, CEC's

warning became more severe.

92.    Starting in 2009, Caesars' long-range plans—which included its projected

EBITDA for the next five- to seven-year period—predicted negative free cash flow for the

foreseeable future.  When adjusted to account for interest expense and capital expenditures, the

long-range plan prepared at year-end 2009 projected negative cash flow at CEOC of

$799 million in 2010, negative $914 million in 2011, and continuing negative figures for the

remainder of the forecast period.  The long-range plan prepared at year-end 2010 was worse.  It

forecast CEOC's cash flow as negative $1.133 million for 2011, negative $931 million for 2012,

and continuing negative figures throughout the forecast period.  Similarly, the long-range plan

CEOC prepared at year-end 2011 projected negative cash flow of $862 million for 2012,

negative $588 million for 2013, and continuing negative figures throughout the forecast period.

93.    By early 2012, CEC began to admit that it did not expect to be able to pay its

debts.  CEC's 10-K for 2011, for example, disclosed:

> As of December 31, 2011, $11.1 billion face value of our indebtedness is
> scheduled to mature in 2015 (assuming the extension options with respect to the
> CMBS Financing and PHW Las Vegas senior secured loan are exercised),

representing 49% of the total face value of our debt . . . .  We do not expect that
our cash flow from operations will be sufficient to repay this indebtedness.

CEC's 10-K filings for 2012, 2013, and 2014 included similar language.

94.    By this point, the market had taken notice of CEOC's precarious situation.

CEOC's debt was trading at a significant discount, a clear indication that the market did not

believe CEOC would be able to fully repay its debt.  CEC, in fact, purchased $5.9 million of

CEOC debt in 2012 at a discount of 46%.  In August 2012, Barclays stated, "Caesars is the most

highly levered company in our coverage universe, which not only limits its financial flexibility,

but also keeps the risk of bankruptcy high, in our view."  Barclays, *Patiently Waiting; Initiating

Coverage at UW* (Aug. 22, 2012).

95.    In February 2013, RBC Capital Markets concluded that Caesars would

"effectively run out of cash by the end of 2014."  RBC Capital Markets Report, *Q4 Results

Uninspiring; Maintaining Underperform* (Feb. 26, 2013).  In May 2013, RBC opined that

Caesars' asset sales were "short-term solutions" that would "only buy them time until 2015,"

when "a contentious debt-for-equity exchange or distressed debt exchange will need to be

consummated."  RBC Capital Markets Report, *Q1 Results Did Little to Change Our View*

(May 2, 2013).  In June 2013, Deutsche Bank sent the Sponsors an analysis indicating CEOC's

equity value was negative $5.8 billion and predicting that CEOC would not be able to pay debt

holders.

96.    The transfers of valuable assets from CEOC to CEC and its affiliates only

deepened CEOC's insolvency.  Although touted as measures that would improve CEOC's

liquidity, the transfers stripped CEOC of its chief sources of material and incremental EBITDA,

making it even harder for CEOC to service its debt load with the remaining, lower growth and

lower margin regional casinos.

### C.      THE CONFLICTED BOARDS OF DIRECTORS.

97.      At all relevant times, the Sponsors have owned a controlling interest in CEC. Moreover, pursuant to a January 28, 2008 stockholders' agreement, the Sponsors control the makeup of the nine-person CEC board, with four members designated by Apollo and four members by TPG.  Through this control, the Sponsors also control the management, business decisions, and operations of each of CEC's subsidiaries, including CEOC.  Although others sometimes joined or left the CEC board, the core group of directors on the CEC board at all relevant times consisted of defendants Loveman, Bonderman, Davis, Rowan, and Sambur. Loveman was CEC's Chairman and CEO; Rowan and Sambur were partners of Apollo; and Bonderman and Davis were partners of TPG.

98.      CEOC was a wholly-owned subsidiary of CEC until May 2014, when CEC purported to sell a 5% interest in CEOC to a group of hedge funds.  However, at all times CEC owned the controlling interest in CEOC and appointed all members of CEOC's board.  Between 2009 and June 2014, CEOC's board consisted of only two directors.  Defendant Loveman was a director at all times and the other director was either CEC's incumbent CFO, which was either Eric Hession or Jonathan Halkyard, or CEC's Deputy General Counsel, Michael Cohen.  The following chart depicts the composition of CEOC's board at the times relevant to this Complaint:

| Date Range | CEOC Inside Directors | CEOC Independent Directors |
|---|---|---|
| April 2009-May 2012 | Loveman, Halkyard | None |
| July 2012-April 2014 | Loveman, Cohen | None |
| May 2014-June 27, 2014 | Loveman, Hession | None |
| June 27, 2014-January 2015 | Loveman, Rowan, Sambur, Bonderman, Davis | Stauber, Winograd |

99.      In addition, it was generally understood that Apollo directly supervised the strategic direction of CEOC, including decisions about financing, divestments, and restructuring.

Defendant Sambur, an Apollo partner served, in effect, as CEOC's Chief Financial Officer.

Defendant Rowan, similarly, often acted as CEOC's *de facto* CEO.

100.    Many of the CEC and CEOC directors stood to benefit financially from the

transactions they approved or caused CEOC to approve.  Rowan and Sambur each had interests

in the Apollo-sponsored private investment fund that, through affiliates, owned a significant

percentage of CEC and CAC.  Upon information and belief, defendants Bonderman and Davis

had similar equity interests in CEC and CAC through investment vehicles sponsored by TPG.

Upon information and belief, Loveman and Halkyard also participated in a management

incentive plan that rewarded them with grants of options on CEC's stock.  Additionally,

Loveman and Hession were shareholders of CAC, which had a significant equity interest in

Growth Properties, which was the transferee of many of the transferred CEOC assets, held

one-third of the voting rights in CES, and owned approximately 84.4% of CIE.

101.    CEOC was at all relevant times until June 2014, in fact or substance, owned,

controlled, and dominated by CEC and the Sponsors or individuals related to them.  CEOC was

also, at all relevant times, insolvent.  Thus, all of the transactions identified in this Complaint

between CEOC and CEC, CIE, CERP, CAC, Growth Partners, or other subsidiaries or affiliates

of CEC were self-dealing transactions.  As a result, the consideration CEOC received for each

transfer, the negotiation process that led to each transaction's terms and conditions, and the

governance process that resulted in each transaction's approval by the CEOC board are subject to

the test of their entire fairness to CEOC.  The burden of establishing entire fairness is one

defendants bear.

102.    Although it is common in self-dealing transactions for the affected parties to form

special board committees to negotiate the transactions, that did not happen here.  CEOC had no

outside or independent directors from April 2009 until June 2014 and no special committee of

CEOC's board was formed at any time in that period to review the terms, conditions,

consideration, or substance of any of the asset transfers that took place.  In fact, while CEC's

public filings stated at various times that special board committees had been formed to review

particular transactions, in each case those committees were committees of CEC's board—not

CEOC's.  Similarly, while CEC disclosed that it had solicited or received opinions from outside

advisors about the fairness of transactions from a financial point of view, those opinions

concerned the fairness of the transactions to CEC or to the transferees of the assets, were

prepared by financial advisors retained by CEC or the Sponsors, or were manipulated to align

with the goals of CEC and the Sponsors.  In no case did CEOC receive an independent fairness

opinion.

103.    Throughout this period, CEOC was compelled to transfer to CEC or affiliates of

CEC CEOC's most valuable assets without the benefit of a non-conflicted board, without

independent legal advisors, without independent financial advisors with an appropriate

engagement letter, without independent fairness opinions, and without the benefit of the most

rudimentary elements of fair process.  Instead, the Sponsors and CEC conspired to deprive

CEOC of the most basic principles of corporate governance so that the Sponsors and CEC could

remove the company's best assets with impunity.  One reason CEOC's legal protections and

rights were ignored was that the lawyers representing CEOC in these transactions—the law firm

of Paul Weiss—also served, simultaneously, as the lawyers for CEC and the CEC affiliates who

were taking the assets from CEOC.  Simply put, no one was looking out for CEOC's interests in

connection with these transfers.

**D.    CEC AND THE SPONSORS' EFFORTS TO DELAY, HINDER OR
DEFRAUD CREDITORS**

104.    By no later than late 2011, it had become clear that CEOC would never repay its
debts at anything close to face value, a fact CEC conceded a few months later in its 10-K filing.
By June 2012, Apollo had prepared an analysis that projected CEOC's projected 2012 cash flow
would be nearly $1 billion in the red and further concluded that CEOC would be billions of
dollars short if it were forced to pay debts as they became due.

105.    At this point, a core group of individuals—affiliated with CEC and the Sponsors
and who at that time controlled and implemented every significant aspect of Caesars' strategic
direction—agreed upon and conspired in a multi-faceted scheme to strip CEOC of valuable
assets, to compel CEOC to enter into damaging financial transactions, and to otherwise position
CEC and the Sponsors to benefit from CEOC's inevitable bankruptcy or major restructuring.
This core group of individuals included the conflicted members of the CEC and CEOC boards—
CEC's Loveman, Apollo's Rowan and Sambur, and TPG's Bonderman and Davis (collectively,
the "Conflicted Directors")—who stood to benefit financially from the transactions they
conceived, implemented, and approved.

106.    A presentation that Apollo prepared and circulated to its co-conspirators in
October 2012 described the plan.  That presentation proposed what would become the transfer of
CEOC's Planet Hollywood and CEOC's interest in the Baltimore Horseshoe casino, and it called
for the creation of a new entity outside of CEC and CEOC—owned and controlled by CEC and
the Sponsors but unburdened by CEOC's massive debts—to take ownership of the assets.  The
presentation pointed out that CEC and the Sponsors could use this new entity to purchase a
"controlling stake in strategically valuable unencumbered assets."  It also observed that the
transaction provided "ancillary benefits in the event of a restructuring," including the ability to

32

"strengthen our hand in a potential restructuring with as little capital outlay as possible." Even more candidly, it admitted that a "transaction like this is the only way we see it to 'have our cake and eat it too'."

107.    The conspirators implemented their plan over the ensuing two years. In that period, they stripped CEOC almost entirely of its valuable properties in Las Vegas, transferred control over CEOC's invaluable intellectual property and property management business to a "bankruptcy remote" entity, forced CEOC to repay the entirety of its intercompany revolver with CEC, and engaged CEOC in financial transactions aimed to benefit CEC and the Sponsors. As detailed throughout this Complaint, the conspirators performed countless overt acts in furtherance of their scheme, from the transactions themselves to repeated efforts to reduce the consideration paid to CEOC; used a variety of machinations to obtain valuation opinions from financial advisors with terms and ranges beneficial to CEC and the Sponsors; made misrepresentations concerning the origins of the transactions; and concealed material information that contradicted their goals.

108.    Throughout the course of their scheme, the conspirators knew that CEOC's insolvency complicated their efforts to take assets from CEOC. The October 2012 presentation observed that a "[n]ovel transaction like this is more difficult to do should things get more dire" and that the "legal analysis gets more difficult with passage of time."

109.    Despite—or, perhaps, because of—this knowledge, an indispensable feature of the conspirators' scheme was to ensure that they completely controlled the process by which the asset transfers and financial transactions were structured, evaluated, and approved. They selected the assets to be transferred and they initiated the financial transactions. They suggested, established, and negotiated the financial terms of the transactions. They chose and controlled the

financial advisors and any special committees used to evaluate the consideration to be paid to

CEOC.  The conspirators made certain that there were no meaningful controls in place to

advocate for and protect CEOC's independent interests.  They assured that CEOC, despite its

insolvency and divergent interests from CEC, would have no role in the negotiation of financial

terms, no independent legal or financial advisors, and no independent board members.  As a

result, CEOC had no one to negotiate the fair value of the properties or challenge the specious

arguments, counter-factual assumptions, and misinformation that the conspirators advanced to

implement their plan.

### E.    CAESARS' BUSINESS PLAN

#### 1.    Caesars' Success Is Driven By Synergies

110.    Commercial gaming is built on a business model that is attractive to investors.  At

its most basic level, thanks to the law of large numbers, gaming is a business where the customer

buys a dollar worth of chips with the expectation over time of receiving (1) entertainment value

and (2) something less than a dollar in return.  Thus, the more time a casino can keep its

customers gaming (or shopping, staying, eating, and drinking) in its properties the better.

Caesars, in its form at the time of the LBO transaction, largely had been structured to maximize

the amount of time its customers spent in Caesars' properties, both on an absolute basis and

relative to the properties of its competitors.  Caesars did this by capitalizing on three key

categories of synergies.

111.    The first was the synergies created by the structure of Caesars itself—in

particular, the sheer scale of the company and its geographic diversity.  Over the course of many

years, Caesars had developed a network of local and regional casinos that extended its brand into

global markets, including properties in virtually every gaming market of significance in the

United States.  Many of these local and regional casinos were only modestly profitable in their

own right; however, they provided Caesars with the critical ability to interact with potential customers of its destination Las Vegas properties in their home markets.  This hub-and-spoke system increased Caesars' revenues by incentivizing Caesars' large international and domestic customer base to patronize its Las Vegas casinos when customers visited there.  The system also benefited the regional properties, whose affiliation with the Las Vegas properties encouraged customers to visit local Caesars properties rather than competitors' properties.

112.    The second category was the synergies created by Caesars' assemblage of properties on the Las Vegas Strip.  Over time and through a number of acquisitions preceding the LBO transaction, Caesars developed a dominant and concentrated presence in the center of the Las Vegas Strip (which it called "the 50 yard line"), including properties such as Caesars Palace, Paris Las Vegas, Bally's Las Vegas, The Cromwell, Harrah's Las Vegas, and The Quad, as well as surrounding undeveloped land.  After the LBO, Caesars continued to build this presence through the acquisition of the Planet Hollywood casino and the development of the Linq retail and entertainment venue.  Caesars' strategy to anchor its business model at the key intersection of Flamingo Road and Las Vegas Boulevard was intended to ensure that, once brought to Las Vegas, customers would stay within the Caesars system.

113.    The third category of synergies was Caesars' Total Rewards customer loyalty program.  Total Rewards was the brainchild of defendant Gary Loveman, an academic who holds a doctorate in economics and taught at Harvard Business School.  Loveman was an expert in loyalty management programs, having implemented them for such companies as Disney, McDonald's, and American Airlines in the 1990s.  In 1998, Harrah's hired him to become its Chief Operating Officer.

35

## 2.   Total Rewards:  "The Key To The Empire."

114.   Total Rewards serves several functions, the foremost of which is to incentivize every Caesars customer to focus his or her gaming and entertainment spend exclusively on Caesars properties.  It is, at once, the system by which Caesars observes and records the preferences, activity, and spending of individual customers; compiles data about customer preferences and interests; optimizes its promotional offerings to customers; creates incentives for customers to spend money at its properties; keeps customers within the Caesars casino, hotel, entertainment, and retail system; and serves as a communication channel between Caesars and its customers.  In so doing, Total Rewards is the engine that drives and optimizes the synergies of Caesars' broad network of properties.  It is, as CEC itself has claimed, "The Key to the Empire."

115.   Total Rewards currently has 46 million customers, and Caesars estimates that 7 million customers are active at any given time.  Upon joining Total Rewards, Caesars customers are issued a membership card, which they swipe whenever they gamble, drink, dine, or shop at a Caesars property.  In return, customers receive Rewards Credits they can redeem for food, lodging, and other purposes at all Caesars properties, as well as for perks through partner organizations.  Total Rewards sets consistent and transparent earnings rates for Reward Credits and recognizes a member's status consistently across properties.  According to its members, the most valuable feature of Total Rewards is that its members can redeem Reward Credits at any Caesars property, regardless of where the Reward Credits were earned.

116.   Underlying Total Rewards is an extensive database containing information about Caesars' customers, which the program collects as customers use their cards.  This data—"big data"—reveals useful information about customer spending, such as the days of the week and the times of days customers patronize Caesars properties; what they spend money on and where they

spend it; what sort of dining, shopping, and gambling they prefer; what Caesars properties they frequent; and, most fundamentally, how much money they spend or can be expected to spend.

117.   Caesars' software tracks its customers' activities on both an individual and a general level.  Caesars then tailors its product offerings and business strategy accordingly.  In particular, Caesars uses Total Rewards to target selected customers with marketing promotions, to drive traffic to specific properties or particular products, and as a way to reach its customers by direct mail, social media, and other means.  Total Rewards also employs sophisticated prediction models to compare actual customer behavior with predicted behavior.

118.   Through these advanced analytics, Total Rewards has improved the "win per position" at the casinos in its network.  For example, in the twelve months preceding June 30, 2013, CEC had a 15% and 21% fair share premium in its destination and regional markets, respectively, versus competitors.  As a result, with virtually identical gaming machines or tables, and presumably a very similar cost structure, CEC properties generated significant incremental gaming revenue per position, per day, across its portfolio of properties compared to its competitors.

119.   It was this system that allowed Caesars to build its extensive network of properties and realize its plan to collect customers nationwide and drive them to its marquis properties in Las Vegas.  And when those customers do travel to Las Vegas, promotional offers encourage them to stay in Caesars hotels, dine at Caesars restaurants, entertain themselves at Caesars venues, and gamble at Caesars casinos.  Caesars thus generates significant cross-market play, or "cross play," as customers move from one casino to another.  The Sponsors and Caesars have repeatedly credited Total Rewards as the key to its business success.  In a 2013 offering memorandum, for example, CEC disclosed:

> Caesars Entertainment revolutionized the approach the gaming industry takes
> with respect to marketing by introducing the Total Rewards loyalty program in
> 1997.  Continual improvements have been made throughout the years enabling the
> system to remain the most effective in the industry and enabling Caesars
> Entertainment to grow and sustain revenues more efficiently than its largest
> competitors and generate cross-market play, which is defined as play by a guest in
> one of Caesars Entertainment's properties outside its home market, which is
> where the guest signed up for Total Rewards.  To support the Total Rewards
> loyalty program, Caesars Entertainment created the Winner's Information
> Network, or WINet, the industry's first sophisticated nationwide customer
> database.  In combination, these systems supported the first technology-based
> customer relationship management strategy implemented in the gaming industry
> and have enabled Caesars Entertainment's management teams to enhance overall
> operating results at its properties.

CERP Preliminary Offering Memorandum, dated September 24, 2013, at 2, *available at* CEC

8-K (Sept. 24, 2013).

120.    After coming to Harrah's as its Chief Operating Officer in 1998, Loveman

became its Chief Executive Officer in 2003 and its Chairman in 2005.  Loveman has consistently

extolled the importance of Total Rewards to Caesars' business.  In a 2003 Harvard Business

Review article, Loveman wrote that "we've come out on top in the casino wars by mining our

customer data deeply, running marketing experiments, and using the results to develop and

implement finely tuned marketing and service-delivery strategies that keep our customers

coming back."  Gary W. Loveman, *Diamonds in the Data Mine*, Harv. Bus. Rev. (May 2003).

As Loveman explained, the depth of the database that he created, coupled with the ability to use

Total Rewards at multiple properties, was critical to its effectiveness:  "It's important to note that

our database strategy hinged on our ability to combine data from all of our properties, so

customers could use their reward cards in multiple locations.  Combining transactional data from

all our sites was so important that we developed and ultimately patented the technology to do it."

*Id.*

121.    Total Rewards has unquestionably driven Caesars' growth and profits.  For

example, in its first year of operations as part of the Caesars network, the revenues at

Planet Hollywood increased by 24%.  Likewise, when Harrah's Chester opened in Pennsylvania

in 2007 as the second casino in the area and in a less desirable location than its competitors, its

first-year revenue still outperformed its competitors by 6%.  Caesars attributed that success to

leveraging its Total Rewards program and its preexisting relationships with members in the area.

By contrast, after Harrah's East Chicago, Indiana casino was sold, and thus taken out of the Total

Rewards program, there was a material drop in its gross gaming revenue; tellingly, there also

was a corresponding increase in play at Harrah's other properties from Total Rewards members

who had exclusively patronized the East Chicago casino before it was sold.

### CEOC'S UNLAWFUL TRANSFERS

122.    At the direction of the Sponsors, CEC's board undertook a series of transactions

between 2009 and 2014 to reorganize Caesars into a "Good Caesars" and a "Bad Caesars."  The

plan was to transfer CEOC's more valuable, higher-growth properties to affiliates owned and

controlled by the Sponsors and CEC (the "Good Caesars"), while leaving the low-growth or

no-growth (and, often, money-losing) properties and massive acquisition debt at CEOC (the

"Bad Caesars").  Freed from the demands of debt service, "Good Caesars" would prosper.

Meanwhile, CEOC—the "Bad Caesars"—would flounder until its creditors agreed to restructure

their debt or CEOC simply erased its debt in a bankruptcy filing.

123.    At the heart of the Sponsors' plan was the strategy of transferring to the Good

Caesars those CEOC assets with a promising future.  This included its burgeoning online gaming

business, its well-known World Series of Poker franchise, CEOC's valuable Las Vegas

properties, and its strategic and irreplaceable Total Rewards program.  This was planned as a

series of steps, with a new transfer being undertaken after the last one closed.  Under the pretext

of creating "liquidity" for CEOC or "extending the runway," the Sponsors and CEC were, in truth, simply removing CEOC's best assets and hastening its demise.

124.    The transfer of these key assets meant, among other things, that the synergies of the Caesars hub-and-spoke system and the economies of scale and marketing advantages arising from the contiguous properties CEOC had assembled were moved from CEOC to affiliates of CEC, such as CIE, CERP, Growth Partners, and Caesars Enterprise Services.  In terms of particular casinos, CEOC was left with only Caesars Palace in Las Vegas (and because the conjoined Octavius Tower is no longer owned by CEOC, in reality CEOC now has only part of Caesars Palace) and local and regional casinos that primarily served to drive traffic to CEOC's Las Vegas properties—which now were not CEOC's anymore.  These critical assets were transferred for inadequate consideration and for less than reasonably equivalent value. Completely lacking independence, CEOC's board rubber-stamped the transfers, usually without even bothering to have a board meeting.

125.    The divestment of CEOC's Las Vegas properties also changed the character of CEOC itself.  Previously, CEOC was an enterprise centered on its Las Vegas properties and was valued by the multiples of EBITDA commonly used for Las Vegas-based gaming companies. Today, though, CEOC has only one significant property in Las Vegas.  As a result, CEOC is now generally viewed simply as a regional gaming company.  Accordingly, it is valued by the market at a lower multiple of EBITDA than it would have been but for the asset transfers.

A.      **TRANSFER OF CAESARS' ONLINE GAMING BUSINESS**

126.    One of CEOC's most promising corporate opportunities was the advent of online gaming, which included both the opportunity for online customers to play for fun ("PFF") and, if and when permitted by state gaming laws, "real money" games.  Even before the LBO, Caesars had begun to explore online gaming opportunities, established an internal working group, and

retained the consulting firm of Booz Allen Hamilton to advise it about online business

opportunities.  A January 2008 Booz Allen report contemplated that meaningful revenue would

be earned from PFF and found that CEOC's online business already had 45,000 unique monthly

visitors, each playing an average of thirteen games.  A September 2009 presentation to the CEC

board estimated that PFF could produce $10 million to $15 million in EBITDA.  That spring and

summer, a Caesars management internal working group and representatives of the Sponsors

studied how to expand CEOC's online gaming business.  Moreover, upon information and belief,

during this time frame, CEOC was already entering into partnerships that gave its brands a

presence in social and mobile gaming

127.    CEOC already had a ready advantage in this online market because of its long-

time sponsorship of the well-known World Series of Poker ("WSOP") and its ownership,

control, and licensing of the intellectual property associated with WSOP.  Although it was

uncertain if and when Congress or state legislatures would legalize "real money" online gaming,

the enormous revenue potential was obvious.  For example, in a March 2, 2010 presentation,

CED told investors that online opportunites "could change the game" and was one of the "key

drivers" of Caesars' future value.  An October 2012 presentation prepared by Apollo described

expanded online poker as one of the "[c]ompelling upside opportunities."

128.    In any event, not long after the LBO, the Sponsors and CEC decided to usurp the

corporate opportunities and considered a variety of options and structures to help them do so.  In

2008, Caesars hired Mitch Garber, an entrepreneur experienced in the online gaming market, to

help them enter the market.  Garber became a full-time Caesars employee in January 2009.

129.    Ultimately, CEC and the Sponsors decided that the online gaming business should

be moved to CEC, with a significant equity stake also going to Garber and other executives of

the business.  In April 2009, CEC formed Harrah's Interactive Entertainment ("HIE")—now

known as Caesars Interactive Entertainment ("CIE")—as a subsidiary of CEC.[6]  The sole

purpose of CIE was to receive this intellectual property from CEOC and exploit the opportunities

in online gaming.

130.    The CEC board approved the transfer of CEOC's online gaming business at a

board meeting held on April 30, 2009.  This meeting was attended by defendnts Bonderman,

Davis, Loveman, Rowan and Sambur.  The two-person CEOC board—which consisted of

Loveman and Halkyard—approved the transfer by signing a boilerplate written consent that

same day.  Loveman and Halkyard gave no meaningful consideration to the transaction and, in

fact, did not even bother to hold a board meeting.

131.    On May 1, 2009, in a series of back-to-back transactions, CLC (a wholly owned

subsidiary of CEOC) transferred its ownership in the WSOP trademark, related intellectual

property, and all of its sponsorship, media, and licensing contracts to CEC.  CEC accomplished

this by having CEOC transfer these assets to a newly formed, CEC-owned holding company,

HIE Holdings Topco ("TopCo"), with a license back to CEOC of rights to use the intellectual

property in WSOP events held on CEOC's own properties.  TopCo then transferred the assets to

an intermediate holding company, HIE Holdings, which then transferred the assets to CIE.  In

return, CEOC received 150,000 shares of preferred stock and 1,000 shares of common stock of

TopCo, which in turn held 150,000 preferred shares in HIE Holdings.  However, CEC had all of

the voting stock and 90,000 preferred shares in HIE Holdings, which in turn owned 87.1% of

HIE.

---

[6]    CEC failed to disclose that CIE was a subsidiary of CEC until March 15, 2012, when the
formation of Acquisition and Growth Partners was announced.  Even then, that "disclosure"
was buried in notes to CEC's financial statements.

132.    A hurried, flawed and incomplete opinion from Duff & Phelps on April 30, 2009 valued the rights CEOC transferred (net of the license back) at $15 million, although the dilution CEOC suffered in the three-tiered CIE holding company structure meant that CEOC received substantially less.  Duff & Phelps' method of valuing CEOC's intellectual property was improper.  Duff & Phelps also relied upon projections provided by a member of Garber's team, who had a motive to undervalue CEOC's contribution since he himself would be getting equity in CIE.  These projections were inconsistent with and materially below the projections Caesars had prepared and used in the ordinary course of its business.  Duff & Phelps also ignored other evidence of the value of the WSOP intellectual property and used an exaggerated discount rate.  Moreover, Duff & Phelps did not take into consideration any of the enormous upside that featured so prominently in the multiple valuations and analyses previously prepared by Caesars and its consultants, including the potential legalization of online gambling and PFF gaming.

133.    There was no reason why this corporate opportunity could not have stayed with, and been exploited by, CEOC.  CEOC already controlled the WSOP trademark and associated intellectual property and, of course, was prominent in the gaming space overall.  Moreover, while CEOC was financially pressed by 2009, it had the financial resources to support its entry into the online gaming space as shown by its ability to fund other business initiatives.

134.    The lack of process in the transfer of WSOP's intellectual property and Caesars' online gaming business is striking.  The price of the WSOP rights was not negotiated at arm's length; in fact, there is no evidence that anyone actually negotiated the $15 million price at all, and certainly no one negotiated it on behalf of CEOC.  None of the intellectual property transferred was offered to any third-party buyer or investor and none was subject to any marketing process to ensure that CEOC could maximize the value of the transferred assets.

There was no special committee of independent directors formed from CEOC's board to review

the deal (and, in fact, CEOC had no independent directors).  CEOC did not have independent

lawyers or advisors to represent it, and no analysis was done of CEOC's solvency.  Similarly, the

CEOC board gave no consideration to whether CEOC should have received any value for the

potential upside of its online gaming business, whether CEOC should have had a means in

sharing in CIE's upside, or even whether the TopCo preferred stock CEOC received really was

worth $15 million.

135.    Instead, the entire process was dominated by CEC and the Sponsors.  They

conceived of the idea of transferring CEOC's intellectual property to an entity which they

controlled, retained Duff & Phelps to value the assets, decided upon the deal structure, and set

the price for the transfer.  All of the transaction documents on behalf of every single Caesars

entity, including CIE and CEOC, were signed by one person, CEC's CFO Jonathan Halkyard.

136.    The consideration CEOC received for the transfer of its WSOP intellectual

property was grossly inadequate.  Although nominally worth $15 million, the TopCo preferred

stock CEOC received probably was worth less than $12 million.  By contrast, the value of the

assets CEOC transferred—even ignoring their enormous upside potential—was more than

$60 million.  More fundamentally, the transaction CEC and the Sponsors engineered was

designed to usurp the valuable future corporate opportunity CEOC expected in the online gaming

space.  Even before the Sponsors had completed the LBO in 2008, CEOC had been exploring

these opportunities, using PFF to expand into broader forms of social gaming and online real

money games, and leveraging its existing franchise in the WSOP.  However, those opportunities

were diverted to CIE which, in turn, was mainly owned by CEC.  Upon information and belief,

the damages to CEOC from this usurpation of corporate opportunity could exceed $1 billion.

## B.    CEOC INTERCOMPANY LOAN TO CEC

137.    In 2009, CEOC borrowed $235 million and made an intercompany loan of that amount to CEC.  CEC did not pay any interest on this loan, despite the fact that CEOC itself had paid about $5.8 million in interest to borrow the money to lend to CEC.  CEOC was insolvent at the time.

138.    There is no evidence that CEOC received anything of value in return for its interest-free loan to CEC, that the CEOC board did anything to consider the reasonableness of the loan, or that CEOC's board even approved it.

## C.    2010 CMBS LOAN AGREEMENT AMENDMENT AND TRADEMARKS TRANSFER

139.    At the time of the 2008 LBO, CEOC transferred six properties (the Flamingo Las Vegas, Paris Las Vegas, Rio Las Vegas, Harrah's Las Vegas, Harrah's Atlantic City, and Harrah's Laughlin (collectively, the "CMBS Properties")) to CEC to facilitate CEC's efforts to raise $6.5 billion in debt secured by the properties.  Both before and after the transfer, the CMBS Properties used intellectual property assets, such as their trademarks and other intellectual property associated with the properties' casinos, restaurants, shops, and other activities (the "CMBS IP") in the course of their business.  The CMBS IP was held and owned by a CEOC subsidiary known as Caesars License Company, LLC ("CLC").

140.    Upon information and belief, CLC had no operations or premises independent from those of CEOC and was formed solely to serve as the nominal holder of intellectual property owned by CEOC.  Upon information and belief, CEOC was the sole member of CLC, appointed all of its officers and dominated all aspects of CLC's business and operations.  Accordingly, CEOC and CLC are appropriately viewed as alter egos and the acts, decisions, and assets of CLC should be viewed as the acts, decisions, and assets of CEOC itself.

141.    In the years after the LBO, the Sponsors and the CMBS lenders discussed possibly restructuring the CMBS loans.  Among other things, the CMBS lenders sought to improve their position in the event they decided to foreclose on a CMBS property by obtaining either the right to require Caesars to continue to operate the properties after foreclosure or the right to withdraw the properties from the Caesars system but have the continuing ability to use the CMBS IP.  This latter option would require CEOC to give the CMBS lenders a license to the CMBS IP.

142.    CEOC, through CLC, owned the CMBS IP and should have had the right to charge a substantial amount for any license to use it.  However, the negotiations with the CMBS lenders were handled by David Sambur of Apollo, not by anyone representing CEOC.  As a result, these assets were taken from CEOC for almost nothing.

143.    Because CLC was not a party to the CMBS loan documents, a complicated structure was used to transfer the CMBS IP from CLC to each of the CMBS PropCos.  This was done by amending existing licenses and executing assignments of CLC's rights.  Specifically, on August 31, 2010, CLC executed intellectual property assignment agreements with each CMBS PropCo by which CLC assigned all of its right, title, and interest in the relevant CMBS IP to the PropCo.  In return, CLC received $100 from each PropCo.  Simultaneously, the parties executed Amended and Restated License Agreements, in which each of the CMBS PropCos granted to both CLC and CEOC non-exclusive, limited-use, royalty-free, and nontransferable licenses to the CMBS intellectual property in exchange for $100.  The Amended and Restated License Agreements also contained a reversionary clause providing that, if and when the CMBS debt was repaid, the CMBS PropCos would give CLC an exclusive royalty-free, irrevocable, transferable, and sublicensable license to use the CMBS IP.

46

144.    The effect of these agreements, then, was (a) to have the CMBS PropCos each pay CLC $100 for the wholesale transfer of CLC's intellectual property rights, (b) to have CLC and CEOC repay each PropCo the $100 for limited licenses to that same intellectual property, and (c) to arrange for CLC to have a reversionary interest in the intellectual property when the CMBS loans were repaid.  Put another way, CLC conveyed its intellectual property rights to the CMBS Properties for the term of the loans for no consideration.  The amendment to the CMBS Loan Agreement and the transfer of the CMBS IP closed on August 31, 2010.

145.    The CMBS Trademarks were, and are, extremely valuable.  The book value of the intellectual property has been calculated as high as $320.9 million, and even conservative analyses value the trademarks at no less than $42 million and probably far more.

146.    As with other asset transfers, CEOC and its wholly owned subsidiary, CLC, did not have the benefit of independent directors, independent lawyers, independent advisors, or a fair and open process.  Nor was a fairness opinion solicited or received on CEOC's or CLC's behalf.  Instead, the transfers were decided upon, negotiated, and documented by Sambur, the Sponsors, CEC, and advisors to CEC and the CMBS PropCos.  In fact, CEOC and CLC were so far removed from the process that there is no evidence that the boards of CEOC or CLC even executed approvals, consents, or authorizations for the transfers.

### D.    TAX REFUND

147.    For the taxable years 2005 through 2008, CEOC was a member of the CEC consolidated group for tax purposes ("CEC Group").  In 2009, the CEC Group reported a net operating loss ("NOL") and carried it back to the 2006 and 2008 tax years by filing a tentative refund claim on Form 1139 Corporation Application for Tentative Refund in October 2010.  The 2009 NOL carryback generated a Federal income tax refund ("2009 Refund") based in part upon

a comparison between the CEC Group NOL and the amount of income taxes reported by the

CEC Group from 2005 to 2008, some of which was attributable to CEOC.

148.    In March 2011, CEOC was credited with $220.8 million, the cash amount of the

2009 Refund provided to the CEC Group.  CEOC, however, was owed $55.8 million above and

beyond that credit.  CEC did not credit or otherwise pay CEOC this amount and failed to provide

any justification for failing to do so.  Moreover, there is no indication that CEOC was even

aware of its right to any portion of the 2009 Refund until March 17, 2011, when CEC filed its

2010 Form 10-K.

149.    In addition to the 2009 Refund, CEC did not fairly compensate CEOC for CEC's

use of the NOLs that CEOC and the other Debtors generated.  Non-debtors, including CEC, used

approximately $4.02 billion of the NOLs without any compensation to CEOC or recognition

that—had these NOLs not been used by the non-Debtors—they would have been available to the

Debtors to be applied against future taxable income.

150.    Because the non-Debtors, including CEC, never paid CEOC or the other Debtors

for use of these NOLs, CEOC is entitled to the value of the lost economic benefit from the

utilization of these NOLs by the non-Debtors.

**E.      2011 EASEMENT ON UNDEVELOPED LAND**

151.    In 2011, CEOC subsidiaries DCH Exchange LLC, Las Vegas Resort

Development Inc., Winnick Holdings LLC, and TRB Flamingo LLC granted affiliates of CEC

easements over four lots of unimproved Las Vegas real estate, comprising approximately

25.8 acres, directly east of The Linq, The Cromwell, and the Flamingo Las Vegas Hotel &

Casino.  The transferees (the "Easement Transferees") were Flamingo Las Vegas Propco, LLC,

Imperial Palace Corporation (now known as 3535 LV Corp.), and Caesars Linq, LLC.

152.    Two of the transferees make an annual payment to CEOC for granting the easements of about $1.7 million, subject to annual 3% increases; however, a third transferee—Flamingo Las Vegas PropCo—has paid nothing for the easement granted to it.  Granting the easement diminished CEOC's value by as much as $60 million, and correspondingly increased the value of the transferees.

153.    There is no evidence that CEOC followed any governance process in reaching the decision to grant the easements, that it used any marketing process to price or sell the easements, that it offered the easements to any third party on an arm's-length basis, that the decision to grant the easements was made by disinterested directors of CEOC, that CEOC engaged independent financial or legal advisors to review the granting of the easements, or that CEOC requested or received a fairness opinion about the transfer.  In fact, there is no evidence that CEOC's board was even asked to consider or approve the transfer, or did.

**F.    2011 WSOP TRANSACTION**

154.    The 2009 transfer of CEOC's WSOP intellectual property rights left CEOC with a residual business of hosting live, in-person WSOP tournaments ("WSOP Tournament Rights").  In 2011, however, CEC and the Sponsors decided to take these assets, too, away from CEOC.

155.    Planning for this transfer began in mid-2010.  As with the May 2009 transfer of WSOP's trademarks and intellectual property and CEOC's online gaming business, the negotiations essentially were between CEC and CIE, even though the assets being sold belonged to CEOC.  Moreover, since CEC owned the vast majority of CIE equity, the discussions basically involved CEC talking with itself.  Over a year and a half of discussion, the price CIE contemplated paying CEOC for its WSOP Tournament Rights steadily fell from as much as $55 million to $38 million to $30 million to $25 million, finally dropping to $20.5 million.

156.    The 2011 WSOP Transaction, which closed on September 1, 2011, consisted of a series of interrelated transfers.  First, CEC created a new wholly-owned subsidiary called Caesars Tournament, LLC ("CT"), which paid CEOC $20.5 million for its rights to host the WSOP tournament.  CT then sublicensed those rights to CEC for five years for a yearly license fee of $2 million.  Next, CIE purchased the rights from CT for $20.5 million and replaced the sublicense between CT and CEC with one directly between CIE and CEC for the same term of years and same annual license fee.  CEC then granted CERP's Rio Las Vegas property the right to operate the WSOP tournaments for $2 million per year.  Finally, CIE granted CEC the right to operate certain live WSOP tournament events for a per-event fee.

157.    Lost in all of this complexity was any legitimate negotiation with CEOC, any meaningful board process, or any tangible economic benefit to CEOC.  No independent law firm represented CEOC:  instead, the firm of Paul Weiss represented all of the entities involved in the deal.  CEOC's board consisted of two inside directors: Loveman and Halkyard, who were the CEO and CFO, respectively, of CEC.  Both were clearly conflicted, and neither reviewed the transaction in his capacity as a CEOC director.  Upon information and belief, this transaction was never presented to the CEOC board for review or approval; it was instead approved by CEC's board alone.  Halkyard signed the numerous transaction agreements on behalf of all non-CIE entities to the transactions, including CEOC, CEC, and CT.

158.    As with the earlier transfer of WSOP's trademarks and intellectual property and CEOC's online gaming business, the transfer of the WSOP Tournament Rights was one-sided and unfair to CEOC.  The price, terms, and conditions were not negotiated at arm's-length.  The Tournament Rights were not offered to any true third-party buyers or investors and it was not subject to any marketing process to ensure that CEOC could maximize the value of the

transferred assets.  There was no special committee of independent directors formed of CEOC's board to review the deal, nor did CEOC ask for or receive a fairness opinion.  The process was initiated by CEC, managed by CEC, negotiated by CEC, priced by CEC, and structured by CEC to ensure that there would be no serious outside review of the transaction or its economics.

159.    Although the CEC board engaged a financial advisor named Valuation Research Corporation ("VRC") to issue an opinion about the transaction, VRC's analysis was superficial and flawed.  Among other things, VRC inexplicably reduced forecasted revenues by speculating that the tournament would be moved to a less attractive location, failed to account for gaming revenues tied to entrants in WSOP, subtracted an EBITDA adjustment from hotel revenues, ignored non-financial benefits in valuing the WSOP Tournament Rights, used an unsourced percentage to calculate incremental gaming revenue, and failed to include revenue from spectators at the events.

160.    As a result of this one-sided process, CEOC received the nominal consideration of $20.5 million for surrendering the right to host the world's leading poker tournament.  And, in fact, CEOC did not actually receive $20.5 million in cash—or any cash at all—for the asset; instead, CEC simply wrote down the balance of CEOC's $310 million intercompany debt to CEC by this amount, leaving a balance of $289.5 million.  This amount does not constitute reasonably equivalent value, as the asset was worth at least $50 million at the time of the transfer.

## G.      LINQ AND OCTAVIUS TRANSFERS

161.    At the time of the 2008 LBO, Caesars borrowed $6.5 billion secured upon the CMBS Properties (the "CMBS Debt").  To make the properties available as security for these loans, CEC had CEOC transfer them to CEC, which then placed them into Rio Properties, a CEC subsidiary.

162.    In late 2012, CEC decided to refinance the CMBS Debt.  During the ongoing recession, among other things, credit conditions changed and the credit markets required lower loan to value ratios, creating an "equity gap" that had to be filled before lenders would consent to a refinancing.  Unwilling to invest their own money in this effort, CEC and the Sponsors decided to plug the equity gap by simply taking properties from CEOC.

163.    The two CEOC properties CEC and the Sponsors focused on were both recently built (or not yet completed) properties in Las Vegas.–One was Project Linq, a dining, entertainment, and retail development corridor that connected Caesars' Flamingo Casino and The Quad Resort & Casino on the east side of the Las Vegas Strip.  Linq was especially important to Caesars because of its location at the heart of the Strip across the street from Caesars Palace and in the midst of six other Caesars properties.  Linq was the conduit connecting the assemblage of Caesars properties in Las Vegas, reinforcing the physical synergies CEOC had patiently developed over the years.

164.    The other property was the Octavius Tower, a 23-story, VIP luxury hotel complex that featured 662 guest rooms, 60 suites, and six villas.  Octavius was the newest of the six hotel towers that comprise the Las Vegas Caesars Palace complex, and it was located immediately next to, and structurally integrated into, the Caesars Palace casino itself.  Control of Octavius would give its owner significant ability to influence access to Caesars Palace and its value, future, and use.

165.    Linq and Octavius were valuable assets.  By fall 2013, CEOC had spent $878 million building Linq and Octavius, and CEOC projected that Linq alone would generate between $68 million and $103 million annually in EBITDA.  In addition, Linq and Octavius were integral to CEOC's synergies in Las Vegas, since Linq would be a conduit connecting

several CEOC properties and Octavius was the newest part of the Caesars Palace complex.

Thus, the Sponsors and CEC recognized that selling the properties would undermine CEOC's

value.  In fact, TPG's Bonderman wrote Rowan in 2009 that "alienating the [Octavius] Tower by

selling it or leasing it to someone else for long term is likely to turn out to be a bad idea.  The

Octavius Tower was planned and built as an integral part of our core property, and I suspect that

losing control of that will be value destructive over time."

166.    CEOC, of course, was not an obligor on the CMBS Debt and had no reason to

contribute its assets to plug the CMBS equity gap.  In fact, the Sponsors' plan would actually be

detrimental to CEOC.  In addition to taking two valuable properties away from CEOC, CEC

intended as part of the refinancing to create a new entity—Caesars Entertainment Resort

Properties, LLC ("CERP")—that would ultimately own Linq and Octavius as well as the existing

CMBS Properties.  Six of these eight properties were in Las Vegas, creating in essence a

formidable standalone competitor to CEOC.

167.    It was Apollo that conceived of, planned, structured, and executed the strategy.

From the beginning, Apollo partners Rowan and Sambur pushed to find ways to take Linq and

Octavius from CEOC without paying CEOC anything of value in return.  This included

advocating flawed theories of valuation (one of which resulted in hundreds of millions of dollars

of purported value to CEOC from the release of CEC's guaranty of the CMBS debt even though

CEOC was not an obligor with respect to that debt), arguing for the unprecedented use of

avoided overhead costs as consideration in a transaction or fairness opinion, creating

assumptions for a fairness opinion that were premised on a degree of virtual certainty which

simply did not exist and were contradicted by known facts at the time, and continuing to

pushback on financial experts who rejected Apollo's tactics.  Because CEC was in a position of

conflict, Apollo and Paul Weiss decided to get an opinion from a financial advisor that CEOC

was receiving "reasonably equivalent" value for the transfer of the two properties to CERP.

Apollo and Paul Weiss engaged Perella Weinberg Partners ("Perella") to provide the opinion.

However, throughout this process, it was Apollo and Paul Weiss—and not CEOC—who dealt

with Perella.

168.     Apollo's goal was to avoid paying CEOC any tangible consideration.  Apollo

proposed a succession of specious arguments to justify this outcome.  One argument hinged on

the fact that the CMBS Properties paid CEOC for certain shared service expenses ("allocated

CMBS expenses") relating to the CMBS Properties.  Apollo argued that—if the CMBS Debt

were not refinanced—the CMBS Properties might go bankrupt and then stop paying their share

of these expenses, leaving CEOC with the full burden of some, if not all, of these expenses.

Thus, Apollo maintained, CEOC would receive an intangible benefit from the refinancing by

eliminating this risk, the value of which could be calculated by applying a multiple to the amount

of expense reimbursements that were in jeopardy.

169.     A second theory was even less credible.  CEC had guaranteed CEOC's debts and

also guaranteed the CMBS operating companies' lease obligations to CEOC.  Under the

proposed refinancing, CEC would be released from its guarantees of the CMBS lease payments,

which would improve CEC's financial health and, in turn, would make CEC a more reliable

guarantor of CEOC's debt.  Apollo argued that this was a multi-billion dollar benefit to CEOC.

170.     The final consideration for Linq and Octavius was a basket of securities, debt

forgiveness, cash, and alleged intangible benefits.  This included $69.5 million of CEOC debt

securities, $80.7 million in cash, and forgiveness of $450 million of debt CEOC had incurred in

the construction of Octavius and Linq.  In addition, there was the alleged intangible benefit

relating to protection of CEOC's continued receipt of the allocated CMBS expenses, which

Perella valued at $378 million.  Although Apollo continued to urge that there was value in the

release of the CEC lease guarantee, Perella gave no value to it.

171.     Even without the CEC lease guarantee, Perella found that this consideration was

"reasonably equivalent" to the value of Linq and Octavius.  In reaching that conclusion, Perella

valued Octavius between $162 million and $203 million; the RDE Casino (which was part of

Linq) between $67 million and $83 million; the Linq High Roller observation wheel between

$265 and $346 million; and the Linq retail areas between $252 million and $303 million.

Combined, Perella's valuation of these properties totaled between $197.8 million and

$386.2 million, net of debt, which itself exceeded, by a large margin on the high end, the

$150.2 million in cash and notes paid to CEOC.  However, Perella then added $378 million in

value attributed to additional costs that Perella assumed would have otherwise been allocated to

CEOC if the refinancing did not occur and the lenders foreclosed on the assets.  Based on that

purported value of $378 million, Perella concluded that CEOC received value in excess of the

value of the transferred assets.

172.     Perella's analysis was based upon information provided to Perella by Apollo.

Much of this information was inaccurate and untrue.  For example:

      a.     Perella's valuations of Linq and Octavius were based upon the owners'

rights to receive lease payments from CEOC under the existing operating

leases, which were $15 million per year for the RDE Casino and

$35 million annually for Octavius.  At Apollo's direction, Perella used

several wrong assumptions, including the assumption that these were fair

market value leases when, in fact, the RDE Casino lease payments had

been based upon outdated assumptions from the earnings of a previous

casino and the Octavius lease had been created to provide credit support

for the Linq/Octavius debt.

173.     As to the High Roller observation wheel, Perella assumed that there would be

flat cash flow from the operation, instead of recognizing that receipts would, at a minimum,

reflect inflation.

174.     Perella also relied upon inaccurate and untrue assumptions in ascribing a

$378 million value to the ostensible protections CEOC received from the risk that the CMBS

Properties would default someday on the allocated CMBS expenses.  Apollo's theory was that,

absent a refinancing, the CMBS Properties were likely to default on their loans, which would

cause the CMBS lenders to foreclose on the properties, then remove them from CEOC's

management, and then stop paying the allocated CMBS expenses.  But each of these assumptions

was wrong.  First, there was no evidence that the refinancing was at risk; instead, both sides

viewed a foreclosure as "mutually destructive."  Second, there was little evidence that the CMBS

lenders would have foreclosed, or that Apollo would have allowed them to foreclose.  Third,

there was even less evidence that the CMBS lenders, upon foreclosure, would have removed the

properties from the CEOC system.  In fact, as described above, in 2010 the lenders had

specifically negotiated for, and won, the right to keep the properties under CEOC's management

in the event of foreclosure.  Thus, under no plausible scenario was CEOC at risk of losing this

payment stream.

175.     The effect of this misinformation was that Perella substantially undervalued Linq

and Octavius and materially overvalued the consideration CEOC received in the transactions.

Conversely, by giving any value at all to the possibility that the refinancing had assured CEOC

the continued payment of the allocated CMBS expenses, Perella concluded that the transaction provided CEOC with a net benefit of about $230 million.

176.    Perella's analysis also did not take into account the reduction in value CEOC suffered from the transfer of Octavius.  Octavius had over 650 of the most modern and expensive rooms and villas in the Caesars Palace complex.  By moving the property out of CEOC, Apollo effectively gave CERP (and, thus, CEC) significant leverage in renegotiating lease terms as well as a seat at the table in any potential sale or other disposition of Caesars Palace.  Thus, there was also a control premium attached to this transfer that Perella should have, but failed to, consider.

177.    The officers and directors of CEOC played no meaningful role in the negotiations about the sale of Linq and Octavius to CERP.  Instead, the discussions were between Sambur and Paul Weiss on the one hand and Perella on the other.  Even then, the negotiations were not about what CERP would be willing to pay or what CEOC would be willing to accept.  Instead, the subject of the discussions was what it would take before Perella would sign a letter giving the opinion that CEOC was receiving reasonably equivalent value for the assets.  Thus, although Sambur was officially negotiating on the "buy side," he was also controlling the decisions on the "sell side."  Relying upon inaccurate and untrue information from Apollo, Perella finally agreed to issue its opinion.

178.    The CEOC board consisted of two inside directors, Gary Loveman and Michael Cohen.  Neither was disinterested.  Loveman was the CEO and Chairman of CEC.  Cohen was a senior vice president, deputy general counsel, and corporate secretary of CEC.  Loveman and Cohen received materials about the transaction the night before their board meeting.  The board meeting, held at 6:30 a.m. local time, was telephonic and lasted 45 minutes.  During the meeting, Loveman and Cohen heard presentations from financial and legal advisors, and considered and

approved the sale.  There was no apparent discussion as to whether the sale was a fraudulent

transfer, whether CEOC was insolvent, whether there were bankruptcy-related litigation risks, or

whether the consideration was adequate.  Instead, Loveman and Cohen quickly rubber-stamped

the deal.

179.    The transaction closed on October 11, 2013.  Octavius Linq Holding Co. (a

wholly owned subsidiary of CEOC) transferred the equity of Octavius Linq Intermediate

Holding Co., which owns Octavius Tower, Linq, RDE Casino and the High Roller observation

wheel, to CEC (which then subsequently transferred it to Rio Properties LLC).  The deal violated

every principle of corporate governance.  The transaction was conceived and implemented by

one of CEOC's controlling shareholders, without substantive input from or involvement by

officers or directors of CEOC.  Although the transfer was a related party transaction and CEOC

was insolvent, no independent committee of the CEOC board was constituted to oversee it and,

in fact, CEOC had no independent directors at the time.  Nor was Linq and Octavius offered to a

third party, or subject to a marketing process to maximize the price CEOC would receive for the

properties.  There was no meaningful negotiation over the price of the transfers.  Instead the

consideration for the transaction was negotiated among Apollo and Paul Weiss and Perella,

which made faulty assumptions based on inaccurate or incomplete information Apollo and Paul

Weiss provided to it.  Approval of the transfers was made by a CEOC board that was conflicted,

uninformed, hurried, and poorly advised.

180.    Not surprisingly, the consideration CEOC received for these two properties was

far below their fair market value.  Octavius and the RDE Casino were soon conveyed to CERP in

a sale-leaseback under which CERP received lease payments of $35 million for Octavius and

$15 million for RDE for a 15-year term.  Using standard valuation methods, this indicates that

the purchase price should have been at least $213 million for Octavius and at least $87 million for RDE.  If more realistic assumptions are used, moreover, the value of Octavius and RDE would be even greater.  Linq was similarly undervalued.  As already described, misinformation and erroneous assumptions used by Perella undervalued the RDE Casino by millions of dollars. Likewise, unrealistic assumptions about the High Roller observation wheel resulted in an excessive range of value for the asset (of $265 million to $346 million) that materially understated the midpoint of its real value, which was around $340 million or greater.  In sum, excluding the alleged consideration in the form of "indirect benefits" and faulty valuation assumptions, the actual equity value of these properties (net of debt) was at least $325 million and likely more than $425 million.

### H.      TRANSFER OF PLANET HOLLYWOOD AND HORSESHOE BALTIMORE CASINO

181.    At about the same time as the Linq and Octavius transfers, the Sponsors and CEC were also arranging for CEOC to transfer two valuable casino properties to a newly-formed CEC affiliate named Caesars Growth Partners.  The purpose of the transfers was to take profitable, irreplaceable, and promising assets from CEOC and place them in an entity that would be removed from the claims of CEOC's creditors and that would capture the assets' value for the Sponsors and CEC.

### 1.      The Creation of CAC and Growth Partners

182.    The Sponsors, CEC, and their advisors started by creating the affiliates they would need to take ownership of the CEOC assets.  First, they formed a holding company named Caesars Acquisition Company ("CAC") to serve as the vehicle for the Sponsors' investment in the scheme.  CEC capitalized CAC by distributing subscription rights to CAC's common stock to CEC's existing shareholders.  Because the Sponsors and their affiliates owned most of CEC's

common stock, they ended up with most of the CAC stock as well, investing $457.8 million for 66.3% of CAC Class A common stock.

183.    Paul Weiss then formed an operating company named Caesars Growth Partners. On October 21, 2013, CAC used the $1.17 billion in proceeds from the CAC rights offering to purchase a 42.47% equity interest in Growth Partners.  Simultaneously, CEC acquired 57.6% of the equity interest in Growth Partners by contributing its interest in CIE and its holdings of CEOC 5.625% Senior Notes due June 2015.  Although these notes had a face value of $1.1 billion, CEC and the Sponsors valued them at only $750 million because of CEOC's insolvency.  That same day, the Sponsors entered into an Omnibus Voting Agreement with CEC and CAC that gave the Sponsors absolute control of CAC's board of directors.

184.    At the end of the day, the Sponsors owned slightly more than half of CAC and CAC owned 42.4% of Growth Partners.  CEC owned the other 57.6% of Growth Partners, and the Sponsors owned 60% of CEC.  Adding it all up, this meant that the Sponsors had a 60% interest in Growth Partners, as well as complete control of CAC's board and, thus, Growth Partners' management and operations.

185.    As noted before, the purpose of these entities was to remove CEOC assets from the reach of creditors the value of these assets would flow to the Sponsors, and not CEOC or its creditors.  As one CEC executive frankly admitted, "CGP enables us to raise capital for and inject our own capital into the growth areas of our business and protect them from insolvency given $20B+ in debt."  Even better from the Sponsors' point of view, the value of these assets would flow to the Sponsors, and not CEOC or its creditors.

## 2.     Planet Hollywood and Horseshoe Baltimore Transfers

186.    On October 21, 2013, CEC, CAC, and Growth Partners entered into an agreement (the "2013 Transaction Agreement") with CEOC that required CEOC to transfer to Growth

Partners CEOC's interests in the Planet Hollywood Resort and Casino in Las Vegas and the

Horseshoe Baltimore Casino, as well as 50% of the stream of management fees CEOC would

earn from managing those two properties.  In addition, the Agreement contemplated that CEOC

would enter into a Management Services Agreement with Growth Partners and CAC that would

redefine the economic relationship between CEOC and CEC.

187.    CEOC had acquired Planet Hollywood in 2010.  Planet Hollywood occupied

35 acres adjacent to other Caesars properties on the Las Vegas Strip.  It had 2,500 guest rooms,

an outdoor pool, 9 restaurants, 6 bars, and a 64,500 square foot casino.  Planet Hollywood had

generated significant free cash flow, partly because CEOC had invested substantial amounts in it

each year.  In fact, between 2010 and 2012, Planet Hollywood revenue increased by 27% and

EBITDA by 186%.

188.    Horseshoe Baltimore, which opened in August 2014, is a casino with a 122,000

square foot gaming floor, 2,500 slot machines, 150 video poker machines, a 25-table WSOP

Poker room, and 150 table games.  In October 2012, Caesars entered into a joint venture

agreement with Rock Gaming and three local partners to build this casino.

189.    The plan to transfer Planet Hollywood and Horseshoe Baltimore was conceived

by the Sponsors in 2012.  The specific purpose of the transaction was to strengthen the Sponsors'

hand in negotiations with creditors in a potential restructuring, to maintain the Sponsors' and

CEC's ownership of the assets for future upside potential, and to create a CEC "war chest" in the

event of a potential restructuring.  According to Bonderman, the Sponsors selected properties

with excess cash flow in order to achieve precisely those goals.

190.    A first step was to deal with the conflicts inherent in the transaction.  Although

the transfer of Planet Hollywood and Horseshoe Baltimore from CEOC to Growth Partners was a

related party transaction, the Sponsors and CEC did not address that issue.  But they were

troubled by another fact, namely, that CEC (the ultimate owner of CEOC) and CAC (the ultimate

owner of Growth Partners) had different sets of public shareholders, while the Sponsors were on

both sides of the deal, creating the possibility of litigation from the public shareholders of CEC

and CAC.  Although CEOC's insolvency that motivated the Sponsors and CEC to undertake the

Growth transaction, no one protected CEOC's interests by constituting a special committee to

ensure fairness to CEOC.

191.    The Sponsors directly represented CAC in the negotiations.  On November 14,

2012, the CEC board created the Valuation Committee to negotiate with the Sponsors, and the

Valuation Committee soon hired Evercore Partners as its financial advisor to review and opine

on the structure of the transaction and the fairness of the price from CEC's perspective.  But the

CEC Valuation Committee and Evercore were acting on behalf of CEC and CEC alone; neither

they nor anyone else negotiated on behalf of CEOC or reviewed the transaction from CEOC's

vantage point.  And, as with other transfers of CEOC assets, the Sponsors controlled the process:

in fact, Evercore's compensation was contingent upon the transaction being consummated as the

Sponsors envisioned.  Evercore was to be paid a $3.5 million fee upon delivery of a fairness

opinion, as well as a "discretionary fee" of as much as $3 million at the conclusion of the

assignment.  Ultimately, Evercore was paid $2.25 million of this "discretionary fee."

192.    Although the CEC Valuation Committee was supposed to ensure that CEC got a

fair price for the Planet Hollywood and Horseshoe Baltimore, in practice the Committee allowed

the Sponsors to manipulate the valuation process to artificially depress the price of the assets.  As

one example, Caesars management did not provide Evercore with updated projections for

Planet Hollywood revenue, even though Caesars had more recent sets of projections and Evercore had specifically asked for them.

193.    The Sponsors also manipulated projections in other ways.  At the time of the transaction, Planet Hollywood was on the verge of signing entertainer Britney Spears to a multi-year deal to perform at Planet Hollywood and renovating the show's venue.  CEOC projected that this would substantially increase Planet Hollywood's EBITDA.  But those forecasts never made it to Evercore.  Instead, the Sponsors told Evercore that the Spears contract would have no material impact on Planet Hollywood's EBITDA or value.  The Sponsors' desire to depress the price for Planet Hollywood was so strong that a TPG officer, Greg Kranias, at one point objected to entering into the agreement with Britney Spears at all because the deal might increase the value of Planet Hollywood, thus raising the price Growth Partners would have to pay for the property.

194.    In the end, the Spears contract was more successful than even CEOC had hoped. Her tickets went at twice the rate of other successful shows, and VIP packages for the shows quickly sold out.  By then, though, Planet Hollywood was in the hands of Growth Partners and it was Growth Partners, not CEOC, that reaped the benefits of Planet Hollywood's success.

195.    In addition to the Sponsors' manipulation of projections and information, Evercore made several errors that lowered the valuation of both properties.  In valuing Planet Hollywood, for example, Evercore treated Planet Hollywood as a regional property despite its prime location on the Las Vegas Strip.  As a result, Evercore used the wrong multiple of EBITDA to calculate Planet Hollywood's value.  Evercore also used an incorrect EBITDA value in its projections and failed to apply a forward-looking multiple to account for Planet Hollywood's significant expected growth.

196.     In valuing CEOC's joint venture interest in the Horseshoe Baltimore, Evercore

simply misunderstood how much of the joint venture CEOC owned.  Evercore valued CEOC's

interest in the Horseshoe Baltimore by assuming that CEOC owned 40.9% of the venture.  In

fact, CEOC had 51.8%.  Evercore's mistake arose from the faulty assumption that CEOC would

sell some of its equity in the property to its venture partners in the fourth quarter of 2013.  In

fact, the sale did not occur then, and CEOC's ownership interest was still 51.8% at the time

Horseshoe Baltimore was transferred.  Although CEOC later did sell some of its interest in the

casino to its partners, the sale happened in February 2014; by then, Growth Partners owned the

property, so the proceeds went to Growth Partners, not CEOC.

197.     Relying upon manipulated and outdated projections based on other mistakes,

Evercore gave the opinion that consideration "reasonably equivalent to the fair market value of

each such asset" was a cash payment of $360 million, constituting $210 million for

Planet Hollywood, $70 million for the Planet Hollywood management fees, and $80 million for

the Baltimore casino and management fees.  Additionally, a subsidiary of Growth Partners

assumed $513 million of debt secured by Planet Hollywood, although this was offset by roughly

$40 million in restricted cash on deposit and as much as another $175 million in unrestricted

cash held by the holding company that owned Planet Hollywood.

198.     In light of these errors, it is no surprise that this valuation was deficient by at least

$437 million, and probably much more.  Contemporaneous indicators of value confirm that

Planet Hollywood and Horseshoe Baltimore were worth significantly more than the

consideration CEOC received.  As one example, Cushman & Wakefield, who had been engaged

by Key Bank Real Estate Capital, appraised Planet Hollywood at $866.9 million under an

income capitalization approach.  TPG reached a similar estimate of $830 million for

Planet Hollywood's value in December 2012, using the same management projections that had

served as the basis for Evercore's opinion.  Shortly after the Planet Hollywood and Horseshoe

Baltimore transfers were closed, Apollo estimated that, by 2016, these properties would be worth

$579 million and $260 million, respectively.

199.    A reason for this disparity, of course, was that the Planet Hollywood and

Horseshoe Baltimore transfers were one-sided and unfair to CEOC.  The sale was not negotiated

at arm's length, the assets were not offered to any third-party buyers or investors, and no

marketing process was used to help CEOC maximize the value of the transferred assets.  CEOC

did not have independent legal or financial advisors or any other form of unconflicted

representation in the negotiations.

200.    The CEC board approved the Planet Hollywood and Horseshoe Baltimore

transaction at a board meeting held on October 21, 2013, and attended by defendants

Bonderman, Davis, Loveman, Rowan, and Sambur.

201.    The CEOC board at the time consisted of two interested directors, Gary Loveman

and Michael Cohen.  Both were senior executives of CEC, and Loveman owned stock in CAC.

There was no special committee of independent directors formed of CEOC's board to review the

deal, nor did CEOC ask for or receive a fairness opinion.  The deal was presented to Loveman

and Cohen for approval only after all of its terms had been finalized.  Loveman and Cohen did

not hold a meeting to consider the transaction, but instead approved the deal on October 21,

2013, by signing a standard written consent.  Once approved, CEOC subsidiaries PHW Las

Vegas, LLC, PHW Manager, LLC, Caesars Baltimore Acquisition Company, LLC and Caesars

Baltimore Management Company, LLC transferred their equity interests in Planet Hollywood

Las Vegas and Caesars Baltimore Investment Co., LLC as well as 50% of the management fees

from PHW Manager, LLC and Caesars Baltimore Management Company, LLC to Growth in

exchange for $360 million in cash.

## I.   CMBS, CERP, AND GROWTH PARTNERS ACCESS TO TOTAL REWARDS AND PROPERTY MANAGEMENT SERVICES

202.   As part of the 2010 CMBS Loan Agreement Amendment, CEC directed CEOC to

enter into a contract with the CMBS PropCos called the Shared Services Agreement.  The

purpose of the Shared Services Agreement was to give the CMBS lenders the power to compel

CEOC to continue to manage the CMBS Properties in the event of a foreclosure.  Among other

things, the Shared Services Agreement stated that CEOC would supply each property with a

complete accounting system, offer access to the property's books and records, and prepare

financial statements.  More fundamentally, CEOC was required to provide the CMBS Properties

with access to the Total Rewards program.  As part of this agreement, the CMBS Properties paid

CEC for CEOC's services.  CEOC, by contrast, received nothing from the CMBS PropCos

except for a payment reimbursing CEOC for the "allocated" cost of providing these management

services and 30% of CEOC's "unallocated" corporate overhead expenses.

203.   In October 2013, when the CMBS Properties were transferred to the

newly-formed CERP and Octavius Tower and Project Linq were taken from CEOC and given to

CERP, a new Shared Services Agreement was executed and CEOC was required to provide these

same services to CERP on the same basis as it had previously provided them to the CMBS

Properties.

204.   On October 21, 2013, pursuant to the 2013 Transaction Agreement, CEOC

entered into a Management Services Agreement that required CEOC to continue to perform

management duties for the two properties and also to provide the properties with access to Total

Rewards.  CEOC's compensation under the Management Services Agreement was minimal:

reimbursement of its actual out-of-pocket costs, a 10% "profit margin" on certain costs, and management fees tied to the properties' performance.

205.    Notwithstanding the enormous value of Total Rewards and CEOC's property management services, CEOC was paid little or nothing under these contracts.  This failure to compensate CEOC for its services to CEC, CERP, and Growth Partners was yet another instance where the Sponsors and CEC took assets—in this case, services and access to its intellectual property—of value from CEOC for inadequate consideration.

206.    And, as before, CEOC's directors and senior officers were conflicted because they were also directors or officers of CEC, CERP, CAC, Growth Partners, or other CEC affiliates and, in some cases, had a personal economic stake in CEC or these affiliates.  CEOC's board approved the 2010 Shared Services Agreement with the CMBS Properties, the 2013 Shared Services Agreement with CERP, and the 2013 Management Services Agreement with Growth Partners without analyzing what consideration CEOC was receiving, or should receive, in return for the transfer of its rights in Total Rewards and the provision of property management services.  At no point in this period did CEOC have independent directors who would have been in a position to consider the fairness of these transactions to CEOC, nor the benefit of any independent legal or financial advisors.  Similarly, no fairness opinion was solicited, received, or considered in connection with any of these transactions.

**J.      ASSET TRANSFERS OF MAY AND JUNE 2014**

207.    By no later than the beginning of 2014 (if not long before then), CEOC's liquidity had certainly reached the point where it would have to reach an out of court restructuring with its creditors or file for bankruptcy.  With time running out, the Sponsors and CEC embarked upon a course of wholesale asset transfers, refinancings, and related transactions to strengthen the Sponsors' hand in negotiations with creditors and ready CEOC for bankruptcy.  The overall

purpose and effect of these transactions was to place CEOC assets in entities that the Sponsors

and CEC owned and controlled and that were beyond the reach of creditors, to capture all of the

synergies of the Caesars system for the Sponsors and CEC, and to intentionally diminish the

value of CEOC.  This reduced creditor leverage in any restructuring negotiations and, if a

bankruptcy followed, simplified the Sponsors and CEC's attempt to reacquire the assets of the

"Bad Caesars" and re-create the original Caesars system.

208.    The measures the Sponsors and CEC took in the first half of 2014 were divided

into separate transactions, but in truth they were part and parcel of a single overarching plan.

The plan involved the transfer to Growth Partners of four more irreplaceable CEOC properties in

Las Vegas and New Orleans, moving money out of CEOC into Growth Partners, transferring

highly valuable undeveloped real estate to Growth Partners, moving control of Total Rewards to

a "bankruptcy-remote" entity that Growth Partners and CERP would govern, taking CEOC's

property management business away from it, attempting to remove CEC's guarantee of CEOC's

bond debt, having CEOC take on new first lien bank debt to garner the first lien banks' support

for a restructuring of CEOC, and amending CEOC's credit agreements to change CEC's

guarantee of CEOC's first lien bank debt from a guarantee of payment to a guarantee of

collection.  Once the Sponsors and CEC completed these steps, they reconstituted CEOC's

board, placing partners of Apollo and TPG in the majority.  For the first time, the Sponsors also

added to the CEOC board two outside directors, both of whom they knew from other business

connections.

### 1.    The 2014 Transaction Agreement

209.    On March 1, 2014, CEOC entered into a Transaction Agreement (the "2014

Transaction Agreement") that required CEOC to transfer four of its premier assets to Growth

Partners.  It also required CEOC to license Total Rewards and most of its other intellectual

property to a new joint venture controlled by Growth Partners and CERP called Caesars

Enterprise Services ("CES").  The total consideration to CEOC for these transfers included

$1.815 billion in cash and the assumption of $185 million in debt, far less than the value of the

properties.  CEOC received no consideration at all in return for ceding control over Total

Rewards and its intellectual property to the joint venture.

### 2.     The Four Properties Transaction

210.    The 2014 Transaction Agreement required CEOC to sell three of its Las Vegas

casinos and its flagship New Orleans casino to Growth Partners.  In addition, CEOC was

required to relinquish 50% of the stream of management fees CEOC would have earned from

managing the four properties.

211.    The three Las Vegas properties were located at the center of the Las Vegas Strip.

They occupied two of the four corners of the central intersection and were uniquely positioned to

take advantage of synergies from the other, nearby Caesars properties.  The three casinos also

benefitted from substantial foot traffic, which would increase when Linq was completed.

a.      Bally's Las Vegas had been a staple of the Las Vegas Strip since 1973,

with a large customer base and a substantial convention business.  In 2013,

CEOC funded a full renovation of its South Tower and, in late 2013, a

third party began development of the Grand Bazaar, a retail venue there.

b.      CEOC had acquired The Cromwell (then known as the Barbary Coast) in

2007.  In February 2013, CEOC shut the property for 15 months to

redevelop and rebrand it with funds CEOC had raised.  When The

Cromwell reopened in April 2014, it had fully remodeled hotel rooms, an

extension of the rooftop for a pool and nightclub, a renovated facade, and

a new restaurant and parking garage.

c.      In 2005, Caesars acquired The Quad, then known as Imperial Palace.  In December 2012, it underwent a $90 million, year-long renovation.  Shortly thereafter, a second renovation began, which included improvements to the hotel towers, pool, and entertainment venues.  This second phase of the renovation took more than a year and cost over $200 million.

212.    The fourth property was Harrah's New Orleans, which had opened in 1999.  Harrah's is the largest casino in Louisiana and the only land-based casino in New Orleans.  Harrah's was located in downtown New Orleans and drew both tourists and locals as customers.  CEC described Harrah's as a "large asset in a stable market with no near-term new competition."

213.    The Sponsors began working on the Four Properties Transaction in 2013.  As before, Apollo conceptualized the transaction, selected the properties to be transferred, decided to whom they would be sold, and determined the structure and details of the sale.  The proposal was presented to the CEC board on November 26, 2013.

214.    CEC and the Sponsors were again in a position of conflict.  The Sponsors controlled both CEC and CAC which, respectively, owned the seller of the assets and the buyer of the assets.  Nevertheless, CEC and CAC each also had public shareholders, whose interests were opposed.  Thus, CEC and CAC each formed a Special Committee to structure and negotiate the price of the transfers.  The CEC Special Committee first hired Centerview Partners LLC as its financial advisor.  Later, it retained Duff & Phelps to provide a fairness opinion that the Four Properties Transaction was "on terms no less favorable to CEOC . . . than would be obtained in a comparable arm's-length transaction with a person that is not an affiliate of [CEC]."  The CAC Special Committee engaged Lazard as its financial advisor.

215.    However, neither of these Special Committees nor their advisors protected CEOC's interests or negotiated on behalf of CEOC, and no special committee of the CEOC board was formed at all.  Nor did CEOC's board ask for or receive an independent fairness opinion.

216.    In fact, on information and belief, the Sponsors pushed back on any attempt to have the fairness of the transaction to CEOC investigated by anyone.  In connection with the transaction, an indirect subsidiary of CAC named Caesars Growth Properties Holdings borrowed $2 billion from a syndicate of banks that included Citibank, Credit Suisse, Deutsche Bank and UBS.  The bank lenders insisted as a condition of closing that CEOC receive an opinion from an independent source that the consideration for the transfers was reasonably equivalent value and fair consideration.  After negotiations, the banks accepted an opinion letter that said only that the purchase price was fair, from a financial point of view, to Growth Partners.

217.    Negotiations over the price and terms of the Four Properties Transaction occurred primarily between one of the CEC independent directors, Fred Kleisner, and one of the CAC independent directors, Marc Beilinson.  CEOC was not involved or represented in any capacity. Ultimately, Kleisner and Beilinson agreed that CEOC should convey the four properties and its rights in the stream of management fees from those properties for consideration of $1.815 billion in cash and the assumption of $185 million in debt.

218.    On February 24, 2014, Centerview issued its fairness opinion to the CEC Special Committee and the CEC board, concluding (1) that the Four Properties Transaction was "fair, from a financial point of view" to CEC and (2) that the consideration was "reasonably equivalent to the aggregate of the enterprise value" of the Four Properties and to the management fee stream.  On February 25, 2014, Lazard issued its fairness opinion to the CAC Board and the

CAC Special Committee, concluding that the Four Properties Transaction was "fair, from a financial point of view, to CGP."  On March 1, 2014, Duff & Phelps issued its fairness opinion to the CEC Special Committee and the Boards of CEC and CEOC, concluding that the Four Properties Transaction "is on terms that are no less favorable to CEOC or such relevant restricted subsidiary, as applicable, than would be obtained in a comparable arm's-length transaction with a person that is not an affiliate."  Centerview and Duff & Phelps updated their opinions, with substantially identical language, on May 5, 2014, the date of the closing of the three Las Vegas properties, and May 19, 2014, the date of the closing of Harrah's New Orleans.

219.    None of these opinions properly advised CEOC of the fairness of the Four Properties Transaction to CEOC.  The Centerview opinion addressed whether the Four Properties Transaction was fair to CEC, and the Lazard opinion concluded only that the transaction was fair to CAC.  The Duff & Phelps opinion—which at least purported to look at the transaction from CEOC's point of view—did not consider the fairness of the deal, but instead concluded only that its terms were no less favorable to CEOC than an arm's-length negotiation would have produced.  Duff & Phelps was not retained by CEOC to independently assess the fairness of the consideration to CEOC because Sambur opposed it.

220.    Moreover, the Duff & Phelps opinion was defective because Duff & Phelps was instructed to rely upon inaccurate information.  CEOC had projections—called the "January Business Plan"—that it prepared in the ordinary course of its business and which set forth the forecasted EBITDA for the four properties.  Although the CEC board previously had approved the January Business Plan, the CEC Special Committee instructed Centerview and Duff & Phelps to use a different set of projections—known as the "February Business Plan"—in valuing the assets.  The February Business Plan was not a forecast reflecting CEOC management's best

72

judgment about the future of its business; instead, upon information and belief, it was created by

CEC—at the behest of Kleisner—and was never used for any purpose other than valuing the

Four Properties.

221.   The February Business Plan materially reduced the forecasted EBITDA for the

four properties, which lowered their valuations correspondingly.  For Harrah's New Orleans and

Bally's Las Vegas, the February Business Plan reduced 2017-18 growth projections by half,

applied a 25% haircut to forecasted financial improvements from management initiatives, and

assumed added costs of 1.5%.  For the Quad, the February Business Plan lowered 2017-18

growth assumptions from 5% to 3%, reduced by half the amount of revenue the Quad would

capture from adjacent casinos in the Linq complex, and cut revenue per occupied room by 7.5%.

The February Business Plan reduced occupancy at The Cromwell, discounted its expected slot

and table game revenues by 20%, and increased capital spending by $15 million.  The overall

effect of these adjustments was to reduce revenues for the four properties by over 5% for the

period from 2014 through 2018 and EBITDA by more than 12%, even though the properties'

actual performance missed budgets during this period by only 2.8%.

222.   CAC paid CEOC $1.815 billion in cash and assumed $185 million in debt related

to the four properties.  Because this price was based on manipulated projections, it was

materially below the assets' true value.  Moreover, CAC did not actually pay this much for the

properties because of offsets.  First, there was a cost item known as "Remaining Cromwell

Costs" which were needed to reopen The Cromwell, and the funds to pay this already were on

deposit and were transferred from CEOC to Growth Partners as part of the deal.  Second, CEOC

was required to indemnify Growth Partners for up to $33.465 million in cost overruns that might

occur at The Quad.  And third, CEOC was obligated to indemnify Growth Partners for

additional, still unquantified liabilities under multiemployer benefit plans based on facts and circumstances which already were known.

223.    There was a complete lack of fair process to protect CEOC.  CEOC was not directly represented in the negotiations with CAC, did not have a special committee from its own board to negotiate or review the transaction, did not have independent legal or financial advisors, and did not ask for or receive an independent fairness opinion.  In fact, although outside directors for CEOC were recruited as early as February 2014, the Sponsors decided that they would not join the CEOC board until after the completion of the Four Properties Transaction.  There was no marketing process for the assets or any effort to solicit potential third-party buyers for bids on them.  And this was by design: the CEC Special Committee lacked the authority to market these assets to third parties primarily because the Sponsors had decided that the properties should stay within the Caesars structure.

224.    Through these transactions, 3535 LV Parent, LLC transferred CEOC's interests in 3535 LV NewCo, LLC (the Quad), Corner Investment Company Newco, LLC transferred CEOC's interests in Corner Investment Company, LLC (the Cromwell), JCC Holding Company II NewCo, LLC transferred CEOC's interests in JCC Holding Company II, LLC (Harrah's New Orleans), and Parball Corportion and Parball Parent, LLC (together with their subsidiaries) transferred CEOC's interests in Parball NewCo, LLC (Bally's Las Vegas) and other assets to Growth Partners.  Management fees associated with these properties, including fees owned by management entities Cromwell Manager, LLC, Bally's Las Vegas Manager, LLC, and The Quad Manager, LLC, also were transferred to Growth Partners through these transactions.

### 3.    Transfer of Undeveloped Las Vegas Real Estate

225.    In addition to its other Las Vegas assets, CEOC owned a substantial assemblage of prime undeveloped land to the east of several Caesars properties.  CEOC purchased these

parcels in the early 2000's as a way of protecting its ability to grow in Las Vegas.  Upon information and belief, CEOC paid as much as $1 billion to buy these properties.

226.    As part of the Four Properties Transaction, CEOC transferred 31 acres of this land to Growth Partners.  This was accomplished by CEOC subsidiaries 3535 LV Corp., 3535 Parent LLC, Octavius Linq Holding Co. LLC, Parball Corporation and Parball Parent LLC transferring their interests in the land to 3535 LV Newco LLC, Caesars Linq, LLC, and Parball Newco LLC. Despite the substantial value of the land, it was conveyed to Growth Partners for no consideration, and no value was attributed to this land in CEOC's internal analysis, CEC's internal analysis, or in the Centerview, Lazard, or Duff & Phelps opinions about the Four Properties Transaction.  The Special Committees, too, apparently did not know about it.  In fact, upon information and belief, Centerview, Lazard, Duff & Phelps, Kleisner, Beilinson, and Loveman were all unaware that the undeveloped land was included in the transaction.  Similarly, the land's transfer was not mentioned in CEC's March 3, 2014 announcement of the Four Properties Transaction or in the May 6, 2014 8-K's filed by CEC, CEOC and CAC, which disclosed and described the Four Properties Transaction.

227.    This transfer of 31 acres of CEOC's undeveloped Las Vegas land was not made for adequate consideration or reasonably equivalent value and was never offered to a true third-party buyer or subject to any marketing process.  In addition, the transfer also materially reduced the value of the 42 remaining acres of land that CEOC retained.  The sale of the 31 acres cut off any direct access across CEOC-owned land between this remaining parcel and the Las Vegas Strip and reduced the parcel's value for future development by removing its contiguousness with CEOC's other properties.

#### 4.    Degradation of CEOC Enterprise Value

228.    The structure of the CEOC enterprise had been designed to create a nationwide hub-and-spoke system of regional and destination casinos.  However, the successive property transfers in 2013 and 2014 stripped away from CEOC almost all of its Las Vegas casinos as well as the Harrah's New Orleans Hotel and Casino.  Thus, after the transfer of Octavius Tower, Project Linq, and Planet Hollywood in 2013 and the 2014 transfers of The Cromwell, The Quad Resort & Casino, Bally's Las Vegas, Harrah's New Orleans Hotel and Casino, and CEOC's undeveloped land in Las Vegas, CEOC was relegated to having a single casino-hotel in Las Vegas – part, but not all of, Caesars Palace – and no longer credibly could be considered to be a Las Vegas-based gaming company.

229.    Because of the higher profitability of Las Vegas properties, gaming companies with a strong Las Vegas presence are valued at higher multiples of EBITDA than the multiples commanded by gaming companies that are predominantly regional.  In 2014, for example, the former enjoyed average EBITDA multiples of 12.4 compared to 8.4 for regional operators.  This, of course, was a fact well known to the Sponsors, CEC, CEOC's board and their financial advisors, since all were intimately familiar with the gaming industry and since the entire purpose of constructing the CEOC system was to maximize revenues at its Las Vegas properties.

230.    The transfers of CEOC's Las Vegas properties in 2013 and 2014 reduced CEOC's EBITDA from its Las Vegas operations by nearly $330 million.  In percentage terms, CEOC's EBITDA from Las Vegas operations fell from 41% to 28%.  Applying standard multiples to this shift in EBITDA indicates that the enterprise value of CEOC fell by billions of dollars.

231.    This destruction of value was no accident.  The Sponsors and CEC conceived of, planned and executed these transactions precisely because they wished to transfer CEOC's value to CERP, Growth Partners, and CEC itself.  Apart from removing assets from the reach of

creditors, the transfers had the purpose and effect of increasing the Sponsors and CEC's leverage against CEOC's creditors when restructuring negotiations began and creating operational and structural issues that would favor a CEC-sponsored plan of reorganization if and when CEOC entered bankruptcy.

### K.      THE B-7 TRANSACTION

232.      In addition to its bond debt, CEOC also had substantial borrowings from banks. At the beginning of 2014, this amounted to $4.4 billion and was secured by first liens upon CEOC's assets.  The bank debt was governed by a 2008 First Lien Credit Agreement, and was guaranteed by CEC (the "Bank Guarantee").  This Bank Guarantee was a guarantee of payment, meaning that CEC would be required by the first lien banks immediately to make good on CEOC's bank debt in the event of a default.  In practice, this meant that a CEOC bankruptcy would immediately lead to a CEC bankruptcy.

233.      In late 2013, CEC began thinking of an amendment to the First Lien Credit Agreement.  One reason was that CEC wanted to move cash out of CEOC and into Growth Partners.  Another was that CEC hoped to convert its Bank Guarantee into a guarantee of collection, which would allow CEC to postpone paying on the guarantee until CEOC emerged from bankruptcy.  A third was that a refinancing of CEOC's bank debt, and part of its bond debt, would provide a cover for other transactions CEC had in mind, such as its plan to remove its Bond Guarantees.  And all of these measures would serve CEC's overriding goal of weakening the bargaining position of CEOC's creditors and strengthening the Sponsors' hand in the restructuring negotiations that were to start in a few months.

234.      As before, Sambur led the efforts of CEC and the Sponsors, which conceived, designed, and structured this transaction, including the details of the amendment of CEOC's

bank loans and the attendant modification of CEC's Bank Guarantee, the redemption of the 2015

Notes, and the timing, structure, pricing, and implementation of the transaction.

235.   The B-7 Transaction had several elements:

a.   The first was an amendment to the First Lien Credit Agreement to modify

CEC's Bank Guarantee from a guarantee of payment to a guarantee of

collection.  CEC needed the consent of a majority of the bank lenders to

obtain this, which CEC obtained by arranging for two backstop lenders,

GSO and BlackRock, to lend $1.1 billion under the First Lien Credit

Agreement and, thus, give CEC a majority of favorable votes.

b.   Second, the B-7 Transaction was intended to replace term loans

(denominated B-1, B-3, B-4, B-5, and B-6) that would mature between

2015 and 2017.  The new B-7 term loans would amount to $1.75 billion,

have first priority liens, and bear interest at a rate of 9.75% per annum.

c.   Third, CEOC had two issues of its bond debt, the 5.625% Senior Notes

due 2015 and the 10% Second Priority Notes due 2015 (together, the

"2015 Notes"), which were scheduled to mature in 2015.  As part of the

B-7 Transaction, CEOC was to redeem both issues of notes.

The B-7 Transaction also was part of other initiatives CEC was pursuing at the same time.  For

example, the modification of CEC's Bank Guarantee was conditioned upon CEC's success in

selling a portion of its CEOC stock, to promote CEC's goal of removing the Bond Guarantees.

Similarly, CEC used the redemption of the 2015 Notes as a method of rewarding Chatham Asset

Management for joining in the stock purchase that CEC used to claim it had removed the Bond

Guarantees.  The B-7 Transaction also took place at the same time as a financing that Apollo and

CEC were arranging for Growth Partners to pay for the Four Properties Transaction, and parties such as Chatham participated in both.  Finally, CEC and CEOC used the redemption of the 2015 Notes as a means to shift hundreds of millions of dollars from CEOC to Growth Partners, providing Growth Partners with working capital needed to operate the casinos and hotels it was about to acquire in the Four Properties Transaction.

236.    Ostensibly, the B-7 Transaction was undertaken to improve CEOC's liquidity, extend the maturities of its funded debt, and provide CEOC with a "runway" to recover from its insolvency.  In fact, the B-7 Transaction was intended to, and accomplished, exactly the opposite.  More than $219 million went to pay the fees and expenses of the transaction.  About $795 million was used to roll over existing B-1, B-3, B-4, B-5, and B-6 term loans.  Over $1 billion was paid to redeem the 2015 Notes.  These amounts, of course, exceeded the $1.75 billion CEOC borrowed in the B-7 Transaction.  As desperately short of cash as CEOC was, it was required to come up with $315 million to cover the shortfall.  Thus, at a time when the Sponsors and CEC were championing the notion of raising cash by selling CEOC assets, the B-7 Transaction required CEOC to burn up $315 million of its scarce cash, increased its bank debt, and raised the interest rate CEOC was paying for that debt.

237.    CEC's true motivation for this was to set the stage for the restructuring the Sponsors and CEC intended to impose on CEOC's creditors and, if that failed, to protect CEC when CEOC filed for bankruptcy.  Almost every feature of the B-7 Transaction was intended to benefit the Sponsors and CEC, if not to intentionally inflict damage upon CEOC.  For example:

a.    The $129 million in fees paid to GSO and BlackRock were not necessary to help CEOC.  Instead, those were the fees GSO and BlackRock charged for the backstop facility, the purpose of which was to allow CEC to

marshal the votes it needed to change the terms of its Bank Guarantee to a

guarantee of collection.

b. There was no need to "roll" over the B-4, B-5, and B-6 term loans.  None

was due any earlier than 2016, and all had interest rates below the 9.75%

rate of the new B-7 loans.  In fact, none of the term loans was due in 2014

and only $29.1 million was due in 2015.  The purpose of rolling over the

term loans was to justify the trouble and expense of undertaking the B-7

Transaction in the first place, and as a further inducement to the lenders to

approve the change of the Bank Guarantee to a guarantee of collection.

c. There was no need to redeem the 2015 Notes.  The purpose of the

redemption was to funnel cash into Growth Partners as a device to remove

the cash from the reach of CEOC's creditors and to improve Growth

Partners' liquidity.  Similarly, the reason Chatham's notes were redeemed

was to compensate Chatham for its agreement to pay $4 million to

purchase CEOC stock—which even Apollo conceded was worthless—in

order to help CEC renounce its obligations under the Bond Guarantees.

d. Although the 2015 Notes were trading at a substantial discount to their

face value, the Sponsors and CEC made no effort to negotiate the best

price for their repurchase.  Instead, CEOC was required to redeem the

notes at par, plus a premium, plus accrued interest.  This is in stark

contrast to CEC's earlier practice of always negotiating the best price

when it repurchased CEOC's distressed debt.  Moreover, only seven

months before—when the Sponsors and CEC capitalized Growth

Partners—those same notes had been valued at 68% of their face amount
and CEOC's financial condition had only deteriorated since then.

e.      $452 million went to buy 2015 Notes from Growth Partners, which had
received them from CEC only eight months before.  Originally, Growth
Partners had agreed to put this money back into CEOC by participating in
the B-7 financing.  However, when the financing was oversubscribed,
Growth Partners was relieved of this obligation and simply kept the
money.  The obvious purpose of this redemption was to move cash out of
CEOC to protect it from claims of CEOC's creditors.

f.      Over $400 million was paid to buy 2015 Notes from Chatham which, in
turn, agreed to buy worthless CEOC stock from CEC.   Chatham profited
handsomely from this *quid pro quo*.

## L.      CEOC BOARD APPROVAL OF THE 2014 TRANSACTION AGREEMENT AND THE B-7 TRANSACTION

238.    It is difficult to overstate the significance of the 2014 Transaction Agreement, the

Four Properties Transaction, and the B-7 Transaction.  At the end of the day, the transactions

resulted in CEOC losing four of its remaining five destination properties; increasing its level of

indebtedness; paying off over $750 million of bank loans that were not yet due and borrowing

the money to do so at a substantially higher interest rate; redeeming over $1 billion of notes that

were not yet due, and doing so at a substantial premium to the notes' market value; repaying the

balances on its intercompany revolver, which also were not yet due; paying $129 million in fees

to GSO and BlackRock for a financing facility CEOC did not need; and dipping into its scarce

cash reserves to find an additional $315 million to pay for it all.  Obviously, CEC's purpose was

not to help CEOC.

239.   Both transactions were approved on May 5, 2014 by CEOC's two-man board. The two directors were Loveman and Hession, neither of whom was independent and both of whom were profoundly conflicted.  Loveman was and remained CEC's Chairman and Chief Executive Officer, and enjoyed an incentive plan that would reward him with CEC stock if the company succeeded.  Hession was CEC's Chief Financial Officer.  Both Loveman and Hession also owned stock in CAC and, therefore, stood to benefit personally from the below-market price at which CEOC had sold the four properties to Growth Partners and from CEOC's purchase of 2015 Notes from Growth Partners at above-market prices.

240.   The CEOC board followed no processes at all.  There was no effort to bring independent directors aboard to consider the transactions; no special committee of the board was considered or constituted; the CEOC board did not ask for or have independent financial or legal advisors; the board did not ask for or receive a fairness opinion on the transactions; and the board did not seem to be aware that it also was giving away 31 acres of prime undeveloped Las Vegas land.  In fact, the CEOC board did not even bother to hold a meeting.  Instead, Loveman and Hession signed a boilerplate "unanimous consent" approving the 2014 Transaction Agreement and another for the B-7 Transaction.  The facsimile date stamps on Loveman's copy of the consent indicate that only six minutes elapsed from the time he received the document until the time he faxed it back.

241.   The CEC board both convened a series of meetings and signed written consents to approve the 2014 Transaction Agreement and the B-7 Transaction.  After the CEC board approved the 2014 Transaction Agreement on February 24, 2014, it met again on April 21, 2014 to preliminarily approve the B-7 Transaction, and again on April 28, 2014 to give final approval for the B-7 Transaction and related financial transactions.  Upon information and belief,

Defendants Bonderman, Davis, Kleisner, Loveman, Rowan and Sambur were in attendance on

April 21, and Defendants Sambur, Kleisner, Loveman, and Rowan were in attendance on April

28.  On May 4, 2014, the CEC Executive Committee, comprised of Loveman, Rowan and Davis,

executed a written consent approving the First Amendment to the 2014 Transaction Agreement.

Finally, on May 19, 2014, Loveman signed a written consent on behalf of the CEC board

approving the Amended & Restated CES LLC Agreement and the Omnibus Agreement.

### M.    TRANSFER OF TOTAL REWARDS

242.    The 2014 Transaction Agreement also contemplated the creation of a new, CEOC

bankruptcy remote entity that would assume control and dominion over CEOC's most important

intellectual property, including Total Rewards.  The new joint venture, which was characterized

as a "shared services company," was a concept formulated by Apollo in late 2013 and was

designed to keep Total Rewards out of the reach of CEOC's creditors and to allow all Caesars

entities, including Growth, CERP, and their subsidiaries, to have continued access to CEOC's

management services and intellectual property when CEOC entered bankruptcy.  Paul Weiss and

Apollo both actively participated in crafting the documents and agreements governing this shared

services company and in implementing terms that were beneficial to CEC, Growth Partners,

CERP, and the Sponsors at the expense of CEOC.  The Sponsors did not share these underlying

goals with anyone at CEOC.

### 1.    Creation of Caesars Enterprise Services LLC

243.    The new company was called Caesars Enterprise Services LLC ("CES").  CES

was formed on May 20, 2014, pursuant to a limited liability company agreement (the "LLC

Agreement") among CEOC, CERP, and a wholly-owned, indirect subsidiary of Growth Partners

called Growth Properties.[7]  That same day, CEOC, CERP, and Growth Properties, as well as

CES, Caesars License Company, LLC, and Caesars World, Inc., executed an "Omnibus License

and Enterprise Services Agreement" (the "Omnibus Agreement" and, collectively with the LLC

Agreement, the "Services LLC Agreements").

### 2.      The Omnibus and Services LLC Agreements

244.    The Omnibus Agreement granted CES a "non-exclusive, irrevocable, world-wide,

royalty-free license" to all of CEOC's intellectual property, including Total Rewards.  CES, in

turn, sublicensed this intellectual property to CERP, Growth Partners, and other subsidiaries or

affiliates of CEC.  Effectively, this meant that CERP and Growth Partners obtained the nearly

unlimited right to use—for a small fraction of its value—the Total Rewards software, database,

know-how, algorithms, analytical tools, and accumulated knowledge that has made the Caesars

system so successful for nearly 20 years.  In return, CEOC received a 69% ownership stake in

CES, but only one-third of the voting rights.  CERP and Growth Properties shared the rest of

CES' equity and each had 33% of the voting rights.

245.    These Agreements contained a series of carefully drafted provisions that

transferred effective control of Total Rewards to CERP and Growth Partners, enriching them at

CEOC's direct expense.  These wide-ranging grants included the following:

a.      CES was governed by a three-person Steering Committee consisting of

one member each from CEOC, Growth Properties, and CERP.  Even

though CERP and Growth Partners owned only 31% of CES, they had

---

[7]   The LLC Agreement referred to CEOC, CERP, and Growth Properties as the "Members" of
the joint venture.  Because Growth Properties was a wholly-owned indirect subsidiary of
Growth Partners, CEC and others often referred to Growth Partners and Growth Properties
interchangeably.

two-thirds of the voting rights.  Moreover, under the original LLC

Agreement, CEOC would lose its governance rights if it filed for

bankruptcy.

b.       Without the consent of Growth Partners and CERP, CEOC could not

assign its interest in CES, withdraw from CES, monetize its interest in

Total Rewards, or offer continued access to Total Rewards if it sold a

casino to a third party.

c.       CEOC assigned to CES its rights to manage, maintain, protect, enforce,

defend, license, and sublicense CEOC's intellectual property.

d.       CEOC was compelled to transfer most of its employees to CES, thus

removing management and operation of Total Rewards from CEOC

altogether.

e.       The Omnibus Agreement granted three licenses to CES.  The first, known

as License A, was a sweeping grant of CEOC's intellectual property to

CES, including any intellectual property CEOC acquired down the road.

License A explicitly granted a license to CES to create derivative works;

thus, CEOC has no control over new versions or uses of its intellectual

property that are created by CES, CERP, Growth Partners, or any other

current or future sublicensees.

f.       CES granted irrevocable sublicenses to Growth Partners, CERP, and their

subsidiaries and properties without CEOC's consent and for no

consideration.

g.      Although CEOC technically will continue to own the intellectual property, CEOC has no right to possess the tangible subject matter developed in conjunction with, and instrumental to using, its intellectual property.

h.      In addition, it is now CES—not CEOC—that owns the know-how that is at the heart of the Total Rewards program.

246.    The effect of the CES Agreements is to take control of Total Rewards away from CEOC.  This prevented CEOC from leveraging any of the value of Total Rewards to generate funds to operate the business or pay its debts.  In return, CEOC received only a 69% equity share in CES, an entity that is intended to have very limited earnings and which CEOC does not and never will be able to control.

### 3.      Allocation of CES Expenses

247.    Ownership in CES was allocated among CEOC, CERP, and Growth Partners, with CEOC receiving 69% ownership, CERP 20.2% and Growth Partners 10.8%.  Pursuant to the LLC agreement, costs were allocated 70% to CEOC and 30% to CERP and Growth Partners together.  This allocation was intended to reflect the historical shares of the revenue each entity contributed to the Caesars enterprise.

248.    However, after the Four Properties Transaction closed in May 2014, CEOC's share of this revenue declined to about 53%, while the share enjoyed by CERP and Growth Partners correspondingly increased.  Nevertheless, the cost allocation method was not changed, resulting in CEOC paying more than its share of CES' costs.  It is estimated that, for the period June 2014 to December 2015, CEOC has overpaid the expenses of CES by roughly $14.5 million compared to its share of Caesars revenues in that period.

### 4.    Lack of Fair Process

249.    The same lack of process that tainted the transfer of the Four Properties and the

B-7 Transaction impugned the transfer of Total Rewards and the creation of CES.  The

negotiations over the sale of the asset was a negotiation only between CEC and CAC; CEOC did

not have a seat at the table.  CEC and CAC each formed a Special Committee, but neither

Committee nor their advisors protected CEOC's interests or negotiated on behalf of CEOC.

Although each Special Committee hired independent financial and legal advisors to advise it on

the entire transaction, CEOC had no independent directors, legal counsel, or financial advisors to

review the transfer.  CEOC did not ask for or receive a fairness opinion, and there was no

analysis done by anyone of CEOC's solvency.  And, as with other CEOC asset transfers, Total

Rewards was never offered to any true third-party buyers or subject to any marketing process to

ensure that CEOC could get the best price.

250.    The CEC Special Committee does not seem to have considered the fact that CEC

and CEOC had divergent interests or that the Committee itself had a fiduciary duty to protect

CEOC because of CEOC's insolvency.  The Special Committee also never considered whether

CEOC should retain control over Total Rewards, even though there would be obvious long-term

consequences to CEOC if management of Total Rewards were transferred to entities the

Sponsors controlled.

251.    The terms of the Services LLC Agreements were drafted by Paul Weiss and

Apollo in early 2014, revised by TPG, and only presented to the CEC and CAC Special

Committees after the terms had been decided upon.  This process ensured that not even the CEC

and CAC Special Committees could meaningfully weigh in on the transfer to a bankruptcy

remote entity of a strategic and irreplaceable asset.  Indeed, there were no material changes to the

term sheets after Paul Weiss and the Sponsors sent them to the Special Committees for their

review and approval.

252.    At the time of the transfers, the only CEOC directors were Loveman and Hession,

both of whom were senior executives at CEC and shareholders of CAC, Growth Partners' parent.

Loveman and Hession never convened a board meeting to discuss the transfer of Total Rewards,

nor gave the subject any serious attention.  Instead, they approved the transfer of "the key to the

empire" in a simple written consent.

### 5.    Loss of Value

253.    Total Rewards had independent, standalone value even apart from the earnings

boost it gave to the CERP and Growth Partners properties.  One indicator of its worth is the

valuation Caesars' independent accountants, KPMG, performed of the Total Rewards trademark

and customer relationships in a Purchase Price Allocation performed as part of the Sponsors buy-

out of Harrah's in January 2008 ("2008 PPA").  According to the 2008 PPA, the fair value of the

Total Rewards trademark alone was $495.1 million at the time of the sale.  KPMG reasoned that

the trademark was so valuable because "[t]he majority of Harrah's trade names [including Total

Rewards] are highly recognizable in the casino entertainment industry and carry a reputation for

products and service, strong customer recognition, and positive consumer perception.  These

perceptions are supported by internal analyses we reviewed.  As such, the trade names are

valuable assets."

254.    The PPA valued the Rated Customer Relationships within Total Rewards at

approximately $1.455 billion.  According to KPMG, "[r]ated player relationships represent a key

intangible asset that has a separate and distinct value apart from both the purchased tangible

assets and goodwill.  Over time, Harrah's has increased its name recognition and, cultivated

relationships with rated players . . . through the Total Rewards program."  Like other assets,

these customer relationships were deemed to have a finite lifespan.  As of December 31, 2014,

the carrying value of the acquired customer relationships had depreciated to $529 million.

Because this amount does not take into account any new customer relationships developed after

the 2008 PPA, this $529 million value is the floor of the current accounting value of the

customer relationships.  There is no reason to think that the value of Total Rewards has fallen

since KPMG performed its valuation, and there is every reason to believe that it has risen.  Since

2008, CEOC has invested enormous amounts in Total Rewards, expanded the program, and

rolled out a new version of its software.  Given these enhancements, the customer relationships

CEOC has developed since 2008 are now worth hundreds of millions of dollars more than those

identified in the 2008 PPA.

### 6.     Redemption of Total Rewards Credits

255.    CEOC also has been injured by CEC's requirement that it use an unfair method to

allocate costs when a customer redeemed Total Rewards credits.  Total Rewards customer credits

are allocated as an expense to the property where the credits were earned.  Thus, CEOC

shoulders the cost when customers from its regional casinos spend their credits in Las Vegas or

New Orleans.  Originally, this had little overall effect upon CEOC, since it owned these

destination properties as well as the regional properties where the credits arose.  However, after

the loss of most of CEOC's Las Vegas properties, this meant that CEOC has been bearing the

costs of Total Rewards incentives without reaping the benefits.  This has become, at bottom,

simply another means of subsidizing CEC, CERP, and Growth Partners.

### N.     TRANSFER OF CEOC'S PROPERTY MANAGEMENT BUSINESS, WORKFORCE, AND ENTERPRISE SERVICES

256.    A material source of CEOC's income came from the fees it earned for managing

its properties and, later, the CMBS and CERP properties.  In connection with the Four Properties

Transaction, however, CEOC was compelled to assign its portfolio of property management
agreements to CES, which took over the business.

257.    The property management contracts were unquestionably valuable.  Upon
information and belief, CEOC had earned many millions from managing Planet Hollywood and
Horseshoe Baltimore for Growth Partners, and also should have earned substantial fees for
managing the CMBS Properties and the CERP properties.  Moreover, upon information and
belief, the fees CEOC could have expected in future years from managing the properties would
have amounted to hundreds of millions of dollars.  Nevertheless, CEOC was paid virtually
nothing by CES or anyone else for assigning its interests in these valuable contracts.  Instead,
CEOC was given a 69% equity interest (but only a one-third share of the voting interests) in
CES, an entity that was intentionally structured to have no profits.

258.    As with the rest of the transactions in the spring of 2014, at no point did CEC, the
Sponsors, CEC's board or CEOC's board consider whether CEOC was receiving, or should
receive, reasonably equivalent consideration in return for the transfer of its property management
business.  Nor at any point in this period did CEOC have independent directors who would have
been in a position to consider the fairness of these transactions to CEOC or have the benefit of
any independent legal or financial advisors.  Similarly, no fairness opinion was solicited,
received, or considered in connection with any of these transfers.

*                         *                         *

259.    In summary, under the 2014 Transaction Agreement and the resultant Four
Properties Transaction and CES Agreements, CEOC (i) transferred four of its most valuable
properties and undeveloped land to Growth Partners, (ii) gifted control of its most valuable
intangible asset to CES, and (iii) was stripped of its property management contracts.  As a result,

Growth Partners and CERP now effectively own most of the "hub" of the Caesars enterprise,

leaving CEOC with the "spokes" that are located in deteriorating markets and that exist largely

to feed profitable business to CERP and Growth Partners.

260.    The enormous transfer of value from CEOC to CAC and Growth Partners is

reflected in the dramatic increase in the price of CAC's publicly traded stock after the terms of

the 2014 Transaction Agreement were disclosed.  In the five trading days following the March 3,

2014 announcement of the deal, CAC's stock price increased 17.4%, from $13.63 to $16.00.

During that same period, the stock prices of comparable gaming companies did not experience

similar increases.  Obviously, the market concluded that Growth Partners got more value than it

had paid for.

261.    The 2014 Transaction Agreement not only was made while CEOC was insolvent,

but also further deepened CEOC's insolvency.  The announcement of the 2014 Transaction

Agreement led to the immediate downgrade of CEOC's credit rating.  On March 28, 2014,

Moody's lowered CEOC's credit rating to Caa3 and of the Second-Lien Notes from Caa3 to Ca.

Moody's wrote:

> The proposed sale comes on the heels of the sale of Planet Hollywood, sale of its
> interest in a casino development in Baltimore, and the sale of Octavius Tower and
> Project Linq in Las Vegas, NV in late 2013.  Moody's estimates that on a
> pro-forma basis, the proposed sale of the four casinos along with the previous sale
> of Planet Hollywood will reduce CEOC's annual EBITDA (which included
> Planet Hollywood for three quarters) in the range of $250 - $300 million,
> representing about 21% of CEOC's 2013 adjusted EBITDA.  As a result,
> debt/EBITDA will rise above the estimated 16x at year-end 2013.  Additionally,
> assuming an 8x multiple for valuation purposes, Moody's estimates bondholders
> will lose value in the range of $2.0 billion to $2.4 billion.

https://www.moodys.com/research/Moodys-takes-rating-actions-on-several-entities-in-the-

Caesars–PR_295963.  On April 8, 2014, Standard & Poor's followed suit, lowering its recovery

rating on CEOC's first lien debt to "3" (50% to 70% recovery) and its issue-level rating to CCC.

### O.     PURPORTED RELEASE OF THE BOND GUARANTEES

262.     Another element in the transactions the Sponsors and CEC engineered in these months was an effort to purport to release—for no consideration—the guarantees CEC made of $14.75 billion of CEOC's debt to bondholders and noteholders (the "Bond Guarantees"). Among other things, the Bond Guarantees disincentivized CEC from stripping CEOC of assets, since the guarantees kept CEC on the hook for the repayment of CEOC's debts.

263.     CEC's guarantees of CEOC's debt were plainly set forth in the bond indentures, which themselves were carefully-written, sophisticated legal documents that followed decades of precedent.  The indentures specified methods by which the CEC guarantees could be released. In addition, certain of the methods for releasing the guarantees required an affirmative election by CEOC itself.

### 1.     CEC's Sale of CEOC Stock.

264.     On May 5, 2014, CEC sold a 5% of its equity.  The CEOC stock was worthless. CEC's financial advisor, Blackstone, determined that, if traditional valuation methods were used, CEOC stock had a negative value.  And even Apollo's Sambur equated the shares' value to "pixie dust."

265.     Sambur solved this problem, in part, by turning to two hedge funds that already owned stock in CEC.  One was Paulson & Co., which owned 9.9% of the common voting stock of CEC pursuant to a debt-for-equity swap it had closed a few years before.  The second was Scoggin LLC.  Even though the CEOC stock was worthless, both Paulson and Scoggin were willing to buy it because, on information and belief, Sambur had disclosed to them his plan to use the stock sale as a mechanism to attempt to release CEC's bond guarantees.  Once the Bond Guarantees were purportedly released, the potential liability would disappear and CEC's stock

price would increase, more than compensating Paulson and Scoggin for the cost of the worthless CEOC stock.

### 2.   Apollo's Side Deal with Chatham Asset Management

266.   Sambur also began negotiations with a third possible buyer of the CEOC stock, Chatham Asset Management, a New Jersey-based asset manager with whom he had previous dealings and was in frequent contact.  Unlike Paulson and Scoggin, Chatham did not own CEC stock.  However, Chatham had accumulated a substantial position in CEOC's 2015 Notes.

267.   Chatham also was a member of the syndicate that loaned money to Growth Partners in connection with the Four Properties Transaction in 2014.  On information and belief, at some point, someone told Chatham about the Sponsors' strategy to strip profitable assets out of CEOC and place them in entities that the Sponsors and CEC themselves owned and controlled.  A February 11, 2014 email from Greg Roselli (a Chatham analyst), for example, described Apollo's overarching strategy as causing "the new spin-off company … to start picking the best properties out of Opco to help force the lenders to take a haircut."  A March 3 internal Chatham e-mail from Roselli to Chatham portfolio manager Evan Ratner described the planned "Four Properties" transaction as a sale that "[e]xtends the liquidity profile but doesn't change the story for the 2nds in the long run; and they've stripped the best assets…."

268.   This should have worried Chatham, which was a major holder of the very debt that Apollo was trying to debase.  Instead, upon learning of Apollo's plans, Chatham steadily increased the amount of the 2015 Notes it held.  In January 2014, Chatham owned $264.8 million in principal of the Notes.  By May 1, 2014, Chatham had upped its holdings of Notes to over $400 million in principal.  Upon information and belief, the majority of these new holdings were purchased on April 29 and 30, 2014.

269.    Upon information and belief, the reason for this increase was that Chatham and Sambur were discussing a proposal under which the Sponsors would have CEOC redeem the 2015 Notes as a means of shifting cash to Growth Partners.

270.    Consistent with those discussions, Apollo did, in fact, arrange a secured financing to raise money to buy the 2015 Notes held by Chatham.  Although Sambur had previously bought CEOC's distressed debt only at a discount, in the B-7 Transaction, he had CEOC pay par, plus a premium, for the 2015 Notes.  Finally, this was indeed a device to get cash into CAC's subsidiary Growth Partners.

271.    As the B-7 Transaction took form, another element of Apollo's *quid pro quo* with Chatham became apparent.  Although Chatham had no reason to purchase the worthless CEOC stock from CEC, it became the biggest buyer of that stock—paying about $4 million for two-thirds of the CEOC stock being sold.  Chatham, of course, lost money on the stock purchase given CEOC's insolvency and defendants' scheme to strip valuable assets from CEOC.

272.    However, Chatham was rewarded for participating in the scheme.  Under the Note Purchase Agreement that Apollo negotiated with Chatham, at the same time that it negotiated the CEOC stock purchase, CEOC spent $412 million to purchase $435 million in principal amount of Chatham's 2015 Notes at a premium and with accrued interest.

273.    Chatham, Paulson, and Scoggin paid CEC $6.1 million for the CEOC stock.  Even though the stock was all but worthless, each of the three funds profited handsomely.  In the hours after CEC announced its claim that the Bond Guarantees had been removed, their CEC stock rose 14%, while CEOC's 9% Senior Secured Notes due 2020 fell 10%.

### 3.    Purported Removal of CEC's Bond Guarantees

274.    CEOC, of course, received nothing from the proceeds of the stock sale.  Nevertheless, on or about June 2, 2014, CEOC CFO Donald Colvin delivered to the indenture

trustee for the 2009 indenture a certificate stating that CEOC "elects to automatically release the Parent Guarantee pursuant to the last paragraph of Section 12.02(c) of the 2009 Indenture."  On information and belief, similar certificates also were delivered to the indenture trustees for the other indentures governing the Second Priority Notes.

275.     CEOC received no benefits from the transaction.  It received no consideration in return for delivering this certificate and releasing its legal rights.  However, CEOC's purported exercises of its elections under the Bond Guarantees were unquestionably valuable, a fact proven by the jump in CEC's stock price when the purported removal of the Bond Guarantees was announced.

276.     As usual, upon information and belief, CEOC followed no governance process in its decision to relinquish this asset.  It did not have independent legal or financial advisors, independent directors, or an independent committee of its board, and it did not ask for or receive a fairness opinion or other valuation of the asset.  Nor does it appear that its board ever considered or approved of CEOC's election to remove the Bond Guarantees.

## P.     INTERCOMPANY REVOLVER

277.     In August 2008, CEC extended CEOC an unsecured credit facility called the Intercompany Revolver under which CEC would lend money to CEOC up to a maximum principal amount of $200 million.  The maturity date of the Intercompany Revolver was January 29, 2014, which later was extended to November 2017.

278.     Apollo, not CEC or CEOC, governed the use of the Revolver.  CEOC followed the practice of notifying Apollo of its use of the Intercompany Revolver, and Apollo monitored CEOC's borrowings and repayments under the facility.  At all relevant times, Apollo was aware of and controlled CEOC's use of the Intercompany Revolver, including decisions to repay amounts owing under the Revolver.

279.    In December 2010, the Intercompany Revolver was amended to increase its maximum principal amount to $500 million.  The facility was increased again in February 2011. In November 2012, the Intercompany Revolver was amended and increased to $1 billion. However, at the same time, the Revolver was changed from a committed facility to an uncommitted facility.  Moreover, under the amendment, CEOC now was required to make solvency representations to request funds, something that—as CEC and Apollo well knew—it would not be able to do.

280.    Between November 2012 and May 2014, CEOC repaid CEC principal and interest totaling $400.7 million.  These repayments occurred at the very time the Growth Transaction was being developed to allow CEOC to obtain much needed liquidity by selling assets to CEC affiliates.  CEC used $320 million of this to benefit CEC's CMBS Properties, either by repurchasing CMBS Debt in the market at a discount or by providing necessary cage cash to CMBS Properties.  After CEOC received the proceeds from the Four Properties Transaction, the Sponsors—led by Sambur—instructed CEOC to repay all amounts remaining under the Intercompany Revolver.  On May 30, 2014, CEOC's board complied with this instruction and approved the repayment of the $261.8 million outstanding on the Revolver.

281.    Altogether, CEOC borrowed, and repaid, about $1.8 billion under the facility over the years, as well as $47 million in interest.  Of this, CEOC made $289.0 million in payments of principal and interest to CEC in the year prior to its Petition Date and $546.5 million in the two years before the Petition Date.  The maximum outstanding balance on the Intercompany Revolver was $644.2 million, which was reached on November 14, 2012.  CEOC paid $18.3 million in interest with respect to that balance.

### Q.    NEW YORK LAWSUIT

282.    In June and July 2014, CEOC brought aboard two independent directors who selected the law firm of Kirkland & Ellis LLP as CEOC's restructuring counsel.  The two independent directors also formed a Special Governance Committee ("SGC") of the CEOC Board.  The SGC, assisted by Kirkland to provide legal advice and Mesirow Financial Consulting to provide financial advice, began investigating the various asset transfers and other transactions, in part to determine what claims CEOC had against the Sponsors, CEC, directors of CEC and CEOC, and others and the value of such claims.

283.    Simultaneously, the persons and entities whom the SGC was charged with investigating began devising a means of defeating the SGC's work before it even started.  CEC counsel prepared a declaratory judgment complaint for CEC and CEOC to file that sought a declaration that CEC and CEOC were not liable for fraudulent transfers or breaches of fiduciary duty.

284.    The decision whether to file the case went before the boards of CEC and CEOC on August 3, 2014.  The two boards were largely interlocking, and their meetings were held in quick succession that evening.  The CEC Board first approved it.  Shortly thereafter, the same individuals who had just approved it on behalf of CEC approved the filing of the complaint as CEOC directors.  The CEOC board meeting was a mere formality, held over the phone and lasting only 13 minutes.  Because they were just beginning their investigation and did not know the facts yet, the two independent directors SGC abstained.  Instead, the filing of the lawsuit was approved by Rowan, Sambur, Loveman and Davis, each one of whom was also a director of CEC, a partner or officer of Apollo or TPG, and a putative defendant, and thus completely conflicted.

285.     The declaratory relief sought by the lawsuit was intended to prevent CEOC's newly-formed SGC from conducting a meaningful investigation, since a main purpose of the lawsuit was to obtain a declaration that CEC was not liable to CEOC for the very transactions that the SGC was directed to investigate.

286.     The suit was filed in New York state court on the morning of August 5, 2014 on behalf of CEC and CEOC.  The complaint's prayer for relief, among other things, asked for "[a] judicial declaration stating that . . . plaintiffs have not breached their fiduciary duties or engaged in fraudulent transfers, or otherwise engaged in any violation of law."  On September 15, 2014, an amended complaint was filed repeating the prayer for this same relief.

**R.     PIK NOTES TRANSACTION**

287.     On February 1, 2008, CEOC issued about $18 million of so-called PIK or "toggle" notes, under which CEOC had the option of paying interest either in cash or in kind until the notes matured in 2018.

288.     CEC had guaranteed the PIK Notes.  By late 2014, CEOC was in default, and noteholders were threatening to sue CEC on its guarantee.  Even worse from CEC's point of view was the fact that CEC's guarantee of the notes was a guarantee of payment, and not of collection.  The previous June, CEC had negotiated an amendment to its credit agreement with bank lenders changing the Bank Guarantee from a guarantee of payment to a guarantee of collection; however, that amendment had a "most favored nations" clause that would have given the banks the benefit of any form of guarantee CEC provided to anyone else that was more favorable than the guarantee of collection CEC had just negotiated with them.  Thus, if CEC were required to pay the holders of the PIK Notes under its guarantee of payment, it would trigger the most favored nations clause and CEC's Bank Guarantee would once again be one of

payment, not collection.  Since CEOC was on the verge of filing its bankruptcy petition, this put

CEC in immediate jeopardy.

289.    CEC once again decided to help itself to CEOC's assets.  Despite the fact that the

PIK Notes were trading at a fraction of their face value, CEC directed CEOC to redeem the

Notes at 103.583% of par.  CEOC had, by then, independent directors and its board had formed

the Special Governance Committee to address self-dealing transactions.  Yet the SGC and its two

members were ignored.  Instead, on October 2, 2014, the CEOC board's Executive Committee,

which consisted of Rowan, Davis and Loveman, approved the redemption of the PIK Notes.

290.    The redemption was a windfall to holders of the PIK Notes.  CEOC was

obviously insolvent, and it was widely known that CEOC was preparing for bankruptcy.  (In fact,

one provision of the note purchase agreement that was drawn up between CEOC and the

noteholders stipulated that the noteholders would be paid directly by the indenture trustee and

paid before the expiration of the indenture's 30-day waiting period to avoid the Bankruptcy

Code's 90-day preference period.) Thus, since the notes were not due until 2018, a purpose of

the redemption was to protect CEC from the implications of its Bank Guarantees.

291.    The notes were redeemed at a 627% premium over the market value on the

redemption date.  CEC itself participated in this windfall.  It owned $4.3 million in face amount

of the PIK Notes, and it received $4.7 million when its notes were redeemed.

292.    Although CEOC had independent directors and a SGC to address issues such as

this, the process was completely ignored.  There was no fair process.  The three members of

CEOC's executive committee who approved the redemption all were also directors of CEC.  In

voting to redeem the PIK Notes above par, they did not bother to investigate the prices at which

the notes had been trading.  No independent legal or financial advisers were engaged to guide the

Executive Committee's deliberations, and there was no opinion rendered that the transaction was fair to CEOC in any way.  Altogether, CEOC paid $17.7 million to redeem the PIK Notes.

## S.     PREEMPTION OF THE RESTRUCTURING PROCESS

293.    The campaign of asset transfers and intentional encumbrance of CEOC's business was undertaken by the Sponsors and CEC for the admitted purpose of strengthening their leverage over CEOC's creditors.  The cumulative effect of the transfers was to spread Caesars' synergies among CEC, CAC, Growth Partners, CERP, CIE, CES, and other affiliates in order to impede any effort by creditors to remedy the numerous fraudulent transfers.  These efforts also created certain risks to formulating a plan of reorganization (in addition to structural issues that already existed) that would allow CEOC to emerge from chapter 11 as a standalone entity.

294.    The separation of the Debtors from the Caesars enterprise would be a significant undertaking.  Currently, substantially all of the Debtors' non-property-based "back office" and corporate-level support services, such as IT, legal, human resources, accounting, and finance, are provided by personnel employed by CES and through services governed by agreements with CES.  CES also employs CEOC's senior property management team.  Under a standalone plan, the Debtors would need to establish their own fully-independent back-office, property management, and corporate -level support and management teams to provide services comparable to those provided by CES.

295.    The Debtors would own Total Rewards under a standalone plan as they own substantially all of the intellectual property associated with Total Rewards.  But as explained in the Debtors' disclosure statement, CERP and Growth Partners would be competitors with their own rewards programs:

> [A proposed] Standalone Plan assumes that Total Rewards will become a
> "CEOC-only" rewards program, with participation from casinos owned by CERP
> and CGP terminated as of the Effective Date.  In addition to transition and

potential litigation costs associated with terminating CGP and CERP's access to
the Total Rewards program, the Debtors anticipate that CGP and CERP properties
will either develop their own customer loyalty program or affiliate with an
alternative existing program to compete with the Debtors and that the Debtors'
customers will no longer earn Total Rewards credits at CGP or CERP properties.
The result will be incremental gross margin compression, particularly in the
Las Vegas market, as CEOC and non-CEOC properties compete for existing Total
Rewards customers and spend more on marketing to these customers.

The Disclosure Statement further stated: "As the Total Rewards network shrinks in Las Vegas

and Atlantic City in the Standalone Plan scenario, the options available to the Debtors'

customers to leverage Total Rewards benefits (earning and redeeming) are also reduced."

296.    With respect to payroll costs, the Debtors forecast that CEOC's regionally

focused operations under a standalone plan would require more senior-level full-time employees

than CEOC's current allocation of such payroll expenses under CES and might need to pay

slightly higher salaries to attract and retain a similar caliber management team, now that the

organization will be primarily regionally focused.  There are also a number of anticipated one-

time costs in connection with the separation of the Debtors from the rest of the existing Caesars

enterprise, including costs related to employee retention, asset purchases from CES related to

corporate services infrastructure, legal and consulting costs, and likely disruptions during the

transition period adversely impacting business performance.

**CAUSES OF ACTION**

297.    Plaintiffs have been injured by defendants' wrongful conduct.  This includes

injury that is irreparable and which can only be remedied by the return of assets that were

wrongfully taken.  In addition, plaintiffs are entitled to money damages.

298.    Defendants' wrongful conduct includes constructive and actual fraudulent

transfers, waste of corporate assets, breaches of fiduciary duties, aiding & abetting breaches of

fiduciary duties, and conspiracy.  These are alleged below in plaintiffs' specific claims against

defendants.  Certain elements of defendants' wrongful conduct, though, are common to many of these claims.

### CEC's Breach of Fiduciary Duty

299.    CEOC was a wholly-owned subsidiary of CEC at all times until May and June 2014, when 11% of CEC's stock in CEOC was sold or transferred to others as part of the scheme by the Sponsors and CEC to purportedly release CEC from its Bond Guarantees.  At all times, CEC dominated the affairs of CEOC and appointed every member of CEOC's board, and, at all relevant times, CEOC was insolvent.  As a result, CEC owed fiduciary duties to CEOC to maximize CEOC's value.

300.    As a fiduciary to CEOC, CEC was required to place the interests of CEOC ahead of CEC's own interests and to not engage in conduct that benefited CEC to the detriment of CEOC.

301.    In addition, because CEC itself was dominated and controlled by the Sponsors, CEC was required to place the interests of CEOC ahead of the Sponsors' interests and to not engage in conduct that benefited the Sponsors to the detriment of CEOC.

302.    As a fiduciary to an insolvent CEOC, CEC was required to avoid self-dealing transactions with respect to CEOC, unless those transactions met the standard of entire fairness.  The standard of entire fairness required that any self-dealing transaction between CEC and CEOC must be entirely fair to CEOC as to price and also entirely fair to CEOC as to the process followed in timing, initiating, structuring, negotiating, and disclosing the transaction and in obtaining approval of the transaction by CEOC's directors.

303.    It was not possible for a self-dealing transaction between CEC and CEOC to be fair as to process unless, among other things, CEOC had the benefit of independent governance and advice.  This meant, among other things, that CEOC was required to have independent

directors on its board, to have independent financial advisors, to have independent legal counsel, and to be fully informed of the price, terms, and conditions of any transaction between CEC and CEOC.  In addition, it required that CEOC have the opportunity to study and review all aspects of any transaction between CEC and CEOC.

304.    Throughout this period, CEC deprived CEOC of these basic safeguards.  At no point until June 2014 did CEC appoint any independent director to the CEOC board; instead, the CEOC board consisted at all times of Gary Loveman – CEC's Chairman and CEO – and a senior CEC officer. Similarly, throughout this period, CEC did nothing to ensure that CEOC had independent financial or legal advisors and, in fact, proceeded to negotiate, structure, and execute transfers of CEOC assets with full knowledge that CEOC did not have independent advisors.  Finally, CEOC often was excluded from negotiations about the transfer of CEOC assets; learned of the prices, terms, and conditions of the transfers only after the negotiations had been completed; and was given no time or opportunity to critically review those prices, terms, and conditions.  As a result, all of these transfers were unfair to CEOC as to process.

**Breaches of Fiduciary Duties by the Conflicted Directors of CEC**

305.    Although it would have been possible for CEOC to have had a functioning board at this time, defendants Loveman, Rowan, Sambur, Bonderman, and Davis (collectively, the "CEC Conflicted Directors") decided to prevent that from happening.  Instead, the CEC Conflicted Directors determined that Loveman and another CEC officer, both beholden to the CEC board, would be CEOC's sole board members.

306.    The CEC Conflicted Directors also acted as the directors-in-fact of CEOC. Among other things, they determined which assets CEOC would sell, and to whom CEOC would sell them; they handled the negotiations of the sale by themselves, without the involvement of CEOC management; they decided the timing, price, terms, and conditions of each sale; they

decided which financial and legal advisors would be called upon to assist in the transactions and, conversely, decided that CEOC would have no independent advisors of its own; they reviewed and approved the transactions at their own board meetings; and they relegated the CEOC board to a role of rubber-stamping the decisions the CEC board already had made.

307.    The CEC Conflicted Directors intentionally and systematically supplanted the CEOC board so that they could implement, unimpeded, their plan to take valuable assets from CEOC and put them beyond the reach of CEOC's creditors.  In preempting the responsibilities and authority of the CEOC board, the CEC Conflicted Directors also succeeded to the fiduciary duties of that board.  As a result, the CEC Conflicted Directors each had a fiduciary duty to avoid self-dealing transactions with an insolvent CEOC that were not entirely fair to CEOC as to price and process.

308.    In addition, the CEC Conflicted Directors treated CEC and CEOC as one and the same company.  This is shown by the fact that, throughout the relevant period, CEC did not appoint independent directors to the CEC board; CEOC did not have a special committee of its board to consider or approve the transactions; CEC was represented by the same law firm that represented CEOC; CEC and CEOC used the same financial advisers; and CEC and CEOC often held joint board meetings.  There was, therefore, only one true board and it was CEC's board; thus, every member of that board had a fiduciary duty to the entire enterprise.  This included a fiduciary duty to avoid self-dealing transactions with CEOC that did not meet the standard of entire fairness.

309.    Furthermore, given CEOC's insolvency and their domination and control over CEOC and its board, the CEC Conflicted Directors owed fiduciary duties to maximize CEOC's value.

310.    As a result, the breaches of fiduciary duties complained of in this Complaint also were breaches of fiduciary duty by the directors of CEC.

311.    In the alternative, by directing and knowingly participating in breaches of fiduciary by CEC and CEOC's directors and officers, the CEC Conflicted Directors are liable for aiding and abetting breaches of fiduciary duties owed to CEOC.

**Liability of Apollo and TPG**

312.    Apollo and TPG each are liable for breaches of fiduciary duties by CEC and by the CEC Conflicted Directors, who were their agents.  Through Hamlet, Apollo and TPG owned the majority of the stock of CEC and had the right to – and did – appoint CEC's entire board.

313.    Because the Apollo and TPG partners or officers who served on the CEC board did so for the benefit of and to further the interests of Apollo, TPG and Hamlet, they were agents of Apollo, TPG and Hamlet, and Apollo, TPG and Hamlet are liable for their conduct.

314.    Similarly, individual partners or officers of Apollo, TPG and Hamlet took affirmative steps to aid and abet breaches of fiduciary duties by CEC, CEOC, and their directors. The Sponsors are thus liable for this conduct of their agents as well.

**Breaches of Fiduciary Duty By CEOC Directors**

315.    CEOC's directors owed fiduciary duties to CEOC.  Because CEOC was insolvent, CEOC's directors had a duty to maximize CEOC's value.  However, at all relevant times, the directors of CEOC were conflicted and did not exercise independent judgment.  Until late June 2014, CEOC's board consisted of two directors.  One was Gary Loveman, who also was chairman and CEO of CEC.  The other was either Jonathan Halkyard, Michael Cohen, or Eric Hession, each of whom was, during his time of service on the CEOC board, an officer of CEC.

316.    CEOC's directors owed fiduciary duties to CEOC.  This included both a duty of loyalty and a duty of care.

317.    The duty of loyalty required the directors to avoid self-dealing transactions with respect to an insolvent CEOC, unless those transactions met the standard of entire fairness.  As set forth herein, CEOC's directors breached their duty of loyalty by approving self-dealing transactions between CEC and CEOC that were not entirely fair to CEOC.  In addition, CEOC's directors breached their fiduciary duties by approving transactions in which they had a personal interest and by participating in a process that was incapable of being a fair process.

318.    The duty of care required CEOC's directors to apprise themselves of all information relevant to their decisions and to carefully and critically consider that information. CEOC's directors breached that duty of care by failing to have sufficient knowledge of the matters they approved; by approving the price, terms, and conditions of transfers without having the benefit of independent financial and legal advice; by approving transactions without receiving fairness opinions and without conducting an analysis of CEOC's solvency; by failing to hold board meetings or by having meetings that were mere formalities; and by failing to assure that certain transfers of CEOC assets were even brought to the board for approval.

**Liability for Aiding & Abetting Breaches of Fiduciary Duties**

319.    In addition to breaching the fiduciary duties that they directly owed to CEOC, the CEC Conflicted Directors, the Sponsors, and the Sponsors' officers and agents aided and abetted others in breaching fiduciary duties owed to CEOC.  These individuals and entities did so with knowledge that CEOC was owed fiduciary duties by its directors and, because CEOC was insolvent, that CEOC also was owed fiduciary duties by CEC and CEC's directors.  These defendants also had knowledge that those fiduciary duties were being breached by the transactions, transfers and actions described in this Complaint.  Because CEOC was injured by the participation of these individuals and entities in breaches of fiduciary duties, these defendants are liable to CEOC as aiders and abettors.

**Civil Conspiracy**

320.    The essential elements of a civil conspiracy are (a) an agreement between two or more persons to do an unlawful act; (b) intentional participation in the plan or purpose; (c) an overt act in furtherance of the conspiracy; and (d) causation and damages.

321.    As set forth above, the Conflicted Directors, a core group of individuals who sat on the boards of CEC and/or CEOC, who were affiliated with CEC and the Sponsors, and who were bound together by overlapping corporate positions and shared financial interests, controlled every significant aspect of Caesars' overall strategic direction.

322.    By no later than mid-2012, the Conflicted Directors realized that CEOC was insolvent and would never be able to repay its debts at anything close to face value.  At that time, the Conflicted Directors agreed and conspired on a multi-step scheme to strip CEOC of valuable assets and otherwise position CEC and the Sponsors for CEOC's inevitable restructuring or bankruptcy.  The Conflicted Directors agreed and conspired to commit unlawful acts, including to fraudulently transfer CEOC's valuable assets, breach fiduciary duties owed to CEOC, engage CEOC in harmful financial transactions, and otherwise delay, hinder, and defraud CEOC and its creditors.  The Conflicted Directors intentionally participated in the scheme.

323.    The Conflicted Directors performed numerous overt acts designed to further and carry out their conspiracy.  Those overt acts include a number of the transactions and transfers complained of in this suit, including the Linq and Octavius transfers; the transfer of Planet Hollywood and Horseshoe Baltimore; the transfer of Bally's Las Vegas, The Cromwell, The Quad and Harrah's New Orleans; the transfer of undeveloped land in Las Vegas; the Transfer of Total Rewards; the transfer of CEOC's property management business; the B-7 Transaction; and the purported release of CEC's Bond Guarantees.  The overt acts also include

independent actions taken in connection with creating, structuring, negotiating, evaluating, and

approving the aforementioned transactions and transfers, as more fully detailed herein.

## CLAIM I

### TRANSFER OF CEOC'S ONLINE GAMING BUSINESS
(Nev. Rev. Stat. §§ 112.180, 112.190, 112.210; 6 Del. C. §§ 1304, 1305, 1307; and
11 U.S.C. §§ 544, 550)
(Fraudulent Transfer, Breach Of Fiduciary Duty,
Aiding & Abetting Breach Of Fiduciary Duty)

**2009 Transferees, CEC, Sponsors,**
*CEC Conflicted Directors, Loveman, Benjamin, Peterson, Press, Swann, and Williams*

324.    Plaintiffs repeat and reallege paragraphs 1 through 323.

**Fraudulent Transfer**

325.    At all relevant times, CEOC has been insolvent.

326.    The Internal Revenue Services ("IRS") held claims against the Debtors at the time

of the LBO on January 28, 2008 and on the Petition Date.  Thus, the Debtors are able to step into

the shoes of the IRS for purposes of fraudulent transfer claims and to avoid the transactions or

obligations for the benefit of all creditors, including the transfers to the 2009 Transferees.

327.    Throughout the relevant period, CEC, the directors of CEC, and the Sponsors

completely dominated and controlled CEOC and all of CEOC's subsidiaries and affiliates.

328.    In 2009, one of CEOC's promising corporate opportunities was the development

and expansion of its online gaming business.  As set forth in detail above, it was clear in 2009

that online gaming was a logical extension of CEOC's existing business and CEOC already was

well-positioned in the online gaming market.

329.    On April 30, 2009, CEC formed defendant Caesars Interactive Entertainment,

then known as a Harrah's Interactive Entertainment, as a subsidiary of CEC.  The next day CEC

directed CEOC to transfer CEOC's ownership of the World Series of Poker trademark, related

intellectual property, and all of its existing sponsorship, media, and licensing contracts to a

CEC-owned holding company (HIE Holdings TopCo), which then transferred them to an

intermediate holding company (HIE Holdings), which in turn transferred them to Harrah's

Interactive Entertainment.  This constituted a wholesale transfer of CEOC's online gaming assets

and online gaming business.

330.    CEOC received preferred securities of TopCo in exchange for this transfer.

Although nominally valued at $15 million, the TopCo securities were worth much less.

331.    The assets CEOC transferred to TopCo were worth over $60 million.

332.    In addition, the corporate opportunity that CEC and the 2009 Transferees usurped

and CEOC forewent exceeded $1 billion in value at a time when CEOC was insolvent.

333.    The transfer of CEOC's online gaming assets and business was a constructive

fraudulent transfer because CEOC received inadequate consideration and less than reasonably

equivalent value for them.

334.    In addition, the transfer of CEOC's online gaming assets and business was an

actual fraudulent transfer because the purpose and effect of the transfers was to hinder or delay

CEOC's creditors by placing critical and valuable assets beyond their reach.  Evidence of

fraudulent intent includes the facts that:

> a.    the Sponsors, and Apollo in particular, conceived of the transaction and
>        identified the assets to be transferred;
>
> b.    the transaction was designed and intended to allow CEC and the Sponsors
>        to take control of CEOC's online assets that were thought to have
>        significant potential, transfer those assets beyond the reach of CEOC's
>        creditors, and otherwise better position CEC and the Sponsors in CEOC's
>        restructuring or bankruptcy;
>
> c.    CEOC, CEC, the Sponsors, the 2009 Transferees, and the individual
>        defendants knew that CEOC was insolvent on and after the date of each
>        transfer, as shown, *inter alia*, by the fact that the CEC board was explicitly
>        advised of the legal definition of insolvency in conjunction with this

transfer and that Caesars' long-range plans predicted that CEOC would have substantially negative free cash flows for the foreseeable future;

d.      despite their knowledge that CEC and CEOC had divergent interests, CEC, the Sponsors, and the 2009 Transferees proposed, negotiated, structured, evaluated, and approved the transfers through a process that failed to involve CEOC or protect its interests;

e.      the transfers were to newly created affiliates of CEC, owned and controlled by the Sponsors and CEC;

f.      CEC formed CIE as a subsidiary of CEC rather than CEOC for the express purpose of exploiting the valuable online gaming business that CEOC had created;

g.      CEC and the Sponsors retained control and ownership of the assets;

h.      the price for CEOC's online gaming business and assets was not negotiated and was instead determined by the Sponsors;

i.      the value of the consideration received by CEOC was not reasonably equivalent to the value of the assets transferred;

j.      the transfer substantially impaired CEOC's future ability to service its debt;

k.      the Sponsors and CEC retained Duff & Phelps to value the assets and decided upon the deal structure;

l.      the fairness opinion rendered by Duff & Phelps relied upon inconsistent projections that were performed by an interested party and were not made in the ordinary course of business;

m.      the fairness opinion rendered by Duff & Phelps did not consider the future upside potential of the assets transferred; and

n.      the CEOC board approved the transfer without giving it serious or critical consideration.

335.    The transfer of CEOC's online gaming assets and business is avoidable and recoverable, and the 2009 Transferees are liable based upon the constructive and actual fraudulent transfer of CEOC's online gaming assets and business.

110

**Breaches Of Fiduciary Duty By CEC And CEC's Directors**

336.     At the time of the transfers of CEOC's online gaming assets and business, the

2009 Transferees were direct or indirect subsidiaries or affiliates of CEC.  Thus, the transfer of

CEOC's online gaming assets and business to the 2009 Transferees was a related party

transaction and involved self-dealing.

337.     The price paid to CEOC for transferring the assets was far below the value of

those assets and was not entirely fair to CEOC.

338.     The process by which CEC initiated, structured, negotiated, and disclosed the

transaction was not entirely fair to CEOC.  CEOC was given no say in deciding whether to sell

these assets, how the transaction was structured, or when and how it was disclosed.  CEOC had

no role in the negotiations of the transaction and was not even represented in the negotiations.

CEC used its dominance and control over CEOC to ensure that CEOC lacked independent

directors, financial advisors, and legal counsel necessary to fairly evaluate the transaction and

proposed the transaction to CEOC knowing that CEOC lacked the independent governance or

resources to fairly evaluate the transaction.

339.     Online gaming was an important corporate opportunity for CEOC.  The transfer

of CEOC's online gaming assets and business took this opportunity away from CEOC and gave

it to CIE, which was majority owned by the Sponsors and CEC.

340.     CEC breached its fiduciary duties to CEOC.

341.     The CEC Conflicted Directors and other CEC individual directors, who

individually owed fiduciary duties to CEOC, breached those fiduciary duties.

**Breaches Of Fiduciary Duty By CEOC's Directors**

342.     At the time of the transfer of CEOC's online gaming assets and business, CEOC's

only directors were Gary Loveman and Jonathan Halkyard.  Loveman was CEC's Chairman and

Chief Executive Officer, and Halkyard was its Chief Financial Officer. Neither Loveman nor Halkyard was independent of CEC in making decisions affecting CEOC.

343.    Loveman breached his fiduciary duties to CEOC by approving, authorizing, and facilitating a transaction that was not in the best interests of CEOC.

344.    Loveman also breached his fiduciary duties to CEOC by failing to ensure that CEOC received a fair price for these assets or that a fair process was followed. Loveman made no effort to convene or create a special committee of independent directors to review the transaction; did not consider using a marketing process for the sale of these assets; made no effort to solicit any third-party bids, offers, or proposals; did not retain independent lawyers or advisors to represent CEOC; made no analysis of CEOC's solvency; gave no consideration to whether CEOC should have received any value for the potential upside of its online gaming business; did not consider whether CEOC should have had a means by which to share in CIE's upside or even attempt to determine if the TopCo preferred stock CEOC received really was worth $15 million. Instead, Loveman approved the transaction by signing a routine written consent.

**Aiding & Abetting Breaches Of Fiduciary Duty**

345.    The CEC Conflicted Directors and individual directors, the Sponsors, and the Sponsors' officers knew that CEC, as CEOC's controlling stockholder, and the boards of CEC and CEOC owed fiduciary duties to CEOC. The CEC Conflicted Directors and individual directors, the Sponsors, and the Sponsors' officers and agents knew or should have known that CEC and the boards of CEC and CEOC breached those fiduciary duties by compelling CEOC to enter into transactions that were against CEOC's interests, benefited CEC at CEOC's expense, did not provide a fair price to CEOC, and did not result from a fair process.

112

346.    The CEC Conflicted Directors and individual directors, the Sponsors, and the

Sponsors' officers and agents knowingly participated in those breaches of fiduciary duty in the

following ways:

a.    by virtue of their power to appoint the entire board of CEC and the fact
      that a majority of the directors of CEC's board were officers of Apollo and
      TPG, the Sponsors dominated and controlled the actions of CEC's board
      and CEOC's board;

b.    the Sponsors conceived, designed, and structured the transaction,
      including the selection of CEOC online assets to be sold and the creation
      of new entities that would hold the assets for the benefit of CEC and the
      Sponsors;

c.    the CEC Conflicted Directors, the Sponsors, and the Sponsors' officers
      and agents negotiated and implemented the transaction, even though it was
      not in CEOC's best interests;

d.    CEC and the Sponsors retained Duff & Phelps to value the assets,
      encouraged Duff & Phelps to accept incomplete and misleading
      information, and knew that Duff & Phelps' opinion on the transaction was
      deeply flawed and contradicted projections that Caesars had prepared and
      used in the ordinary course of its business;

e.    although the Sponsors designed the transaction to transfer ownership and
      control of CEOC's online business and its valuable WSOP assets to the
      Sponsors and CEC, place those assets beyond the reach of CEOC's
      creditors, and better position CEC and the Sponsors for CEOC's
      restructuring or bankruptcy, they did not disclose their intentions to
      CEOC's board;

f.    despite their knowledge that CEC and CEOC had divergent interests, the
      Sponsors exploited the CEOC board members' conflicts of interest; and

g.    the Sponsors determined the consideration to be paid to CEOC for its
      online gaming business, which did not provide reasonably equivalent
      value for the transferred assets.

347.    The CEC Conflicted Directors and individual directors and the Sponsors are liable

for aiding and abetting breaches of fiduciary duty in connection with the transfer of CEOC's

online gaming assets and business.

113

348.    CEOC has been injured by these breaches of fiduciary duties in an amount to be determined.

## CLAIM II

### CEOC INTERCOMPANY LOAN TO CEC
(Nev. Rev. Stat. §§ 112.180, 112.190, 112.210; 6 Del. C. §§ 1304, 1305, 1307; and
11 U.S.C. §§ 544, 550)
(Fraudulent Transfer, Unjust Enrichment)

### *CEC*

349.    Plaintiffs repeat and reallege paragraphs 1 through 348.

350.    In 2009, CEOC borrowed $235 million at market rates and loaned that amount to CEC.  CEC did not pay interest on this loan.

351.    During the term of its loan to CEC, CEOC paid $5.8 million in interest on the $235 million it had borrowed.

352.    CEOC received nothing of value in return for making this loan to CEC.

353.    In June 2010, CEC repaid the principal amount of the loan, but did not pay CEOC interest upon the loan.

354.    CEOC was insolvent at the time it made this loan to CEC.

355.    CEC's failure to pay interest upon the loan is avoidable as a constructive fraudulent transfer because CEOC did not receive reasonably equivalent value for the money it loaned to CEC.

356.    CEC has been unjustly enriched at CEOC's expense because of its interest-free loan.

357.    CEC should be ordered to pay CEOC for the value of the property that was fraudulently transferred, in an amount no less than $5.8 million, plus interest from June 2010 to the present.

<u>**CLAIM III**</u>

**2010 CMBS LOAN AGREEMENT AMENDMENT AND
TRADEMARKS TRANSFER**
(Nev. Rev. Stat. §§ 112.180, 112.190, 112.210; 6 Del. C. §§ 1304, 1305, 1307; and
11 U.S.C. §§ 544, 550)
(Fraudulent Transfer, Breach Of Fiduciary Duty,
Aiding & Abetting Breach Of Fiduciary Duty)

***CEC, CMBS PropCos, Sponsors, Sambur, Loveman, Benjamin, Bonderman, Davis, Peterson,
Press, Rowan, Swann and Williams***

358.    Plaintiffs repeat and reallege paragraphs 1 through 357.

**Fraudulent Transfer**

359.    At all relevant times, CEOC has been insolvent.

360.    Throughout the relevant period, CEC, the directors of CEC, and the Sponsors

completely dominated and controlled CEOC and all of CEOC's subsidiaries and affiliates.

361.    At the time of the 2008 LBO, CEOC transferred the six CMBS Properties to the

CMBS PropCos.  In addition to their physical assets, the CMBS Properties used intellectual

property assets, such as their trademarks and trade dress associated with the properties' casinos,

restaurants, shops, and other activities (the "CMBS IP").  The CMBS IP was owned by Caesars

License Company, LLC ("CLC").

362.    CEOC and CLC were alter-egos.  CEOC owned all of the equity of CLC and used

CLC solely as an entity to hold title to certain intellectual property assets.

363.    At the direction of CEC, on August 31, 2010, CLC assigned all of its right, title

and interest in the CMBS IP to the CMBS PropCos.  CLC received $100 per property for that

assignment, but immediately paid each CMBS PropCo $100 for a limited license back of that

same property.  In the end, CLC received little or no overall consideration for this assignment of

its intellectual property rights for the term of the loans made to the CMBS PropCos.

364.    These intellectual property rights were extremely valuable.

365.     The transfer of these intellectual property rights was a constructive fraudulent transfer because CEOC received inadequate consideration and less than reasonably equivalent value for them.

366.     The transfer of the CMBS intellectual property rights is avoidable and recoverable, and the CMBS PropCos are liable for the constructive fraudulent transfer of the CMBS intellectual property rights.

**Breach Of Fiduciary Duty**

367.     At the time of the transfers of CEOC's CMBS IP, the CMBS PropCos were direct or indirect subsidiaries or affiliates of CEC.  Thus, the transfer of CEOC's CMBS IP to the CMBS PropCos was a self-dealing transaction.

368.     The price paid to CEOC for transferring the assets was far below the value of those assets and was not entirely fair to CEOC.

369.     The process by which CEC initiated, structured, negotiated, and disclosed the transaction was not entirely fair to CEOC.  CEOC was given no say in deciding whether to sell these assets, or how the transaction was structured.  CEOC had no role in the negotiations of the transaction, and was not even represented in the negotiations.  Instead, the entire process was dominated by CEC and the Sponsors.  Moreover, CEC used its dominance and control over CEOC to ensure that CEOC lacked independent directors, financial advisors, and legal counsel necessary to fairly evaluate the transaction, and proposed the transaction to CEOC knowing that CEOC lacked the independent governance or resources to fairly evaluate the transaction.

370.     CEC breached its fiduciary duties to CEOC.

371.     CEC's directors, who individually owed fiduciary duties to CEOC, breached those fiduciary duties.

**Breaches Of Fiduciary Duty By CEOC's Directors**

372.     At the time of the transfer of the CMBS IP, CEOC's only directors were Gary

Loveman and Jonathan Halkyard.  Loveman was the Chairman and Chief Executive Officer of

CEC, and Halkyard was CEC's Chief Financial Officer.  As a result, neither Loveman nor

Halkyard was independent of CEC in making decisions affecting CEOC.

373.     Loveman breached his fiduciary duties to CEOC by approving, authorizing, and

facilitating a transaction that was not in the best interests of CEOC.

374.     Loveman also breached his fiduciary duties to CEOC by failing to ensure that

CEOC received a fair price for these assets or that a fair process was followed.  Loveman made

no effort to convene or create a special committee of independent directors to review the

transaction; did not ask for or receive an opinion about the fairness of the transaction to CEOC;

did not consider using a marketing process for the sale of these assets; made no effort to solicit

any third-party bids, offers, or proposals; did not retain independent lawyers or advisors to

represent CEOC; and made no analysis of CEOC's solvency.  In fact, CEOC and CLC were so

far removed from the process that there is no evidence Loveman (or Halkyard) even executed

approvals, consents, or authorizations for the transfers.

**Aiding & Abetting Breaches Of Fiduciary Duty**

375.     The Sponsors and the Sponsors' officers and agents knew that CEC, as CEOC's

controlling stockholder, and the boards of CEC and CEOC owed fiduciary duties to CEOC.  The

CEC Conflicted Directors and individual directors, the Sponsors, and the Sponsors' officers and

agents knew or should have known that CEC and the boards of CEC and CEOC breached those

fiduciary duties by compelling CEOC to enter into transactions that were against CEOC's

interests, benefited CEC at CEOC's expense, did not provide a fair price to CEOC, and did not

result from a fair process.

117

376.    The Sponsors and the Sponsors' officers and agents knowingly participated in

those breaches of fiduciary duty in the following ways:

a.      by virtue of their power to appoint the entire board of CEC and the fact
        that a majority of the directors of CEC's board were officers of Apollo and
        TPG, the Sponsors dominated and controlled the actions of CEC's board
        and CEOC's board;

b.      the Sponsors, and Apollo in particular, led the efforts to conceive of,
        design, and structure the transfer of the CMBS IP;

c.      the CEC Conflicted Directors, the Sponsors, and the Sponsors' officers
        and agents directly negotiated and implemented the transaction, even
        though it was not in CEOC's best interests;

d.      although the Sponsors understood that the transaction was designed to
        allow CEC and the Sponsors to take the valuable CMBS IP for nominal
        consideration, transfer the CMBS IP beyond the reach of CEOC's
        creditors, and otherwise better position CEC and the Sponsors for CEOC's
        restructuring or bankruptcy, they did not disclose these intentions to
        CEOC's board;

e.      despite their knowledge that CEC and CEOC had divergent interests, the
        Sponsors exploited the conflicts of interest of CEOC board members who
        sat on CEC's board or were officers of CEC;

f.      Apollo, through Sambur, led the negotiations with the CMBS lenders;

g.      the Sponsors negotiated financial terms which did not provide CEOC
        reasonably equivalent value for the transferred assets;

h.      despite their knowledge that CEC and CEOC had divergent interests, the
        Sponsors exploited the CEOC board members' conflicts of interest; and

i.      the Sponsors used their control of CEOC to structure the transaction in a
        manner that benefitted the Sponsors without presenting it to the CEOC
        board for its review or approval.

377.    The Sponsors, CEC individual directors and Sambur are liable for aiding and

abetting breaches of fiduciary duty in connection with the transfer of the CMBS intellectual

property rights.

378.    CEOC has been injured by these breaches of fiduciary duties in an amount to be

determined.

## CLAIM IV

**TAX REFUND**
(Nev. Rev. Stat. §§ 112.180, 112.190, 112.210; 6 Del. C. §§ 1304, 1305, 1307; and
11 U.S.C. §§ 542, 544, 548(a)(1)(A),(B), 550)
(Fraudulent Transfer, Turnover, Unjust Enrichment)

### *CEC*

379.    Plaintiffs repeat and reallege paragraphs 1 through 378.

380.    For the taxable years 2005 through 2008, CEOC was a member of the CEC consolidated group for tax purposes ("CEC Group").  In 2009, the CEC Group reported a net operating loss ("NOL") and carried it back to the 2006 and 2008 tax years by filing a tentative refund claim.

381.    In March 2011, CEOC was credited $220.8 million, which was the cash amount of the 2009 Refund provided to the CEC Group.  CEOC, however, was owed $55.8 million above and beyond that cash payment.  CEC did not credit or otherwise pay CEOC this amount and has failed to provide any justification for failing to do so.

382.    In addition to the 2009 Refund, CEC did not fairly compensate CEOC for CEC's use of the Net Operating Losses ("NOLs") that were generated by CEOC and those of its subsidiaries that later filed for bankruptcy.  Non-debtors, including CEC, used approximately $4.02 billion of the NOLs without any compensation to CEOC or recognition that – had these NOLs not been used by the non-Debtors – they would have been available to the Debtors to be applied against future taxable income.

383.    CEOC received no value from CEC or anyone else for the use of these NOLs.

384.    CEOC received inadequate consideration and less than reasonably equivalent value for this asset.

385.    As a result, CEC's use of CEOC's NOLs is a fraudulent transfer that is avoidable and recoverable.

386.    The economic benefit of the NOLs is an asset of CEOC that CEC and affiliates of CEC should turn over to CEOC.

387.    CEC has been unjustly enriched to the detriment of CEOC by CEC's use of the NOLs.  Equity and fairness require that CEC make immediate restitution for the value of the lost economic benefit from the utilization of the NOLs by the non-Debtors.

388.    In addition, CEC breached its fiduciary duties to CEOC by failing to properly compensate CEOC for CEC's use of the NOLs and instead taking the benefit of the NOLs for itself.

## CLAIM V

### 2011 WSOP TRANSACTION
(Nev. Rev. Stat. §§ 112.180, 112.190, 112.210; 6 Del. C. §§ 1304, 1305, 1307; and
11 U.S.C. §§ 544, 550)
(Fraudulent Transfer, Breach Of Fiduciary Duty, Aiding &
Abetting Breach Of Fiduciary Duty)

*WSOP Transaction Transferees, Sponsors, CEC,*
*CEC Conflicted Directors, Loveman, Benjamin, Peterson, Press, Swann, and Williams*

389.    Plaintiffs repeat and reallege paragraphs 1 through 388.

**Fraudulent Transfer**

390.    At all relevant times, CEOC has been insolvent.

391.    Throughout the relevant period, CEC, the directors of CEC, and the Sponsors completely dominated and controlled CEOC and all of CEOC's subsidiaries and affiliates.

392.    Among CEOC's profitable operations was its business of hosting live, in-person tournaments as part of its World Series of Poker franchise.  The World Series of Poker was, and

remains, the premier poker tournament in the world.  CEOC's rights to host and profit from the

World Series of Poker (the "WSOP Tournament Rights") were immensely valuable.

393.    In 2010, CEC began negotiations with CIE to transfer of CEOC's WSOP

Tournament Rights from CEOC to CIE.  Since CEC owned all of the voting stock of CEOC and

most of the equity of CIE, these negotiations essentially were negotiations CEC had with itself.

394.    On September 1, 2011, CEC closed a multi-step transaction CIE (the "2011

WSOP Transaction") pursuant to which CEOC transferred its WSOP Tournament Rights to CIE.

The transfer of CEOC's WSOP Tournament Rights was a constructive fraudulent transfer

because CEOC received inadequate consideration and less than reasonably equivalent value for

the asset.

395.    In addition, the transfer of CEOC's WSOP Tournament Rights was an actual

fraudulent transfer because the purpose and effect of the transfer was to hinder or delay CEOC's

creditors by placing critical and valuable assets beyond their reach.  Evidence of fraudulent

intent includes the facts that:

> a.    the Sponsors, and Apollo in particular, conceived of the transaction and
> identified the assets to be transferred;
>
> b.    the transaction was designed and intended to allow CEC and the Sponsors
> to take control of CEOC's WSOP Tournament Rights, transfer those
> Rights beyond the reach of CEOC's creditors, and otherwise better
> position CEC and the Sponsors for CEOC's restructuring or bankruptcy;
>
> c.    CEOC, CEC, the Sponsors, and the individual defendants understood that
> CEOC was insolvent on and after the date of the transfer;
>
> d.    despite their knowledge that CEC and CEOC had divergent interests,
> CEC, the Sponsors and the WSOP Transaction Transferees proposed,
> negotiated, structured, evaluated, and approved the transfers through a
> process that failed to involve CEOC or protect its interests;
>
> e.    CEC and the Sponsors retained control and ownership of the assets;

f.      the Sponsors, negotiating on behalf of CEC and CIE, actively attempted to reduce the consideration to be received by CEOC, which was initially set at $55 million, to $20.5 million;

g.      the value of the consideration received by CEOC was not reasonably equivalent to the value of the WSOP Tournament Rights;

h.      the Sponsors and CEC proceeded with the transaction with full knowledge that CEOC had not received a fairness opinion and that the fairness opinion prepared by Valuation Research Corporation for the CEC board was flawed in numerous ways;

i.      the Sponsors and CEC proceeded with the transaction with full knowledge that the Tournament Rights were not offered to any true third-party buyers or subject to any marketing process;

j.      the transfer substantially impaired CEOC's future ability to service its debt; and

k.      this transfer was never presented to the CEOC board for review or approval and was instead approved by CEC's board alone.

396.    The transfer of the WSOP Tournament Rights is avoidable and recoverable, and the WSOP Transaction Transferees are liable for the constructive and actual fraudulent transfer of the WSOP Tournament Rights.

**Breaches Of Fiduciary Duty By CEC And CEC's Directors**

397.    At the time of the 2011 WSOP Transaction, the WSOP Transaction Transferees were direct or indirect subsidiaries or affiliates of CEC.  Thus, the transfer of CEOC's WSOP Tournament Rights to the WSOP Transaction Transferees was a self-dealing transaction.

398.    The price paid to CEOC for transferring the assets was far below the value of those assets and was not entirely fair to CEOC.

399.    The process by which CEC initiated, structured, negotiated, and disclosed the transaction was not entirely fair to CEOC.  CEOC was given no say in deciding whether to sell these assets, how the transaction was structured, or when and how it was disclosed.  CEOC had no role in the negotiations of the transaction and was not even represented in the negotiations.

Instead, the entire process was dominated by CEC and the Sponsors.  Moreover, CEC used its

dominance and control over CEOC to ensure that CEOC lacked independent directors, financial

advisors, and legal counsel necessary to fairly evaluate the transaction and proposed the

transaction to CEOC knowing that CEOC lacked the independent governance or resources to

fairly evaluate the transaction.

400.    CEC breached its fiduciary duties to CEOC.

401.    The CEC Conflicted Directors and individual directors, who individually owed

fiduciary duties to CEOC, breached those fiduciary duties.

**Breaches Of Fiduciary Duty By CEOC's Directors**

402.    At the time of the transfer of WSOP Tournament Rights, CEOC's only directors

were Gary Loveman and Jonathan Halkyard.  Loveman was the Chairman and Chief Executive

Officer of CEC and Halkyard was CEC's Chief Financial Officer.  As a result, neither Loveman

nor Halkyard was independent of CEC in making decisions affecting CEOC.

403.    Loveman breached his fiduciary duties to CEOC by approving, authorizing, and

facilitating a transaction that was not in the best interests of CEOC.

404.    Loveman also breached his fiduciary duties to CEOC by failing to ensure that

CEOC received a fair price for these assets or that a fair process was followed.  Loveman did not

consider using a marketing process for the sale of these assets; made no effort to solicit any

third-party bids, offers, or proposals; made no effort to convene or create a special committee of

independent directors to review the transaction; did not ask for or receive an opinion about the

fairness of the transaction to CEOC; did not retain independent lawyers or advisors to represent

CEOC; and made no analysis of CEOC's solvency.  Upon information and belief, Loveman (and

Halkyard) did not even review, consider, or approve this transaction, but instead allowed it to

occur without any effort to review its substance or merits.  Halkyard signed the numerous

transaction agreements on behalf of all non-CIE entities to the transactions, including CEOC, CEC, and CT.

**Aiding & Abetting Breaches Of Fiduciary Duty**

405.    The CEC Conflicted Directors and individual directors, the Sponsors, and the Sponsors' officers and agents knew that CEC, as CEOC's controlling stockholder, and the boards of CEC and CEOC owed fiduciary duties to CEOC.  The CEC Conflicted Directors and individual directors, the Sponsors, and the Sponsors' officers and agents knew that CEC and the boards of CEC and CEOC breached those fiduciary duties by compelling CEOC to enter into transactions that were against CEOC's interests, benefited CEC at CEOC's expense, did not provide a fair price to CEOC, and did not result from a fair process.

406.    The CEC Conflicted Directors and individual directors, the Sponsors, and the Sponsors' officers and agents knowingly participated in those breaches of fiduciary duty in the following ways:

    a.    by virtue of their power to appoint the entire board of CEC and the fact that a majority of the directors of CEC's board were officers of Apollo and TPG, the Sponsors dominated and controlled the actions of CEC's board and CEOC's board;

    b.    the plan to transfer CEOC's WSOP Tournament Rights to CIE was conceived, designed, and structured by Apollo;

    c.    the CEC Conflicted Directors, the Sponsors, and the Sponsors' officers and agents negotiated and implemented the transfer of CEOC's WSOP Tournament Rights, even though it was not in CEOC's best interests;

    d.    although the Sponsors understood that the transaction was designed to allow CEC and the Sponsors to take control of CEOC's WSOP Tournament Rights, transfer those assets beyond the reach of CEOC's creditors, and better position CEC and the Sponsors for CEOC's restructuring or bankruptcy, they did not disclose these intentions to CEOC's board;

    e.    despite their knowledge that CEC and CEOC had divergent interests, the CEC Conflicted Directors and individual directors, the Sponsors, and the

Sponsors' officers and agents exploited the CEOC board members' conflicts of interest who sat on CEC's board or were officers of CEC;

f.   the CEC Conflicted Directors and individual directors, the Sponsors and the Sponsors' officers and agents allowed Paul Weiss to represent all entities in the deal, thus depriving CEOC of independent legal counsel and facilitating the Sponsors and CEC's scheme to deprive CEOC of fair price and fair process;

g.   the Sponsors knew that CEC negotiated the financial terms of the transaction, which did not provide CEOC reasonably equivalent value for the transferred assets; and

h.   the Sponsors used their control of CEOC to structure the transaction in a manner that benefitted the Sponsors without presenting it to the CEOC board for its review or approval.

407.   The CEC Conflicted Directors and individual directors, the Sponsors, and the Sponsors' officers and agents are liable for aiding and abetting breaches of fiduciary duty in connection with the transfer of the WSOP Tournament Rights.

408.   CEOC has been injured by these breaches of fiduciary duties in an amount to be determined.

## CLAIM VI

### LINQ AND OCTAVIUS TRANSFERS
(Nev. Rev. Stat. §§ 112.180, 112.190, 112.210; 6 Del. C. §§ 1304, 1305, 1307; and
11 U.S.C. §§ 544, 548(a)(1)(A),(B), 550)
(Fraudulent Transfer, Breach Of Fiduciary Duty, Aiding & Abetting
Breach Of Fiduciary Duty, Civil Conspiracy)

*Linq/Octavius Transferees, CEC, Sponsors, CEC Conflicted Directors,
Loveman, Sambur, Rowan, Benjamin, Housenbold, Kleisner, Press, Swann, and Williams*

409.   Plaintiffs repeat and reallege paragraphs 1 through 408.

**Fraudulent Transfer**

410.   At all relevant times, CEOC has been insolvent.

411.   Throughout the relevant period, CEC, the directors of CEC, and the Sponsors completely dominated and controlled CEOC and all of CEOC's subsidiaries and affiliates.

412.    CEC and the Sponsors owned, controlled, and dominated the Linq/Octavius Transferees.

413.    In connection with the refinancing of the CMBS Debt in late 2013, CEOC subsidiaries transferred Project Linq and the Octavius Tower to the Linq/Octavius Transferees. The transfer of Project Linq and the Octavius Tower was a constructive fraudulent transfer because CEOC received inadequate consideration and less than reasonably equivalent value for them.

414.    In addition, the transfer of Linq and Octavius was an actual fraudulent transfer because the purpose and effect of the transfers was to hinder or delay CEOC's creditors by placing critical and valuable assets beyond their reach.  Evidence of fraudulent intent includes the facts that:

     a.    the Sponsors, and Apollo in particular, conceived the transaction and identified the properties to be transferred;

     b.    the transaction did not serve any interest of CEOC's, but instead filled an "equity gap" that hindered the refinancing of debt issued by a different Caesars' subsidiary;

     c.    in addition to filling the "equity gap," the transaction was designed and intended to allow CEC and the Sponsors to take control of CEOC assets with significant growth potential, transfer those assets beyond the reach of CEOC's creditors, and better position CEC and the Sponsors for CEOC's restructuring or bankruptcy;

     d.    CEOC, CEC, the Sponsors, the 2013 Transferees, and the individual defendants understood that CEOC was insolvent on and after the date of each transfer evidenced by, *inter alia*, analyses indicating that CEOC had a negative equity value and would be unable to repay its debts, and the decision to create bankruptcy remote entities to receive and hold valuable CEOC assets;

     e.    despite their knowledge that CEC and CEOC had divergent interests, CEOC, CEC, the Sponsors, the 2013 Transferees, and the individual defendants proposed, negotiated, structured, evaluated, and approved the transfers through a process that failed to involve or protect the interests of CEOC;

f.      the transferred properties were never offered to any true third-party buyer or subject to any marketing process;

g.      the transfers were to newly created affiliates of CEC, owned and controlled by CEC and the Sponsors;

h.      CEC and the Sponsors retained control and ownership of the assets;

i.      the value of the consideration received by CEOC was not reasonably equivalent to the value of the assets transferred;

j.      the transfer substantially impaired CEOC's future ability to service its debt;

k.      the transfer of Octavius reduced the value of Caesars' Palace by giving CERP (and, thus CEC) significant leverage in renegotiating lease terms and the ability to influence the terms of any future disposition of, or improvements to, Caesars' Palace;

l.      Apollo, who along with TPG and CEC stood on both sides of the transaction, made repeated efforts to reduce the consideration to be paid CEOC;

m.      Apollo made internally inconsistent and manipulative revisions to its own valuations in order to eliminate or reduce the consideration paid to CEOC;

n.      Apollo selected Perella Weinberg Partners to provide a fairness opinion because Perella had a long-term relationship with Paul Weiss;

o.      Apollo knowingly advanced specious arguments to eliminate or reduce the consideration to be paid by CEOC for the assets;

p.      Perella insisted on additional consideration for CEOC in the form of cash or cash equivalents but indicated that it had "flexibility" on the amount;

q.      Apollo directed Perella to make incorrect untrue assumptions, including assumptions relating to the impact of a failure to successfully refinance the CMBS Debt on CEOC's share of corporate expenses, the fair market value of existing lease payments made to Linq and Octavius, and the future earnings of the High Roller observation wheel;

r.      Apollo requested that Perella not include language in its fairness opinion that sought to assume that the avoidance of costs was a legally cognizable form of consideration; and

s.      the final consideration provided to CEOC, $69.5 million of CEOC debt and $80.722 million in cash, was much less than the $250 million Perella initially suggested was appropriate.

415.    The transfer of Linq and Octavius is avoidable and recoverable, and the

Linq/Octavius Transferees are liable for the constructive and actual fraudulent transfer of Linq

and Octavius.

**Breaches Of Fiduciary Duty By CEC And CEC's Directors**

416.    At the time of the transfers of Linq and Octavius, the Linq/Octavius Transferees

were direct or indirect subsidiaries of CEC.  Thus, the transfers of Linq and Octavius to the

Linq/Octavius Transferees were self-dealing transactions.

417.    The price paid to CEOC for transferring Linq and Octavius was far below the

value of those assets and was not entirely fair to CEOC.

418.    The process by which CEC initiated, structured, negotiated, and disclosed the

transaction was not entirely fair to CEOC.  CEOC was given no say in deciding whether to sell

these assets, how the transaction was structured, or when and how it was disclosed.  CEOC had

no role in the negotiations of the transaction, and was not even represented in the negotiations.

Instead, the entire process was dominated by CEC and the Sponsors.  Moreover, CEC used its

dominance and control over CEOC to ensure that CEOC lacked independent directors, financial

advisors, and legal counsel necessary to fairly evaluate the transaction and proposed the

transaction to CEOC knowing that CEOC lacked the independent governance or resources to

fairly evaluate the transaction.

419.    CEC breached its fiduciary duties to CEOC.

420.    The CEC Conflicted Directors and individual directors, who individually owed

fiduciary duties to CEOC, breached those fiduciary duties.

**Breaches Of Fiduciary Duty By CEOC's Directors**

421.    At the time of the transfer of Linq and Octavius, CEOC's only directors were

Gary Loveman and Michael Cohen.  Loveman was the Chairman and Chief Executive Officer of

CEC, and Cohen was a senior vice president, deputy general counsel, and corporate secretary of CEC.  As a result, neither Loveman nor Cohen was independent of CEC in making decisions affecting CEOC.

422.    Loveman breached his fiduciary duties to CEOC by approving, authorizing, and facilitating a transaction that was not in the best interests of CEOC.

423.    Loveman also breached his fiduciary duties to CEOC by failing to ensure that CEOC received a fair price for these assets or that a fair process was followed.  Loveman did not consider using a marketing process for the sale of these assets; made no effort to solicit any third-party bids, offers, or proposals; made no effort to convene or create a special committee of independent directors to review the transaction; did not retain independent lawyers or advisors to represent CEOC; made no analysis of CEOC's solvency; and conducted no meaningful review of the fairness of the transaction to CEOC.  Instead, Loveman approved the transaction upon inadequate information in a short telephonic board meeting.

**Aiding & Abetting Breaches Of Fiduciary Duty**

424.    The CEC Conflicted Directors and individual directors, the Sponsors, and the Sponsors' officers and agents knew that CEC, as CEOC's controlling stockholder, and the boards of CEC and CEOC owed fiduciary duties to CEOC.  The CEC Conflicted Directors and individual directors, the Sponsors, and the Sponsors' officers and agents knew or should have known that CEC and the boards of CEC and CEOC breached those fiduciary duties by compelling CEOC to enter into transactions that were against CEOC's interests, benefited CEC at CEOC's expense, did not provide a fair price to CEOC, and did not result from a fair process.

425.    The CEC Conflicted Directors and individual directors, the Sponsors, and the

Sponsors' officers and agents knowingly participated in those breaches of fiduciary duties in the

following ways:

a.    by virtue of their power to appoint the entire board of CEC and the fact that a majority of the directors of CEC's board were officers of Apollo and TPG, the Sponsors dominated and controlled the actions of CEC's board and CEOC's board;

b.    the Sponsors and members of CEC's management conceived of the plan to transfer Linq and Octavius to CERP and designed, and structured the transaction to benefit CEC and the Sponsors;

c.    the CEC Conflicted Directors and individual directors, the Sponsors, and the Sponsors' officers and agents negotiated and implemented the transaction, even though it was not in CEOC's best interests;

d.    although the Sponsors understood that the transfer of Linq and Octavius was designed to allow CEC and the Sponsors to maintain control of CEOC assets with significant growth potential, place those assets beyond the reach of CEOC's creditors, and better position CEC and the Sponsors for CEOC's restructuring or bankruptcy, they did not disclose these intentions to CEOC's board;

e.    despite their knowledge that CEC and CEOC had divergent interests, the Sponsors exploited the conflicts of interest of CEOC board members who sat on CEC's board or were officers of CEC;

f.    the CEC Conflicted Directors and individual directors, the Sponsors and the Sponsors' officers and agents allowed Paul Weiss to represent all entities in the deal, thus depriving CEOC of independent legal counsel and facilitating the Sponsors and CEC's scheme to deprive CEOC of fair price and fair process;

g.    Apollo formally engaged Perella only after the opinion was completed and after Perella agreed to accept certain assumptions requested by Apollo;

h.    Apollo made repeated efforts to reduce the consideration to be paid CEOC;

i.    Apollo made internally inconsistent and manipulative revisions to its own valuations in order to reduce the consideration paid to CEOC;

j.    Apollo advanced specious arguments to eliminate or reduce the consideration to be paid by CEOC for the assets;

k.      Apollo directed Perella to make several incorrect and untrue assumptions, including assumptions relating to the impact of a failure to successfully refinance the CMBS Debt on CEOC's share of corporate expenses, the fair market value of existing lease payments made to Linq and Octavius, and the future earnings of the High Roller observation wheel; and

l.      Apollo requested that Perella not include language in its fairness opinion that sought to assume that the avoidance of costs was a legally cognizable form of consideration.

426.    The CEC Conflicted Directors and individual directors and the Sponsors are liable for aiding and abetting breaches of fiduciary duty in connection with the Linq and Octavius transfer.

427.    CEOC has been injured by these breaches of fiduciary duties in an amount to be determined.

**Civil Conspiracy**

428.    Starting in mid-2012, the Conflicted Directors agreed and conspired to commit unlawful acts, including to fraudulently transfer CEOC's valuable assets, breach fiduciary duties owed to CEOC, engage CEOC in damaging financial transactions, and otherwise delay, hinder, and defraud CEOC and its creditors.  Each of the conspirators intentionally participated in this scheme.  The transfer of Linq and Octavius was an overt act taken in furtherance of the conspirators' unlawful scheme.  The conspirators' actions in creating, structuring, negotiating, evaluating, and approving the transfer, as more fully detailed herein, constitute further overt acts taken in furtherance of their unlawful scheme.

429.    The Linq and Octavius Transfers, the conspirators' overt acts in furtherance of that transfer, and the conspirators' overall scheme and agreement to fraudulently transfer CEOC's valuable assets, breach fiduciary duties owed to CEOC, engage CEOC in damaging financial transactions, and otherwise delay, hinder, and defraud CEOC and its creditors caused damages to CEOC in an amount to be determined.

## CLAIM VII

**TRANSFER OF PLANET HOLLYWOOD AND HORSESHOE BALTIMORE**
(Nev. Rev. Stat. §§ 112.180, 112.190, 112.210; 6 Del. C. §§ 1304, 1305, 1307; and
11 U.S.C. §§ 544, 548(a)(1)(A),(B), 550)
(Fraudulent Transfer, Breach Of Fiduciary Duty, Aiding & Abetting
Breach Of Fiduciary Duty, Civil Conspiracy)

***2013 Transferees, CEC, Sponsors, CEC Conflicted Directors,***
***Loveman, Rowan, Sambur, Benjamin, Housenbold, Kleisner, Press, Swann and Williams***

430.    Plaintiffs repeat and reallege paragraphs 1 through 429.

**Fraudulent Transfer**

431.    At all relevant times, CEOC has been insolvent.

432.    Throughout the relevant period, CEC, the directors of CEC, and the Sponsors

completely dominated and controlled CEOC and all of CEOC's subsidiaries and affiliates.

433.    At all relevant times, CEC and the Sponsors owned, controlled, and dominated

the 2013 Transferees.

434.    On October 21, 2013, CEC, CEOC, and the 2013 Transferees entered into the

2013 Transaction Agreement, pursuant to which CEOC subsidiaries transferred the

Planet Hollywood Resort and Casino in Las Vegas and CEOC's interest in the Horseshoe

Baltimore Casino, as well as 50% of the stream of management fees CEOC would earn from

managing those properties to the 2013 Transferees (collectively, the "2013 Transfers").  In

addition, the 2013 Transaction Agreement required CEOC to enter into a Management Services

Agreement with CEOC, Growth Partners, and CAC that redefined the economic relationship

between CEOC and CEC.

435.    The consideration to CEOC for these transfers was a cash payment of

$210 million for Planet Hollywood, $70 million for the Planet Hollywood management fees, and

$80 million for the Baltimore casino and management fees.  Additionally, a subsidiary of Growth

Partners assumed $513 million of debt secured by Planet Hollywood, although this was offset by roughly $40 million in restricted cash on deposit and as much as another $175 million in unrestricted cash held by the holding company that owned Planet Hollywood.

436.    The 2013 Transfers were constructive fraudulent transfers because CEOC received inadequate consideration and less than reasonably equivalent value for the assets transferred.

437.    In addition, the 2013 Transfers were actual fraudulent transfers because the purpose and effect of the transfers was to hinder or delay CEOC's creditors by placing critical and valuable assets beyond their reach.  Evidence of fraudulent intent includes the facts that:

> a.    the Sponsors, and Apollo in particular, conceived the transaction and identified the properties to be transferred;
>
> b.    the transaction was designed and intended to allow CEC and the Sponsors to take control of CEOC assets with significant growth potential, transfer those assets beyond the reach of CEOC's creditors, and better position CEC and the Sponsors for CEOC's restructuring or bankruptcy;
>
> c.    CEOC, CEC, the Sponsors, the 2013 Transferees, and the individual defendants understood that CEOC was insolvent on and after the date of each transfer;
>
> d.    despite their knowledge that CEC and CEOC had divergent interests CEOC, CEC, the Sponsors, and the 2013 Transferees proposed, negotiated, structured, evaluated, and approved the transfers through a process that failed to involve CEOC or protect the interests of CEOC;
>
> e.    the transferred properties were never offered to any true third-party buyer or subject to any marketing process;
>
> f.    the transfers were to newly created affiliates of CEC, owned and controlled by CEC and the Sponsors;
>
> g.    CEC and the Sponsors retained control and ownership of the assets;
>
> h.    the Sponsors actively attempted to reduce the consideration to be received by CEOC;
>
> i.    the value of the consideration received by CEOC was not reasonably equivalent to the value of the assets transferred, as evidenced by analyses

performed by the Sponsors immediately after the closing of the transaction;

j.      the transfer substantially impaired CEOC's future ability to service its debt;

k.      despite repeated requests for updated EBITDA projections for the properties to be transferred, the Sponsors and CEC withheld the latest projections from Evercore;

l.      the Sponsors used their power and influence over the management of CEC and CEOC to cause them to misrepresent to Evercore and others the projected revenue and EBITDA CEOC forecast it would receive as a result of its multi-year contract with entertainer Britney Spears;

m.      the Sponsors and CEC misrepresented or failed to correct misleading information relied upon by Evercore as to the timing of the sale of a portion of CEOC's ownership interest in the Horseshoe Baltimore casino;

n.      the fee for the fairness opinion rendered by Evercore was largely contingent upon consummation of the transaction; and

o.      the putative purpose of the transfer—to provide CEOC with short-term liquidity—was inconsistent with efforts, taken during the time the transaction was developed, to transfer cash from CEOC to CEC through repayments of the intercompany revolver.

438.    The 2013 Transfers are avoidable and recoverable, and the 2013 Transferees are liable for the constructive and actual fraudulent transfer of Planet Hollywood and Baltimore Horseshoe and others assets included in the 2013 Transfers.

**Breaches Of Fiduciary Duty By CEC And CEC's Directors**

439.    At the time of the 2013 Transfers, the 2013 Transferees were direct or indirect subsidiaries or affiliates of CEC.  Thus, the 2013 Transfers were self-dealing transactions.

440.    The price paid to CEOC for the 2013 Transfers was far below the value of the assets and was not entirely fair to CEOC.

441.    The process by which CEC initiated, structured, negotiated, and disclosed the transaction was not entirely fair to CEOC.  CEC misrepresented to Evercore Planet Hollywood's

earnings and prospects and the percentage of CEOC's ownership interest in the Horseshoe
Baltimore.

442.     CEC dominated and chose the board of directors of CEOC.  Although CEC was
fully aware that transactions between CEC (or affiliates of CEC) and CEOC would be
self-dealing transactions that would require fair process, CEC failed to appoint to the CEOC
board any directors who were independent of CEC.  CEC thus deprived CEOC of fair process by
preventing CEOC from having directors who would be able to independently consider the
fairness of the transaction.  Similarly, CEC deprived CEOC of fair process by proceeding with
the transfers with knowledge that CEOC did not have independent financial advisors or
independent legal advisors.

443.     CEOC was given no say in deciding whether to sell these assets, how the
transaction was structured, or when and how it was disclosed.  CEOC had no role in the
negotiations of the transaction, and was not even represented in the negotiations.  Instead, the
entire process was dominated by CEC and the Sponsors.  Moreover, CEC used its dominance
and control over CEOC to ensure that CEOC lacked independent directors, financial advisors,
and legal counsel necessary to fairly evaluate the transaction and proposed the transaction to
CEOC knowing that CEOC lacked the independent governance or resources to fairly evaluate
the transaction.

444.     CEC breached its fiduciary duties to CEOC.

445.     The CEC Conflicted Directors and individual directors, who individually owed
fiduciary duties to CEOC, breached those fiduciary duties.

**Breaches Of Fiduciary Duty By CEOC's Directors**

446.     At the time of the transfer of Planet Hollywood and CEOC's interest in the
Horseshoe Baltimore, CEOC's only directors were Gary Loveman and Michael Cohen.

Loveman was the Chairman and Chief Executive Officer of CEC and Cohen was a senior vice

president, deputy general counsel, and corporate secretary of CEC.  As a result, neither Loveman

nor Cohen was independent of CEC in making decisions affecting CEOC.

447.    Loveman breached his fiduciary duties to CEOC by approving, authorizing, and

facilitating a transaction that was not in the best interests of CEOC.

448.    Loveman also breached his fiduciary duties to CEOC by approving the transfer of

Planet Hollywood and CEOC's interest in the Horseshoe Baltimore when he had disqualifying

conflicts of interest and by failing to ensure that CEOC received a fair price for these assets or

that a fair process was followed.  Loveman made no effort to have CEOC represented in the

negotiations of the transfers; did not consider using a marketing process for the sale of these

assets; made no effort to solicit any third-party bids, offers or proposals; made no effort to

convene or create a special committee of independent directors to review the transaction; did not

ask for or receive an opinion about the fairness of the transaction to CEOC; did not retain

independent lawyers or advisors to represent CEOC; made no analysis of CEOC's solvency; and

conducted no meaningful review of the fairness of the transaction to CEOC.  Instead, Loveman

approved the transaction upon inadequate information by a routine written consent.

**Aiding & Abetting Breaches Of Fiduciary Duty**

449.    The CEC Conflicted Directors and individual directors, the Sponsors, and the

Sponsors' officers and agents knew that CEC, as CEOC's controlling stockholder, and the

boards of CEC and CEOC owed fiduciary duties to CEOC.  The CEC Conflicted Directors, the

Sponsors, and the Sponsors' officers and agents knew or should have known that CEC and the

boards of CEC and CEOC breached those fiduciary duties by compelling CEOC to enter into

transactions that were against CEOC's interests, benefited CEC at CEOC's expense, did not

provide a fair price to CEOC, and did not result from a fair process.

450.    The CEC Conflicted Directors and individual directors, the Sponsors, and the

Sponsors' officers and agents knowingly participated in those breaches of fiduciary duty in the

following ways:

a.    by virtue of their power to appoint the entire board of CEC and the fact that a majority of the directors of CEC's board were officers of Apollo and TPG, the Sponsors dominated and controlled the actions of CEC's board and CEOC's board;

b.    Apollo conceived, designed, and structured the transaction, including the selection of CEOC assets to be sold and the creation of CAC and Growth Partners, to receive and hold the properties for the benefit of CEC and the Sponsors;

c.    although the Sponsors understood that the transaction was designed to allow CEC and the Sponsors to maintain control of CEOC assets with significant growth potential, transfer those assets beyond the reach of CEOC's creditors, and better position CEC and the Sponsors for CEOC's restructuring or bankruptcy, they did not disclose these intentions to CEOC's board;

d.    Apollo assisted in the preparation of a script used to present the proposed transaction to the CEC board in November 2012, which outlined numerous expected benefits of the transaction but omitted any reference to CEOC's insolvency, the litigation and bankruptcy-related risks of the transaction, and the underlying goals of the transaction;

e.    despite their knowledge that CEC and CEOC had divergent interests, the Sponsors exploited the conflicts of interest of CEOC board members who sat on CEC's board or were officers of CEC;

f.    the CEC Conflicted Directors and individual directors, the Sponsors and the Sponsors' officers and agents allowed Paul Weiss to represent all entities in the deal, thus depriving CEOC of independent legal counsel and facilitating the Sponsors and CEC's scheme to deprive CEOC of fair price and fair process;

g.    the Sponsors negotiated financial terms which did not provide CEOC reasonably equivalent value for the transferred assets;

h.    the Sponsors manipulated the valuation process by, among other things, withholding updated projections, providing or instructing others to provide misleading and incomplete information regarding the impact of the Britney Spears contract, and instructing or allowing Evercore to use

incorrect ownership assumptions regarding the percentage of CEOC's interest in the Horseshoe Baltimore; and

i.     the CEC Conflicted Directors and individual directors, the Sponsors, and the Sponsors' officers misstated that the purpose of the transaction was to increase CEOC's liquidity, when in truth a central purpose of the transaction was to fund CEOC's repayment of over $400 million to CEC under the Intercompany Revolver during the same time the transaction was being developed.

451.    The CEC Conflicted Directors and individual directors and the Sponsors are liable for aiding and abetting breaches of fiduciary duty in connection with the 2013 Transfers.

452.    CEOC has been injured by these breaches of fiduciary duties in an amount to be determined.

**Civil Conspiracy**

453.    Starting in mid-2012, the Conflicted Directors agreed and conspired to commit unlawful acts, including to fraudulently transfer CEOC's valuable assets, breach fiduciary duties owed to CEOC, engage CEOC in damaging financial transactions, and otherwise delay, hinder, and defraud CEOC and its creditors.  Each of the conspirators intentionally participated in this scheme.  The 2013 Transfers constitute an overt act taken in furtherance of the conspirators' unlawful scheme.  The conspirators' actions in creating, structuring, negotiating, evaluating, and approving the transfer, as more fully detailed herein, constitute further overt acts taken in furtherance of their unlawful scheme.

454.    The 2013 Transfers including the transfer of Planet Hollywood and Baltimore Horseshoe, the conspirators' overt acts in furtherance of that transfer, and the conspirators' overall scheme and agreement to fraudulently transfer CEOC's valuable assets, breach fiduciary duties owed to CEOC, engage CEOC in damaging financial transactions, and otherwise delay, hinder, and defraud CEOC and its creditors caused damages to CEOC in an amount to be determined.

<u>**CLAIM VIII**</u>

**ACCESS TO TOTAL REWARDS AND
CEOC'S PROPERTY MANAGEMENT SERVICES**
(Nev. Rev. Stat. §§ 112.180, 112.190, 112.210; 6 Del. C. §§ 1304, 1305, 1307; and
11 U.S.C. §§ 544, 548(a)(1)(A),(B), 550)
(Fraudulent Transfer, Breach Of Fiduciary Duty, Aiding & Abetting
Breach Of Fiduciary Duty)

*Services Transferees, CEC, Sponsors, CEC Conflicted Directors,
Loveman, Benjamin, Housenbold, Kleisner, Peterson, Press, Swann and Williams*

455.    Plaintiffs repeat and reallege paragraphs 1 through 454.

**Fraudulent transfer**

456.    At all relevant times, CEOC has been insolvent.

457.    Throughout the relevant period, CEC, the directors of CEC, and the Sponsors completely dominated and controlled CEOC and all of CEOC's subsidiaries and affiliates.

458.    At all relevant times, CEC and the Sponsors owned, controlled, and dominated the CMBS Properties, CERP, and Growth Partners.

459.    As part of the 2010 CMBS Loan Agreement Amendment, CEC directed CEOC to enter into the Shared Services Agreement with the CMBS PropCos under which CEOC would provide management services and access to Total Rewards to the CMBS Properties for no consideration.  In October 2013, a new Shared Services Agreement was executed, which required CEOC to provide these same services to CERP on the same basis.  That same month, CEC had CEOC enter into the Management Services Agreement, which required CEOC to continue to provide management services for Planet Hollywood and Horseshoe Baltimore, as well as to provide Growth Partners' properties with access to Total Rewards.

460.    The 2010 Shared Services Agreement, the 2013 Shared Services Agreement, and the Management Services Agreement were constructive fraudulent transfers because CEOC

received inadequate consideration and less than reasonably equivalent value for the services it

was required to perform and for the access it was required to give to its Total Rewards program.

461.    In addition, the 2010 Shared Services Agreement, the 2013 Shared Services

Agreement, and the Management Services Agreement were actual fraudulent transfers.

Evidence of fraudulent intent includes the facts that:

      a.    these agreements were designed and intended to benefit CEC and the Sponsors by allowing properties they owned or controlled to access Total Rewards free of charge and to obtain property management services for little to no consideration;

      b.    these agreements were designed and intended to better position CEC and the Sponsors for CEOC's restructuring or bankruptcy by ensuring that properties they owned or controlled would have continued access to Total Rewards and to CEOC's property management services and that CEOC itself would not control these irreplaceable strategic assets;

      c.    CEOC, CEC, the Sponsors, the Service Transferees, and the individual defendants understood that CEOC was insolvent on and after the date of each agreement, as evidenced by, *inter alia*, multiple CEC and Sponsor analyses indicating CEOC had a negative equity value and would be unable to repay its debts, and the decision to create bankruptcy remote entities to receive and hold valuable CEOC assets;

      d.    despite the fact that CEC and CEOC had divergent interests, the transfers were proposed, negotiated, structured, evaluated, and approved through a process that failed to involve or protect the interests of CEOC;

      e.    the agreements benefitted CAC, Growth Partners, CES and other newly created entities that were owned and controlled by CEC and the Sponsors;

      f.    the value of the consideration received by CEOC was not reasonably equivalent to the value of the benefit conferred;

      g.    although it was CEOC that performed the services under the 2010 and 2013 Shared Services Agreements, payment for this work was made to CEC, with CEOC receiving only reimbursement for its allocated cost of providing these services and 30% of unallocated corporate expenses;

      h.    under the Management Services Agreement, CEOC received minimal compensation, including reimbursement of out-of-pocket costs, a 10% profit margin on certain costs, and management fees tied to the properties' performance; and

i.      the agreements substantially impaired CEOC's future ability to service its debt.

462.    The transfers of the 2010 Shared Services Agreement, the 2013 Shared Services Agreement and the Management Services Agreement are avoidable and recoverable, and the Services Transferees are liable for the constructive and actual fraudulent transfer of the 2010 Shared Services Agreement, the 2013 Shared Services Agreement, and the Management Services Agreement.

**Breaches Of Fiduciary Duty By CEC And CEC's Directors**

463.    At the time of the 2010 Shared Services Agreement, the 2013 Shared Services Agreement, and the Management Services Agreement, the CMBS PropCos, CERP and Growth Partners were direct or indirect subsidiaries or affiliates of CEC.  Thus, these contracts were self-dealing transactions.

464.    The price paid to CEOC for the services it was to perform for the CMBS PropCos, CERP, and Growth Partners and for the access CEOC was to provide to Total Rewards was far below the value of those services, and that access and was not entirely fair to CEOC.

465.    The process by which CEC initiated, structured, and negotiated the transaction was not entirely fair to CEOC.  CEC conceived of the approach of having CEOC enter into the 2010 Shared Services Agreement, the 2013 Shared Services Agreement, and the Management Services Agreement as a means of benefiting the CMBS PropCos, CERP, and Growth Partners, and decided upon the general terms and conditions of those contracts.  There were no meaningful negotiations between CEOC and the CMBS PropCos, CERP, and Growth Partners about the price, terms or conditions of the contracts, and CEC took no steps to ensure the contracts' fairness to CEOC.  Moreover, CEC used its dominance and control over CEOC to ensure that CEOC lacked independent directors, financial advisors and legal counsel necessary to fairly

evaluate the transactions, and CEC proposed the transactions to CEOC knowing that CEOC

lacked the independent governance or resources to fairly evaluate the transactions.

466.    CEC breached its fiduciary duties to CEOC.

467.    The CEC Conflicted Directors and individual directors, who individually owed

fiduciary duties to CEOC, breached those fiduciary duties.

**Breaches Of Fiduciary Duty By CEOC's Directors**

468.    At the time the 2010 Shared Services Agreement was executed, Loveman and

Halkyard were the only directors of CEOC.  Loveman and Cohen were CEOC's only directors at

the time the 2013 Shared Services Agreement and the Management Services Agreement

contracts were executed.

469.    Loveman breached his fiduciary duties to CEOC by approving, authorizing, and

facilitating a transaction that was not in the best interests of CEOC.

470.    Notwithstanding his fiduciary duties to CEOC, at no point did Loveman constitute

a committee of independent directors to consider the transactions, ask for or receive an opinion

about the fairness of the contracts to CEOC, or take any steps to consider the fairness of the

contracts to CEOC.  Loveman breached his fiduciary duties to CEOC by approving the 2010

Shared Services Agreement, the 2013 Shared Services Agreement, and the Management Services

Agreement when he had disqualifying conflicts of interest, and by failing to observe the

governance processes that were required when considering a self-dealing transaction.

471.    CEOC has been injured by these breaches of fiduciary duties in an amount to be

determined.

## <u>CLAIM IX</u>

### TRANSFER OF BALLY'S LAS VEGAS, THE CROMWELL,
### THE QUAD & HARRAH'S NEW ORLEANS
(Nev. Rev. Stat. §§ 112.180, 112.190, 112.210; 6 Del. C. §§ 1304, 1305, 1307; and

11 U.S.C. §§ 544, 548(a)(1)(A),(B), 550)
(Fraudulent Transfer, Breach Of Fiduciary Duty, Aiding & Abetting
Breach Of Fiduciary Duty, Civil Conspiracy)

***2014 Transferees, CEC, Sponsors, CEC Conflicted Directors,
Kleisner, Loveman, Rowan, Sambur, Benjamin, Housenbold, Press, Swann, and Williams***

472.     Plaintiffs repeat and reallege paragraphs 1 through 471.

**Fraudulent Transfer**

473.     At all relevant times, CEOC has been insolvent.

474.     Throughout the relevant period, CEC, the directors of CEC, and the Sponsors completely dominated and controlled CEOC and all of CEOC's subsidiaries and affiliates.

475.     On March 1, 2014, CEOC entered into the 2014 Transaction Agreement that required CEOC subsidiaries to transfer Bally's Las Vegas, The Cromwell, The Quad, and Harrah's New Orleans, along with 50% of the management fees payable to CEOC by those properties (together, the "Four Properties") to Growth Partners and entities affiliated with Growth Partners (the "2014 Transferees").

476.     At all relevant times, CEC and the Sponsors owned, controlled, and dominated the 2014 Transferees.

477.     The consideration for the transfers was $1.815 billion in cash and the assumption of $185 million in debt.

478.     The Four Properties Transfer was a constructive fraudulent transfer because CEOC received inadequate consideration and less than reasonably equivalent value for them.

479.     In addition, the Four Properties Transfer was an actual fraudulent transfer because the purpose and effect of the transfers was to hinder or delay CEOC's creditors by placing critical and valuable assets beyond their reach.  Evidence of fraudulent intent includes the facts that:

a.      CEC and the Sponsors conceived of the transaction and identified the
        properties to be transferred;

b.      CEC and the Sponsors selected four of CEOC's most valuable properties
        to transfer to Growth Partners, including three Las Vegas properties
        located at the center of the Las Vegas Strip and its flagship New Orleans
        casino;

c.      the proposal to sell these properties was presented to the CEC board as a
        management proposal, even though it had been conceived by the
        Sponsors;

d.      the transaction was designed and intended to allow CEC and the Sponsors
        to take control of CEOC assets with significant growth potential, transfer
        those assets beyond the reach of CEOC's creditors, and better position
        CEC and the Sponsors for CEOC's restructuring or bankruptcy;

e.      CEOC, CEC, the Sponsors, the 2014 Transferees, and the individual
        defendants understood that CEOC was insolvent on and after the date of
        each transfer, as evidenced by, *inter alia*, multiple CEC and Sponsor
        analyses indicating CEOC had a negative equity value and would be
        unable to repay its debts, the creation of bankruptcy remote entities to
        receive and hold valuable CEOC assets, and the CEC Special Committee's
        refusal to provide a representation that CEOC was solvent, as requested by
        the CAC Special Committee in connection with the transaction;

f.      despite the fact that CEC and CEOC had divergent interests, the transfers
        were proposed, negotiated, structured, evaluated, and approved through a
        process that failed to involve or protect the separate interests of CEOC;

g.      the Sponsors recruited outside directors for CEOC in February 2014, but
        decided they would not join the CEOC board until the transfer of the
        assets to Growth Partners was complete;

h.      the CEC Special Committee lacked the authority to market any of these
        assets to third parties;

i.      the transfers were to newly created affiliates of CEC, owned and
        controlled by CEC and the Sponsors;

j.      CEC and the Sponsors retained control and ownership of the assets;

k.      CEC and the Sponsors retained Duff & Phelps to provide an opinion that
        the transaction was "on terms no less favorable to CEOC . . . than would
        be obtained in a comparable arm's-length transaction with a person that is
        not an affiliate of [CEC]," but did not ask Duff & Phelps to opine whether
        the transaction was fair to CEOC;

l.      with the knowledge and encouragement of the Sponsors, CEC and
members of the CEC board, CEC prepared flawed, transaction-specific,
non-ordinary course projections of EBITDA for the four properties and
conveyed them to Duff & Phelps with the knowledge and expectation that
Duff & Phelps would rely upon them and consequently issue an opinion
that the consideration CEOC was to receive in the transaction was
comparable to that CEOC would have received in an arm's-length
transaction; the Sponsors pushed back on any attempt to have CEOC
receive its own fairness opinion and ultimately succeeded in having the
banks that had requested fairness opinions relent from their request;

m.      negotiations over the price of the transfer occurred between CEC director
Kleisner and CAC director Beilinson, without any participation from
CEOC;

n.      the value of the consideration received by CEOC was not reasonably
equivalent to the value of the assets transferred;

o.      the transfer substantially impaired CEOC's future ability to service its
debt; and

p.      the putative purpose of the transfer—to provide CEOC with short-term
liquidity—is inconsistent with efforts, taken during the time the transfer
was developed, to transfer cash from CEOC to CEC and Growth Partners.

480.    The Four Properties Transfer is avoidable and recoverable, and the 2014

Transferees are liable for the constructive and fraudulent transfer of the Four Properties.

**Breaches Of Fiduciary Duty By CEC And CEC's Directors**

481.    At the time of the Four Properties Transfer, the 2014 Transferees were direct or

indirect subsidiaries or affiliates of CEC.  Thus, the Four Properties Transfers were self-dealing

transactions.

482.    The price paid to CEOC for the Four Properties Transfer was far below the value

of the assets and was not entirely fair to CEOC.

483.    In addition, CEC knew that transferring the four properties from CEOC to Growth

Partners and the other 2014 Transferees would make it even more difficult for CEOC to pay its

debts and would hasten CEOC's bankruptcy.

484.    Notwithstanding CEC's fiduciary duties to CEOC, CEC conceived of, structured, priced, closed, and implemented the Four Properties Transfer to further CEC's own interests to the direct injury of CEOC.

485.    The process by which CEC initiated, structured, negotiated and disclosed the transaction was not entirely fair to CEOC.  Although CEC and CAC both formed special committees of their boards to structure and negotiate the price of the transaction, those committees represented the interests of CEC and CAC, and not the interests of CEOC.  Similarly, although both of those special committees hired financial advisors to assist them, no independent advisors were retained to represent or assist CEOC, and CEOC did not ask for or receive an independent fairness opinion.  Nor did CEOC have independent legal advisors.  In fact, the law firm representing CEOC on the four properties transactions was Paul Weiss, the same law firm that represented CEC.

486.    CEC breached its fiduciary duties to CEOC.

487.    The CEC Conflicted Directors and individual directors, who individually owed fiduciary duties to CEOC, breached those fiduciary duties.

488.    CEC director Kleisner was negotiating the price of the four properties with one of the directors of CAC.  Kleisner was a fiduciary of CEOC because he was a CEC director and the CEC board had taken over the functions of the CEOC board.  In addition, Kleisner was a fiduciary of CEOC because he was an agent expressly acting on CEOC's behalf with the responsibility of negotiating the price and terms and conditions upon which the four properties would be sold to Growth Partners.

489.    Kleisner was aware that Duff & Phelps would rely upon projections of EBITDA for the four properties in reaching its opinion and that CEOC had developed such projections in

the ordinary course of its business.  In violation of his fiduciary duties, Kleisner directed

members of CEC's financial staff to prepare a set of inaccurate projections known as the

February Business Plan that materially understated the projected EBITDA for the four

properties.  Kleisner knew that the February Business Plan was inaccurate and non-ordinary

course, but nonetheless had the CEC financial staff provide it to Duff & Phelps with the intention

Duff & Phelps would rely upon it.  Duff & Phelps did so, with the result that the four properties

were significantly undervalued.

490.    Kleisner breached his fiduciary duties in directing CEC to prepare the February

Business Plan and to provide it to Duff & Phelps.

**Breaches Of Fiduciary Duty By CEOC's Directors**

491.    Although the four properties were some of CEOC's most valuable assets, CEOC

itself was not party to the negotiations about the transaction or the amount of money it would be

paid for these assets.  Instead, CEC and the Sponsors excluded CEOC from those discussions,

which occurred between one of the CEC directors (Kleisner) and one of the CAC directors

(Beilinson).

492.    The CEC special committee hired Duff & Phelps as its financial advisor to render

an opinion whether the terms of the transaction were no less favorable to CEOC than an

arm's-length negotiation would have produced.  However, members of that committee,

representatives from Apollo, and others provided Duff & Phelps with inaccurate transaction-

specific, non-ordinary course information about the business and its prospects of the four

properties.  In particular, they had CEC prepare non-ordinary course, transaction-specific

projections called the February Business Plan that provided inaccurate, depressed forecasts for

the future earnings of the four properties.  As a result, Duff & Phelps was led into incorrectly

believing that the consideration being paid for the assets was equivalent to that CEOC would have received in a true arm's-length transaction.

493.    There was no marketing process for the sale of these assets.  While these four properties were enormously valuable, no effort was made by CEC, CEOC or anyone else to solicit any third-party bids, offers or proposals for buying the properties.

494.    At the time of the Four Properties Transfer, CEOC's board—consisting solely of Loveman and Hession—approved the transaction by signing a boilerplate written consent.  Both Loveman and Hession were conflicted.  Loveman was CEC's Chairman and Chief Executive Officer.  Hession was CEC's Chief Financial Officer.  Both Loveman and Hession owned stock in CAC and, therefore, stood to benefit personally from the below-market price at which CEOC had sold the four properties to Growth Partners.

495.    Loveman breached his fiduciary duties to CEOC by approving, authorizing, and facilitating a transaction that was not in the best interests of CEOC.

496.    Loveman also breached his fiduciary duties to CEOC by failing to ensure that CEOC received a fair price for these assets or that a fair process was followed.  Loveman did not consider using a marketing process for the sale of these assets; made no effort to solicit any third-party bids, offers, or proposals; made no effort to convene or create a special committee of independent directors to review the transaction; did not ask for or receive an independent opinion about the fairness of the transaction to CEOC; did not retain independent lawyers or advisors to represent CEOC; and made no analysis of CEOC's solvency.

497.    CEOC's board did not hold a meeting to consider the sale of the four properties. Instead, Loveman and Hession approved the transaction by signing a boilerplate written consent. In failing to reach an informed opinion, in ignoring basic principles of governance, and in voting

to approve the four properties transaction while they had disqualifying conflicts of interest, Loveman breached his fiduciary duties to CEOC.

### Aiding & Abetting Breaches Of Fiduciary Duty

498.    The CEC Conflicted Directors, the Sponsors, and the Sponsors' officers and agents knew that CEC, as CEOC's controlling stockholder, and the boards of CEC and CEOC owed fiduciary duties to CEOC.  The CEC Conflicted Directors, the Sponsors, and the Sponsors' officers and agents knew or should have known that CEC and the boards of CEC and CEOC breached those fiduciary duties by compelling CEOC to enter into transactions that were against CEOC's interests, benefited CEC at CEOC's expense, did not provide a fair price to CEOC, and did not result from a fair process.

499.    The CEC Conflicted Directors, the Sponsors, and the Sponsors' officers and agents knowingly participated in those breaches of fiduciary duty in the following ways:

a.    by virtue of their power to appoint the entire board of CEC and the fact that a majority of the directors of CEC's board were officers of Apollo and TPG, the Sponsors dominated and controlled the actions of CEC's board and CEOC's board;

b.    Apollo conceived, designed, and structured the transaction, including the selection of CEOC assets to be sold;

c.    the CEC Conflicted Directors and individual directors, the Sponsors, and the Sponsors' officers negotiated and implemented the transaction, even though it was not in CEOC's best interests;

d.    CEC and the Sponsors selected four of CEOC's most valuable properties to transfer to Growth Partners, including three Las Vegas properties located at the center of the Las Vegas Strip and its flagship New Orleans casino;

e.    although the Sponsors understood that the transaction was designed to allow CEC and the Sponsors to take control of CEOC assets with growth potential, transfer those assets beyond the reach of CEOC's creditors, and better position CEC and the Sponsors for CEOC's restructuring or bankruptcy, they did not disclose these intentions to CEOC's board;

f.      the Sponsors caused the CEC board to instruct CEOC to sell assets on the pretext of improving CEOC's ability to service its debt, even though they fully knew that selling the highly profitable Bally's Las Vegas, Cromwell, Quad and Harrah's New Orleans would reduce CEOC's earnings materially and make it more difficult for CEOC to service its debt;

g.      The Sponsors made the decision that CEOC should use the proceeds of the sale to pay off the balances on its Intercompany Revolver with CEC, even though CEOC was desperately short of cash and the repayment would benefit CEC to the detriment of CEC's creditors;

h.      the transaction was presented to the CEC board as a management proposal, even though it had been conceived by the Sponsors;

i.      the proposal, which was crafted by the Sponsors, omitted any discussion of CEOC's insolvency, the litigation and bankruptcy-related risks of the transaction, and the underlying goals of the transaction;

j.      despite their knowledge that CEC and CEOC had divergent interests, the Sponsors exploited the conflicts of interest of CEOC board members who sat on CEC's board or were officers of CEC;

k.      the Sponsors understood that CEOC was insolvent on and after the date of each transfer, as evidenced by, *inter alia*, multiple analyses the Sponsors had prepared or seen indicating CEOC had a negative equity value and would be unable to repay its debts, the creation of bankruptcy remote entities to receive and hold valuable CEOC assets, and the CEC Special Committee's refusal to provide a representation that CEOC was solvent, as requested by the CAC Special Committee in connection with the transaction;

l.      the Sponsors recruited outside directors for CEOC in February 2014, but decided they would not join the CEOC board until the transfer of the assets to Growth Partners was complete;

m.      the Sponsors determined that the properties would not be marketed to any third parties and would stay within the Caesars enterprise;

n.      the Sponsors retained Duff & Phelps to provide an opinion that the transaction was "on terms no less favorable to CEOC . . . than would be obtained in a comparable arm's-length transaction with a person that is not an affiliate of [CEC]" but did not ask Duff & Phelps to opine as to whether the transaction was fair to CEOC;

o.      upon information and belief, the Sponsors were aware that Duff & Phelps had been instructed to rely upon incomplete and inaccurate transaction-specific, non-ordinary course financial projections, yet did nothing to ensure that correct information was given to them instead;

p.      officers of the Sponsors attended the CEC board meetings where the Four Properties Transaction was discussed, and voted to approve the transaction notwithstanding the fact that it was a breach of CEC's fiduciary duties to CEOC; and

q.      the Sponsors pushed back on having CEOC receive its own fairness opinion and ultimately succeeded in having the banks that requested fairness opinions relent.

500.    The CEC Conflicted Directors and individual directors and the Sponsors are liable for aiding and abetting breaches of fiduciary duties relating to the transfer of the Four Properties.

**Civil Conspiracy**

501.    Starting in mid-2012, the Conflicted Directors agreed and conspired to commit unlawful acts, including to fraudulently transfer CEOC's valuable assets, breach fiduciary duties owed to CEOC, engage CEOC in damaging financial transactions, and otherwise delay, hinder, and defraud CEOC and its creditors.  Each of the conspirators intentionally participated in this scheme.  The Four Properties Transfer constitutes an overt act taken in furtherance of the conspirators' unlawful scheme.  The conspirators' actions in creating, structuring, negotiating, evaluating, and approving the transfer, as more fully detailed herein, constitute further overt acts taken in furtherance of their unlawful scheme.

502.    The Four Properties Transfer, the conspirators' overt acts in furtherance of that transfer, and the conspirators' overall scheme and agreement to fraudulently transfer CEOC's valuable assets, breach fiduciary duties owed to CEOC, engage CEOC in damaging financial transactions, and otherwise delay, hinder, and defraud CEOC and its creditors caused damages to CEOC in an amount to be determined.

## CLAIM X

**2011 EASEMENT ON UNDEVELOPED LAND**
(Nev. Rev. Stat. §§ 112.180, 112.190, 112.210; 6 Del. C. §§ 1304, 1305, 1307; and
11 U.S.C. §§ 544, 550)
(Fraudulent Transfer, Breach of Fiduciary Duty)

***CEC, Easement Transferees, Benjamin, Bonderman, Davis, Loveman, Peterson, Press,
Rowan, Sambur, Swann, and Williams***

503.    Plaintiffs repeat and reallege paragraphs 1 through 502.

**Fraudulent Transfer**

504.    At all relevant times, CEOC has been insolvent.

505.    In 2011, various CEOC affiliates granted easements to the Easement Transferees,
all of which were affiliates of CEC, on four lots of unimproved Las Vegas real estate (the
"Easement Transfer").

506.    Two of the Easement Transferees make an annual payment to CEOC for granting
the easements of about $1.7 million, subject to annual 3% increases; however, a third Easement
Transferee—Flamingo Las Vegas PropCo—has paid nothing for the easement granted to it.
Granting the easement diminished CEOC's value by as much as $60 million, and
correspondingly increased the value received by the Easement Transferees.

507.    At all relevant times, CEC and the Sponsors owned, controlled, and dominated
the Easement Transferees.

508.    The Easement Transfer was a constructive fraudulent transfer because CEOC
received inadequate consideration and less than reasonably equivalent value for the easements.

509.    The Easement Transfer is avoidable and recoverable, and the Easement
Transferees are liable for the constructive fraudulent transfer of the aforementioned easements.

**Breaches Of Fiduciary Duty By CEC And CEC's Directors**

510.    At the time of the granting of the easements, the Easement Transferees were direct or indirect subsidiaries or affiliates of CEC.  Thus, the granting of the easements was a self-dealing transaction.

511.    The price paid to CEOC for the granting of the easements was far below the value of the asset and was not entirely fair to CEOC.

512.    The process by which CEC initiated, structured, negotiated, and disclosed the transaction was not entirely fair to CEOC.  There is no evidence that CEOC was even consulted in connection with CEC's decision to have the easements granted.

513.    CEC breached its fiduciary duties to CEOC.

514.    The CEC Conflicted Directors and individual directors, who individually owed fiduciary duties to CEOC, breached those fiduciary duties.

**Breaches Of Fiduciary Duty By CEOC's Directors**

515.    At the time the easements were granted, CEOC's only directors were Gary Loveman and Jonathan Halkyard.  Loveman was the Chairman and Chief Executive Officer of CEC, and Halkyard was CEC's Chief Financial Officer.  As a result, neither Loveman nor Halkyard was independent of CEC in making decisions affecting CEOC.

516.    Loveman breached his fiduciary duties to CEOC by approving, authorizing, and facilitating a transaction that was not in the best interests of CEOC.

517.    There is no evidence that CEOC followed any governance process in reaching the decision to grant the easement, that it used any marketing process, that it offered the easements to any third party on an arm's-length basis, that the decision to grant the easement was made by disinterested directors of CEOC, that CEOC engaged independent financial or legal advisors to

review the granting of the easement, or that CEOC requested or received a fairness opinion about

the transfer.  As a result, the process by which the easements were granted was not fair to CEOC.

518.    In addition, and upon information and belief, Loveman breached his duty of care

to CEOC by failing to inform himself of transfers of assets from CEOC to CEC or affiliates of

CEC, thus allowing the granting of the easements to take place without CEOC receiving

adequate compensation for the easements.

519.    CEOC has been injured by these breaches of fiduciary duties in an amount to be

determined.

## CLAIM XI

### TRANSFER OF UNDEVELOPED LAND IN LAS VEGAS
(Nev. Rev. Stat. §§ 112.180, 112.190, 112.210; 6 Del. C. §§ 1304, 1305, 1307; and
11 U.S.C. §§ 544, 548(a)(1)(A),(B), 550)
(Fraudulent Transfer, Breach Of Fiduciary Duty, Aiding & Abetting
Breach Of Fiduciary Duty, Civil Conspiracy)

*2014 Transferees, CEC, Sponsors, Loveman,*
*CEC Conflicted Directors, Benjamin, Housenbold, Kleisner, Press, Swann and Williams*

520.    Plaintiffs repeat and reallege paragraphs 1 through 519.

**Fraudulent Transfer**

521.    At all relevant times, CEOC has been insolvent.

522.    Throughout the relevant period, CEC, the directors of CEC, and the Sponsors

completely dominated and controlled CEOC and all of CEOC's subsidiaries and affiliates.

523.    On March 1, 2014, CEOC entered into the 2014 Transaction Agreement which,

among other things, required CEOC subsidiaries to transfer to Growth Partners and entities

affiliated with Growth Partners (the "2014 Transferees") 31 acres of undeveloped land in

Las Vegas.

524.   At all relevant times, CEC and the Sponsors owned, controlled, and dominated the 2014 Transferees.

525.   CEOC was paid no cash consideration for the transfer of this undeveloped land and, upon information and belief, was paid no consideration at all for it.

526.   The transfer of the undeveloped land was a constructive fraudulent transfer because CEOC received inadequate consideration and less than reasonably equivalent value for it.

527.   In addition, the transfer of the undeveloped land was an actual fraudulent transfer because the purpose and effect of the transfer was to hinder or delay CEOC's creditors by placing critical and valuable assets beyond their reach.  Evidence of fraudulent intent includes the facts that:

   a.   the Sponsors, and Apollo in particular, conceived of the transaction and identified the land to be transferred;

   b.   the transaction was designed and intended to allow CEC and the Sponsors to take control of CEOC assets with significant growth potential, transfer those assets beyond the reach of CEOC's creditors, and better position CEC and the Sponsors for CEOC's restructuring or bankruptcy;

   c.   CEOC, CEC, the Sponsors, the 2014 Transferees, and the individual defendants understood that CEOC was insolvent on and after the date of each transfer, as evidenced by, *inter alia*, analyses prepared by CEC and the Sponsors indicating that CEOC had a negative equity value and would be unable to repay its debts, the creation of bankruptcy remote entities to receive and hold valuable CEOC assets, and the CEC Special Committee's refusal to provide a representation that CEOC was solvent, as requested by the CAC Special Committee in connection with the transaction;

   d.   despite having knowledge that CEC and CEOC had divergent interests, CEC, Growth Partners, the CEC board, and the Sponsors arranged for and executed the land transfer without any negotiations with CEOC;

   e.   the land transferred was never offered to a true third-party buyer or subject to any marketing process;

f.      the transfers were to newly created affiliates of CEC, owned and controlled by CEC and the Sponsors;

g.      CEC and the Sponsors retained control and ownership of the assets;

h.      CEOC did not receive any consideration for this land, and no value was attributed to this land in CEOC's internal analysis, CEC's internal analysis, or in the Centerview, Lazard, or Duff & Phelps opinions;

i.      neither Centerview, Lazard, Duff & Phelps, Kleisner, Beilinson, nor Loveman was aware that the undeveloped land was being transferred;

j.      the transfer of the land was not disclosed in the March 3, 2014 disclosure of the Four Properties Transaction or in the May 6, 2014 8-Ks; and

k.      the transfer impaired CEOC's future ability to service its debt.

528.    The transfer of the undeveloped land in Las Vegas is avoidable and recoverable, and the 2014 Transferees are liable for the constructive and fraudulent transfer of undeveloped land in Las Vegas.

**Breaches Of Fiduciary Duty By CEC And CEC's Directors**

529.    At the time of the transfers of the undeveloped land, the 2014 Transferees were direct or indirect subsidiaries or affiliates of CEC.  Thus, the transfer of the undeveloped land was a self-dealing transaction.

530.    The price paid to CEOC for the transfer of the undeveloped land was far below the value of the asset and was not entirely fair to CEOC.

531.    The process by which CEC initiated, structured, negotiated and disclosed the transaction was not entirely fair to CEOC.  Although CEC and CAC both formed special committees of their boards to structure and negotiate the price of the transactions that surrounded the transfer of the undeveloped land, those committees represented the interests of CEC and CAC, and not the interests of CEOC.  Similarly, although both of those special committees hired financial advisors to assist them, no independent advisors were retained to represent or assist

CEOC, and CEOC did not ask for or receive a fairness opinion.  Nor did CEOC have

independent legal advisors.  In fact, the law firm representing CEOC on the transaction was

Paul Weiss, the same law firm that represented CEC.

532.    CEC breached its fiduciary duties to CEOC.

533.    The CEC Conflicted Directors and individual directors, who individually owed

fiduciary duties to CEOC, breached those fiduciary duties.

**Breaches Of Fiduciary Duty By CEOC's Directors**

534.    Although the undeveloped land was a valuable CEOC asset, CEOC itself was not

party to the negotiations about the transaction.  Instead, CEC and the Sponsors excluded CEOC

from those discussions which, upon information and belief, occurred between one of the CEC

directors and one of the CAC directors.

535.    There was no marketing process for the sale of these assets.  While the

undeveloped land was enormously valuable, no effort was made by CEC, CEOC, or anyone else

to solicit any third-party bids, offers or proposals for buying the property.

536.    At the time the undeveloped land was transferred, CEOC's only two directors

were Loveman and Hession.  Neither Loveman nor Hession was an independent director, and

both had interests adverse to CEOC's.  Loveman was CEC's Chairman and Chief Executive

Officer, Hession was CEC's Chief Financial Officer, and both Loveman and Hession owned

stock in CAC and, therefore, stood to benefit personally from the transfer of the undeveloped

land.

537.    Loveman breached his fiduciary duties to CEOC by approving, authorizing, and

facilitating a transaction that was not in the best interests of CEOC.

538.    The transfer of the undeveloped land to Growth Partners and the other 2014

Transferees was approved by the CEOC board when it approved the 2014 Transaction

Agreement. However, there was no presentation to the board about the transfer of the undeveloped land or the fact that CEOC was receiving nothing for it. Moreover, the CEOC board did not hold a meeting to discuss the transfer of the undeveloped land, or even to discuss its approval of the 2014 Transaction Agreement. Instead, CEOC's two directors—Loveman and Hession—approved the transaction by signing a boilerplate written consent. In failing to reach an informed opinion, in ignoring basic principles of governance, and in voting to approve the 2014 Transaction Agreement while they had disqualifying conflicts of interest, Loveman breached his fiduciary duties to CEOC. In addition, and upon information and belief, Loveman breached his duty of care to CEOC by failing to inform himself of transfers of assets from CEOC to CEC or affiliates of CEC, thus allowing the transfer of the undeveloped land to take place without CEOC receiving adequate consideration for it.

### Aiding & Abetting Breaches Of Fiduciary Duty

539.    The CEC Conflicted Directors and individual directors, the Sponsors, and the Sponsors' officers and agents knew that CEC, as CEOC's controlling stockholder, and the boards of CEC and CEOC owed fiduciary duties to CEOC. The CEC Conflicted Directors and individual directors, the Sponsors, and the Sponsors' officers and agents knew or should have known that CEC and the boards of CEC and CEOC breached those fiduciary duties by compelling CEOC to enter into transactions that were against CEOC's interests, benefited CEC at CEOC's expense, did not provide a fair price to CEOC, and did not result from a fair process.

540.    The CEC Conflicted Directors, the Sponsors, and the Sponsors' officers and agents knowingly participated in those breaches of fiduciary duty in the following ways:

a.    by virtue of their power to appoint the entire board of CEC and the fact that a majority of the directors of CEC's board were officers of Apollo and TPG, the Sponsors dominated and controlled the actions of CEC's board and CEOC's board;

b.      Apollo conceived, designed, and structured the transaction, including the selection of CEOC assets to be sold;

c.      the CEC Conflicted Directors, the Sponsors, and the Sponsors' officers and agents negotiated and implemented the transaction, even though it was not in CEOC's best interests;

d.      although the Sponsors understood that the transaction was designed to allow CEC and the Sponsors to take control of CEOC assets with significant growth potential, transfer those assets beyond the reach of CEOC's creditors, and better position CEC and the Sponsors for CEOC's restructuring or bankruptcy, they did not disclose these intentions to CEOC's board;

e.      despite their knowledge that CEC and CEOC had divergent interests, the Sponsors exploited the conflicts of interest of CEOC board members who sat on CEC's board or were officers of CEC; and

f.      Upon information and belief, Rowan and Sambur knew that the 2014 Transaction Agreement included provisions for the transfer of the undeveloped land from CEOC to Growth Partners and the other 2014 Transferees for no additional consideration but failed to bring to the attention of the full CEC board that this transfer was taking place.

541.    The CEC Conflicted Directors and the Sponsors are liable for aiding and abetting breaches of fiduciary duty in connection with the transfer of undeveloped land in Las Vegas.

542.    CEOC has been injured by these breaches of fiduciary duties in an amount to be determined.

**Civil Conspiracy**

543.    Starting in mid-2012, the Conflicted Directors agreed and conspired to commit unlawful acts, including to fraudulently transfer CEOC's valuable assets, breach fiduciary duties owed to CEOC, engage CEOC in damaging financial transactions, and otherwise delay, hinder, and defraud CEOC and its creditors. Each of the conspirators intentionally participated in this scheme. The Transfer of Undeveloped Land in Las Vegas constitutes an overt act taken in furtherance of the conspirators' unlawful scheme. The conspirators' actions in creating,

structuring, negotiating, evaluating, and approving the transfer, as more fully detailed herein, constitute further overt acts taken in furtherance of their unlawful scheme.

544.    The Transfer of Undeveloped Land in Las Vegas, the conspirators' overt acts in furtherance of that transfer, and the conspirators' overall scheme and agreement to fraudulently transfer CEOC's valuable assets, breach fiduciary duties owed to CEOC, engage CEOC in damaging financial transactions, and otherwise delay, hinder, and defraud CEOC and its creditors caused damages to CEOC in an amount to be determined.

## CLAIM XII

### DEGRADATION OF CEOC's ENTERPRISE VALUE
(Breach of Fiduciary Duty)

***CEC, Sponsors, CEC Conflicted Directors, Loveman, Benjamin, Housenbold, Kleisner, Peterson, Press, Swann and Williams***

545.    Plaintiffs repeat and reallege paragraphs 1 through 544.

**Breaches Of Fiduciary Duty By CEOC's Directors**

546.    At all relevant times, CEOC has been insolvent.

547.    At all relevant times, CEOC had a two person board, consisting of Loveman and either Halkyard, Cohen, or Hession.  CEOC's directors owed fiduciary duties to CEOC and to CEOC's ultimate stakeholders.

548.    The structure of the CEOC enterprise had been designed to create a nationwide system of regional casinos that would identify customers and, through the use of CEOC's Total Rewards program, feed those customers to CEOC's high-value casinos in Las Vegas and its super-regional casino in New Orleans.  As a result, CEOC was valued as a Las Vegas-based gaming enterprise instead of a gaming company that was principally regional in nature.

549.    This difference was significant because valuations for gaming enterprises that are concentrated in Las Vegas are materially higher than those for regional gaming companies.

550.    At the direction of the Sponsors and CEC, all but one of CEOC's Las Vegas properties was transferred to affiliates of CEC, including CERP and Growth Partners.

551.    Because the Sponsors and CEC directly and indirectly controlled CERP, Growth Partners, and the other transferees, each of these was a self-dealing transaction that was required to meet the standard of entire fairness as to the consideration paid to CEOC for the assets and the process followed in timing, initiating, structuring, negotiating, and disclosing the transaction and in obtaining approval of the transaction by CEOC's directors.

552.    None of the transfers of CEOC's Las Vegas properties met this standard.  In each case, the consideration CEOC received for the property was far below the value of those assets and was not entirely fair to CEOC.  Similarly, the processes used by CEC, Loveman, Halkyard, Cohen, and Hession were not fair to CEOC.

**Breaches Of Fiduciary Duty By CEC And CEC's Directors**

553.    CEC dominated and chose the board of directors of CEOC.  Although CEC was fully aware that transactions between CEC (or affiliates of CEC) and CEOC would be self-dealing transactions that would require fair process, CEC failed to appoint to the CEOC board any directors who were independent of CEC.  CEC thus deprived CEOC of fair process by preventing CEOC from having directors who would be able to independently consider the fairness of the transaction.  Similarly, CEC deprived CEOC of fair process by proceeding with the transfers with knowledge that CEOC did not have independent financial advisors or independent legal advisors.  By transferring from CEOC its signature properties in Las Vegas and its Harrah's New Orleans casino, CEC relegated CEOC to the status of a regional gaming company and, correspondingly, reduced the enterprise value of CEOC.

554.    CEC breached its fiduciary duties to CEOC.

555.    The CEC Conflicted Directors and individual directors, who individually owed

fiduciary duties to CEOC, breached those fiduciary duties.

556.    CEOC has been injured by these breaches of fiduciary duties in an amount to be

determined.

**CLAIM XIII**

**TRANSFER OF TOTAL REWARDS**
(Nev. Rev. Stat. §§ 112.180, 112.190, 112.210; 6 Del. C. §§ 1304, 1305, 1307; and
11 U.S.C. §§ 544, 548(a)(1)(A),(B), 550)
(Fraudulent Transfer, Breach Of Fiduciary Duty, Aiding & Abetting
Breach Of Fiduciary Duty, Civil Conspiracy)

***Total Rewards Transferees, CEC, Sponsors, CEC Conflicted Directors,
Loveman, Rowan, Sambur, Benjamin, Housenbold, Kleisner, Press, Swann and Williams***

557.    Plaintiffs repeat and reallege paragraphs 1 through 556.

**Fraudulent Transfer**

558.    At all relevant times, CEOC has been insolvent.

559.    Throughout the relevant period, CEC, the directors of CEC, and the Sponsors

completely dominated and controlled CEOC and all of CEOC's subsidiaries and affiliates.

560.    The 2014 Transaction Agreement required CEOC to transfer to a newly-formed

company named Caesars Enterprise Services LLC ("CES") most of CEOC's intellectual

property, including its rights to the Total Rewards program and the intangible and tangible

intellectual property that comprised that program (collectively, "Total Rewards").  Total

Rewards was of enormous value to CEOC.

561.    CEOC received no consideration in return for transferring Total Rewards to CES

other than a 69% ownership stake in CES.  However, CES was designed to be a flow-through

entity that was intentionally structured to have no profits.

562.    The other owners of CES were CERP and Growth Partners.  A three-person Steering Committee makes all major decisions for CES.  CEOC, CERP and Growth Partners each has a seat on the Steering Committee.

563.    At all relevant times, CEC and the Sponsors owned, controlled, and dominated CERP and Growth Partners.

564.    Pursuant to a series of agreements and licenses between CEOC and CES, CEOC conveyed to CES all of the rights and powers that usually accompany ownership of intellectual property.  Thus, as a practical matter, it is CES, and not CEOC, that controls Total Rewards.

565.    Because of the governance structure of CES, CEOC has no control over the governance of CES.  Instead, CERP and Growth Partners hold a majority of the votes.

566.    The transfer of Total Rewards to CES was a constructive fraudulent transfer because CEOC received inadequate consideration and less than reasonably equivalent value for Total Rewards.

567.    In addition, the transfer of Total Rewards was an actual fraudulent transfer because the purpose and effect of the transfer was to hinder or delay CEOC's creditors by placing critical and valuable assets beyond their reach.  Evidence of fraudulent intent includes the facts that:

a.    the Sponsors conceived of the transfer of Total Rewards to a bankruptcy-remote entity in late 2013;

b.    the transfer of Total Rewards was designed and intended to give CEC and the Sponsors control and dominion of CEOC's valuable intellectual property, transfer assets beyond the reach of CEOC's creditors, allow other Caesars entities to have continued access to CEOC's intellectual property if CEOC entered bankruptcy, and better position CEC and the Sponsors for CEOC's restructuring or bankruptcy;

c.    as part of the Services LLC Agreements, CES sublicensed its intellectual property to CERP, Growth Partners, and many other subsidiaries or affiliates of CEC, which meant that CERP and Growth Partners obtained a

nearly unlimited right to use the Total Rewards program and related intellectual property free of charge;

d.      CEOC, CEC, the Sponsors, the 2014 Transferees, and the individual defendants understood that CEOC was insolvent on and after the date of each transfer, as evidenced by, *inter alia*, analyses CEC and Sponsor had seen or prepared that showed that CEOC had a negative equity value and would be unable to repay its debts, the creation of bankruptcy remote entities to receive and hold valuable CEOC assets, and the CEC Special Committee's refusal to provide a representation that CEOC was solvent, as requested by the CAC Special Committee in connection with the transaction;

e.      despite their knowledge that CEC and CEOC had divergent interests, the Sponsors and CEC proposed, negotiated, structured, evaluated, and approved the transfer of Total Rewards through a process that failed to involve or protect the interests of CEOC;

f.      control of Total Rewards was transferred to a newly-created shared services company, controlled by CEC and the Sponsors;

g.      the value of the consideration received by CEOC was not reasonably equivalent to the value of the assets transferred;

h.      the transfer substantially impaired CEOC's future ability to service its debt;

i.      the Services LLC Agreements granted CEOC a 69% ownership stake but only 33% of the voting rights;

j.      the Services LLC Agreements transferred effective control of Total Rewards to CERP and Growth Partners, enriching them at CEOC's direct expense, by terminating CEOC's governance rights in the event of its bankruptcy, prohibiting CEOC from assigning its interest in CES or withdrawing from CES without the consent of CERP and Growth Partners, requiring CEOC to transfer most of its employees to CES, requiring CEOC to transfer the know-how at the heart of Total Rewards to CES, and licensing CES and its sublicensees to create derivative works using the licensed and sublicensed intellectual property;

k.      Apollo participated in the drafting the terms of these Services LLC Agreements;

l.      CEOC did not negotiate any of these terms and did not have any independent financial or legal advisors to review them; and

      m.     the two CEOC directors who approved this transfer via written consent were senior executives at CEC and shareholders of CAC, and thus had a financial interest in the Growth Partners receipt of these benefits.

568.    The transfer of Total Rewards is avoidable and recoverable, and the Total Rewards Transferees are liable for the constructive and actual fraudulent transfer of Total Rewards.

### Breaches Of Fiduciary Duty By CEC And CEC's Directors

569.    At the time of the transfer of Total Rewards to CES, CERP and Growth Partners were direct or indirect subsidiaries or affiliates of CEC.  Thus, the transaction was a related party transaction and involved self-dealing.

570.    The price paid to CEOC for transferring Total Rewards was far below the value of Total Rewards and was not entirely fair to CEOC.

571.    The process by which CEC initiated, structured, negotiated, and disclosed the transfer of Total Rewards to CES was not entirely fair to CEOC.  CEOC was given no say in deciding whether to sell these assets, how the transaction was structured, or when and how it was disclosed.  CEOC had no role in the negotiations of the transaction, and was not even represented in the negotiations.  Instead, the entire process was dominated by CEC and the Sponsors.

572.    Although CEC formed a special committee of its board to structure and negotiate the price of the other transactions that happened at this same time, that Committee was never advised that CEC and CEOC could have divergent interests or that the CEC Special Committee would have a fiduciary duty or other obligation to protect CEOC or its creditors due to CEOC's insolvency.  The CEC Special Committee also never considered whether CEOC should retain control over Total Rewards, even though there would be evident long-term consequences to CEOC and its creditors if control of Total Rewards were transferred to entities CEC and the Sponsors controlled.

573.     There was no fair process.  CEOC had no independent directors, legal counsel, or financial advisors to review the transfer of Total Rewards.  There was no marketing process for possible sale of Total Rewards, and no third parties were solicited to determine if they might have an interest in acquiring or licensing all or part of the Total Rewards intellectual property.  CEOC also did not ask for or receive a fairness opinion.

574.     CEC breached its fiduciary duties to CEOC.

575.     The CEC Conflicted Directors and individual directors, who individually owed fiduciary duties to CEOC, breached those fiduciary duties.

**Breaches Of Fiduciary Duty By CEOC's Directors**

576.     CEOC's board at the time the transfer of Total Rewards was approved consisted solely of Loveman and Hession.  Both were conflicted.  Loveman, of course, was CEC's Chairman and Chief Executive Officer.  Hession was CEC's Chief Financial Officer.  Both Loveman and Hession owned stock in CAC and, therefore, stood to benefit personally from the below-market price at which CEOC had transferred Total Rewards to CES.

577.     Loveman breached his fiduciary duties to CEOC by approving, authorizing, and facilitating a transaction that was not in the best interests of CEOC.

578.     Loveman also breached his fiduciary duties to CEOC by failing to ensure that CEOC received a fair price for these assets or that a fair process was followed.  Loveman did not consider using a marketing process for the sale of these assets; made no effort to solicit any third-party bids, offers, or proposals; made no effort to convene or create a special committee of independent directors to review the transaction; did not ask for or receive an opinion about the fairness of the transaction to CEOC; did not retain independent lawyers or advisors to represent CEOC; and made no analysis of CEOC's solvency.

579.    The transfer of Total Rewards to CES was approved by the CEOC board as part

of its approval of the 2014 Transaction Agreement.  However, the CEOC board did not hold a

meeting to discuss the transfer of Total Rewards, or even to discuss its approval of the 2014

Transaction Agreement.  Instead, CEOC's two directors—Loveman and Hession—approved the

transaction by signing a boilerplate written consent.  In failing to reach an informed opinion, in

ignoring basic principles of governance, and in voting to approve the 2014 Transaction

Agreement while they had disqualifying conflicts of interest, Loveman breached his fiduciary

duties to CEOC.

**Aiding & Abetting Breaches Of Fiduciary Duty**

580.    The Conflicted Directors and individual directors, the Sponsors, and the

Sponsors' officers and agents knew that CEC, as CEOC's controlling stockholder, and the

boards of CEC and CEOC owed fiduciary duties to CEOC.  The CEC Conflicted Directors and

individual directors, the Sponsors, and the Sponsors' officers and agents knew or should have

known that CEC and the boards of CEC and CEOC breached those fiduciary duties by

compelling CEOC to enter into transactions that were against CEOC's interests, benefited CEC

at CEOC's expense, did not provide a fair price to CEOC, and did not result from a fair process.

581.    The Conflicted Directors and individual directors, the Sponsors, the Sponsors'

and officers and agents knowingly participated in those breaches of fiduciary duty in the

following ways:

     a.     by virtue of their power to appoint the entire board of CEC and the fact
that a majority of the directors of CEC's board were officers of Apollo and
TPG, the Sponsors dominated and controlled the actions of CEC's board
and CEOC's board;

     b.     the CEC Conflicted Directors and individual directors, the Sponsors, and
the Sponsors' officers negotiated and implemented the transaction, even
though it was not in CEOC's best interests;

c.    Apollo conceived, designed, and structured the transfer of Total Rewards to a bankruptcy-remote entity dominated by CERP and Growth Partners that would have complete control over Total Rewards;

d.    Apollo assisted in preparing the first drafts of the term sheets outlining the terms, conditions, values, and structures of the transfer of Total Rewards to CES, specifically including the methods of diluting CEOC's ownership and control of Total Rewards to the benefit of CERP and Growth Partners;

e.    upon information and belief, TPG reviewed drafts of the term sheets and Services LLC Agreements and provided comments;

f.    although the Sponsors knew and intended that the transfer of CEOC's intellectual property to CES would allow CEC and the Sponsors to maintain control of valuable CEOC assets, transfer those assets beyond the reach of CEOC's creditors, and better position CEC and the Sponsors for CEOC's restructuring or bankruptcy, they did not disclose these intentions to CEOC's board;

g.    despite their knowledge that CEC and CEOC had divergent interests, the Sponsors exploited the conflicts of interest of CEOC board members who sat on CEC's board or were officers of CEC or served as senior executives of CEC;

h.    the Sponsors formulated and decided upon the terms of the Services LLC Agreements that required CES to sublicense the CEOC intellectual property to CERP, Growth Partners, and other subsidiaries or affiliates of CEC, which resulted in CERP and Growth Partners obtaining the nearly unlimited right to use the Total Rewards program and related intellectual property for little or nothing;

i.    CEOC, CEC, the Sponsors, and the individual defendants understood that CEOC was insolvent on and after the date of each transfer, as evidenced by, *inter alia*, the analyses CEC and Sponsor had prepared or seen that indicated CEOC had a negative equity value and would be unable to repay its debts, and the decision to create bankruptcy remote entities to receive and hold valuable CEOC assets;

j.    despite their knowledge that CEC and CEOC had divergent interests, the Sponsors and CEC proposed, negotiated, structured, evaluated, and approved the transfer of CEOC's intellectual property through a process that failed to involve or protect the interests of CEOC;

k.    the Sponsors knew that the value of the consideration received by CEOC was not reasonably equivalent to the value of the assets transferred; and

l.    the Sponsors intentionally structured the Services LLC Agreement to transfer effective control of Total Rewards to CERP and Growth Partners,

enriching them at CEOC's direct expense and specifically provided that CEOC would lose governance rights in CES in the event of bankruptcy, that CEOC could not assign its interest in CES or withdraw from CES without the consent of CERP and Growth Partners, that the CEOC employees necessary to operate Total Rewards would be transferred to CES, that the know-how and tangible intellectual property necessary to operate and maintain Total Rewards would be transferred to CES, and that CES and its sublicensees would have control of derivative works created from CEOC's intellectual property.

582.     The Conflicted Directors and individual directors, the Sponsors, Rowan, and Sambur are liable for aiding and abetting breaches of fiduciary duty in connection with the transfer of Total Rewards.

583.     CEOC has been injured by these breaches of fiduciary duties in an amount to be determined.

**Civil Conspiracy**

584.     Starting in mid-2012, the Conflicted Directors agreed and conspired to commit unlawful acts, including to fraudulently transfer CEOC's valuable assets, breach fiduciary duties owed to CEOC, engage CEOC in damaging financial transactions, and otherwise delay, hinder, and defraud CEOC and its creditors.  Each of the conspirators intentionally participated in this scheme.  The Transfer of Total Rewards constitutes an overt act taken in furtherance of the conspirators' unlawful scheme.  The conspirators' actions in creating, structuring, negotiating, evaluating, and approving the transfers to CEOC's intellectual property, as more fully detailed herein, constitute further overt acts taken in furtherance of their unlawful scheme.

585.     The Transfer of Total Rewards and other CEOC intellectual property, the conspirators' overt acts in furtherance of that transfer, and the conspirators' overall scheme and agreement to fraudulently transfer CEOC's valuable assets, breach fiduciary duties owed to CEOC, engage CEOC in damaging financial transactions, and otherwise delay, hinder, and defraud CEOC and its creditors caused damages to CEOC in an amount to be determined.

<u>**CLAIM XIV**</u>

**TRANSFER OF CEOC'S PROPERTY MANAGEMENT BUSINESS**
(Nev. Rev. Stat. §§ 112.180, 112.190, 112.210; 6 Del. C. §§ 1304, 1305, 1307; and
11 U.S.C. §§ 544, 548(a)(1)(A),(B), 550)
(Fraudulent Transfer, Breach Of Fiduciary Duty, Aiding & Abetting
Breach Of Fiduciary Duty, Civil Conspiracy)

***CEC, CES, Sponsors, CEC Conflicted Directors, Loveman, Rowan, Sambur, Benjamin,
Housenbold, Kleisner, Press, Swann and Williams***

586.    Plaintiffs repeat and reallege paragraphs 1 through 585.

**Fraudulent Transfer**

587.    At all relevant times, CEOC has been insolvent.

588.    The 2014 Transaction Agreement required CEOC to transfer its portfolio of

property management agreements, its workforce and other enterprise services to the

newly-formed Caesars Enterprise Services LLC.   These agreements and enterprise services were

of enormous value to CEOC.

589.    CEOC received no consideration in return for transferring the property

management agreements to CES other than a 69% ownership stake in CES.   However, CES was

designed to be a flow-through entity that was intentionally structured to have no profits.

590.    The other owners of CES were CERP and Growth Partners.   A three-person

Steering Committee makes all major decisions for CES.   Each of CEOC, CERP and Growth

Partners has a seat on the Steering Committee.

591.    At all relevant times, CEC and the Sponsors owned, controlled, and dominated

CERP and Growth Partners.

592.    Because of the governance structure of CES, CEOC had no control over the

governance of CES.   Instead, CERP and Growth Partners hold a majority of the votes.

593.    The transfer of the property management agreements to CES was a constructive

fraudulent transfer because CEOC received inadequate consideration and less than reasonably

equivalent value for the property management agreements.

594.    In addition, the transfer of the property management agreements was an actual

fraudulent transfer because the purpose and effect of the transfer was to hinder or delay CEOC's

creditors by placing critical and valuable assets beyond their reach.  Evidence of fraudulent

intent includes the facts that:

> a.    the Sponsors, and Apollo in particular, conceived of the transaction;
>
> b.    the transaction was designed and intended to allow CEC and the Sponsors
> to maintain control of CEOC's portfolio of management agreements,
> transfer those agreements beyond the reach of CEOC's creditors, and
> better position CEC and the Sponsors for CEOC's restructuring or
> bankruptcy;
>
> c.    CEOC, CEC, the Sponsors, and the individual defendants understood that
> CEOC was insolvent on and after the date of the transfer of the
> management agreements, as evidenced by, *inter alia*, the analyses CEC
> and Sponsor had prepared or seen that indicated CEOC had a negative
> equity value and would be unable to repay its debts, the creation of
> bankruptcy remote entities to receive and hold valuable CEOC assets, and
> the CEC Special Committee's refusal to provide a representation that
> CEOC was solvent, as requested by the CAC Special Committee in
> connection with the transaction;
>
> d.    despite their knowledge that CEC and CEOC had divergent interests, the
> Sponsors and CEC proposed, negotiated, structured, evaluated, and
> approved the transfer of CEOC's portfolio of property management
> agreements through a process that failed to involve or protect CEOC's
> interests;
>
> e.    the transfer of the property management business was to a newly created,
> bankruptcy-remote shared services entity that is controlled by CEC and
> the Sponsors;
>
> f.    CEC and the Sponsors retained control of the assets;
>
> g.    the value of the consideration received by CEOC was not reasonably
> equivalent to the value of the assets transferred; and

      h.      the transfer substantially impaired CEOC's future ability to service its debt.

595.    The transfer of CEOC's property management business, including CEOC's workforce and enterprise services, is avoidable and recoverable, and CEC and CES are liable for the constructive and actual fraudulent transfer of CEOC's property management business.

**Breaches Of Fiduciary Duty By CEC And CEC's Directors**

596.    At all relevant times, CERP and Growth Partners were direct or indirect subsidiaries or affiliates of CEC.  Thus, the transfer of CEOC's property management agreements, workforce, and enterprise services to CES was a related party transaction and involved self-dealing.

597.    The price paid to CEOC for transferring its property management agreements, workforce and enterprise services was far below the value of those agreements and was not entirely fair to CEOC.

598.    The process by which CEC initiated, structured, negotiated and disclosed the transfer of Total Rewards to CES was not entirely fair to CEOC.  CEOC was given no say in deciding whether to sell these assets, how the transaction was structured or when and how it was disclosed.  CEOC had no role in the negotiations of the transaction, and was not even represented in the negotiations.  Instead, the entire process was dominated by CEC and the Sponsors.

599.    Although CEC formed a Special Committee of its board to structure and negotiate the price of the other transactions that happened at this same time, that Committee was never advised that CEC and CEOC could have divergent interests or that the CEC Special Committee would have a fiduciary duty or other obligation to protect CEOC or its creditors due to CEOC's insolvency.  The CEC Special Committee also never considered whether CEOC should retain control over the property management agreements, workforce, and enterprise services, even

though there could be consequences to CEOC and its creditors if control of the property

management agreements, workforce, and enterprise services was transferred to entities CEC and

the Sponsors controlled, such as creating certain risks to formulating a plan of reorganization (in

addition to structural issues that already existed) that would allow CEOC to emerge from chapter

11 as a standalone entity.

600.    CEC breached its fiduciary duties to CEOC.

601.    The CEC Conflicted Directors and the individual directors, who individually

owed fiduciary duties to CEOC, breached those fiduciary duties.

**Breaches Of Fiduciary Duty By CEOC's Directors**

602.    CEOC's board at the time the transfer of the property management agreements

was approved consisted solely of Loveman and Hession.  Both were conflicted.  Loveman was

CEC's Chairman and Chief Executive Officer and Hession was CEC's Chief Financial Officer.

Both Loveman and Hession owned stock in CAC and, therefore, stood to benefit personally from

the below-market price at which CEOC had sold its portfolio of property management

agreements to Growth Partners.

603.    Loveman breached his fiduciary duties to CEOC by approving, authorizing, and

facilitating a transaction that was not in the best interests of CEOC.

604.    Loveman also breached his fiduciary duties to CEOC by failing to ensure that

CEOC received a fair price for its portfolio of property management agreements or that a fair

process was followed.  Loveman did not consider using a marketing process for the sale of these

assets; made no effort to solicit any third-party bids, offers, or proposals; made no effort to

convene or create a special committee of independent directors to review the transaction; did not

ask for or receive an opinion about the fairness of the transaction to CEOC; did not retain

independent lawyers or advisors to represent CEOC; and made no analysis of CEOC's solvency.

605.     The transfer of the property management agreements, workforce, and enterprise services to CES was approved by the CEOC board as part of its approval of the 2014 Transaction Agreement.  However, the CEOC board did not hold a meeting to discuss the transfer of the property management agreements, or even to discuss its approval of the 2014 Transaction Agreement.  Instead, CEOC's two directors—Loveman and Hession—approved the transaction by signing a boilerplate written consent.  In failing to reach an informed opinion, in ignoring basic principles of governance, and in voting to approve the 2014 Transaction Agreement while they had disqualifying conflicts of interest, Loveman breached his fiduciary duties to CEOC.

**Aiding & Abetting Breaches Of Fiduciary Duty**

606.     The Conflicted Directors and individual directors, the Sponsors, and the Sponsors' officers and agents knew that CEC, as CEOC's controlling stockholder, and the boards of CEC and CEOC owed fiduciary duties to CEOC.  The CEC Conflicted Directors and individual directors, the Sponsors, and the Sponsors' officers and agents knew or should have known that CEC and the boards of CEC and CEOC breached those fiduciary duties by compelling CEOC to enter into transactions that were against CEOC's interests, benefited CEC at CEOC's expense, did not provide a fair price to CEOC, and did not result from a fair process.

607.     The Conflicted Directors and individual directors, the Sponsors, and the Sponsors' officers and agents knowingly participated in those breaches of fiduciary duty in the following ways:

a.      by virtue of their power to appoint the entire board of CEC and the fact that a majority of the directors of CEC's board were officers of Apollo and TPG, the Sponsors dominated and controlled the actions of CEC's board and CEOC's board;

b.      the CEC Conflicted Directors, the Sponsors, and the Sponsors' officers negotiated and implemented the transaction, even though it was not in CEOC's best interests;

174

c.      Apollo conceived, designed, and structured the transaction, including the selection of CEOC assets to be sold and the creation of new entities that would hold the properties for the benefit of CEC and the Sponsors;

d.      although the Sponsors understood that the transaction was designed to allow CEC and the Sponsors to maintain control of valuable CEOC assets, transfer those assets beyond the reach of CEOC's creditors, and better position CEC and the Sponsors for CEOC's restructuring or bankruptcy, they did not disclose these intentions to CEOC's board; and

e.      despite their knowledge that CEC and CEOC had divergent interests, the Sponsors exploited the conflicts of interest of CEOC board members who sat on CEC's board or were officers of CEC.

608.    CEOC has been injured by these breaches of fiduciary duties in an amount to be determined.

609.    The Conflicted Directors and individual directors and the Sponsors are liable for aiding and abetting breaches of fiduciary duty in connection with the transfer of CEOC's property management business.

**Civil Conspiracy**

610.    Starting in mid-2012, the Conflicted Directors agreed and conspired to commit unlawful acts, including to fraudulently transfer CEOC's valuable assets, breach fiduciary duties owed to CEOC, engage CEOC in damaging financial transactions, and otherwise delay, hinder, and defraud CEOC and its creditors.  Each of the conspirators intentionally participated in this scheme.  The Transfer of CEOC's Property Management Business constitutes an overt act taken in furtherance of the conspirators' unlawful scheme.  The conspirators' actions in creating, structuring, negotiating, evaluating, and approving the transfer, as more fully detailed herein, constitute further overt acts taken in furtherance of their unlawful scheme.

611.    The Transfer of CEOC's Property Management Business, the conspirators' overt acts in furtherance of that transfer, and the conspirators' overall scheme and agreement to fraudulently transfer CEOC's valuable assets, breach fiduciary duties owed to CEOC, have

CEOC engage CEOC in damaging financial transactions, and otherwise delay, hinder, and

defraud CEOC and its creditors caused damages to CEOC in an amount to be determined.

## CLAIM XV

**THE B-7 TRANSACTION**
(Nev. Rev. Stat. §§ 112.180, 112.190, 112.210; 6 Del. C. §§ 1304, 1305, 1307; and
11 U.S.C. §§ 544, 548(a)(1)(A),(B), 550)
(Waste of Corporate Assets, Fraudulent Transfer, Breach Of Fiduciary
Duty, Aiding & Abetting Breach Of Fiduciary Duty, Civil Conspiracy)

***CEC, Growth Partners, Sponsors, CEC Conflicted Directors,***
***Loveman, Rowan, Sambur, Chatham, Benjamin, Kleisner, Press, Swann and Williams***

612.    Plaintiffs repeat and reallege paragraphs 1 through 611.

**Fraudulent Transfer**

613.    At all relevant times, CEOC has been insolvent.

614.    Throughout the relevant period, CEC, the directors of CEC, and the Sponsors

completely dominated and controlled CEOC and all of CEOC's subsidiaries and affiliates.

615.    On May 5, 2014, CEOC announced a transaction (the "B-7 Transaction")

pursuant to which it borrowed $1.75 billion from a syndicate of banks, repaid certain bank debt,

and agreed to take steps to retire bond debt that was due to mature in 2015.  Ostensibly, the B-7

Transaction was undertaken to improve CEOC's liquidity, extend the maturities of its funded

debt, and provide CEOC with a "runway" to recovering from its insolvency.  In fact, the B-7

Transaction was intended to serve the objectives of CEC and the Sponsors.

616.    In each case, the payments CEOC made were constructive fraudulent transfers

because CEOC received inadequate consideration and less than reasonably equivalent value for

the payments.  Among other things, CEOC paid over $400 million to Chatham, $452 million to

Growth Partners, and $129 million in fees to GSO and BlackRock in conjunction with the B-7

Transaction.

617.   In addition, certain payments CEOC made were actual fraudulent transfers because the purpose and effect of the transfer was to hinder or delay CEOC's creditors by placing critical and valuable assets beyond their reach.  Evidence of fraudulent intent includes the facts that:

a.   the Sponsors, and Apollo in particular, conceived the transaction;

b.   the transaction was motivated principally by the desire of CEC and the Sponsors' desire to modify CEC's Bank Guarantee, to attempt to remove CEC's Bond Guarantees, funnel cash from CEOC to Growth Partners, and avoid receiving a qualified report from its independent accountants about 'EC's viability as a going concern;

c.   CEOC, CEC, the Sponsors, the 2014 Transferees, and the individual defendants understood that CEOC was insolvent at all times during the development and closing of the transaction;

d.   despite their knowledge that CEC and CEOC had divergent interests, the Sponsors and CEC proposed, negotiated, structured, evaluated, and approved the B-7 transaction through a process that failed to involve or protect CEOC's interests;

e.   the CEOC board did not meaningfully consider the transaction and instead approved the transaction through written consent;

f.   CEOC redeemed the 2015 Notes at a premium and with interest, despite the fact that the Notes were selling at a substantial discount in the marketplace;

g.   the redemption of the 2015 Notes at a premium and with interest was contrary to the past practice of CEC and Apollo of negotiating the best price when it repurchased CEOC's distressed debt;

h.   only eight months before, the 2015 Notes had previously been valued at substantial discount from their face value in connection with the creation and capitalization of CAC;

i.   $452 million of the $1.75 billion raised through the B-7 Transaction was paid to redeem, at a premium and with interest, notes held by Growth Partners;

j.   over $400 million of $1.75 billion raised through the B-7 Transaction was paid to redeem, at a premium and with interest, notes held by Chatham, which contemporaneously agreed to purchase worthless CEOC stock to assist in CEC's efforts to remove the Bond Guarantees;

k.      but for the repurchase of the notes through the B-7 Transaction, the notes would have declined in value following the announcement of the release of the Bond Guarantees;

l.      CEC and the Sponsors arranged for CEOC to redeem 2015 Notes held by Growth Partners and Chatham, causing CEOC to enter into stand-alone note purchase agreements with Growth Partners and Chatham;

m.     Growth Partners knew it was receiving a premium on the notes from an entity (CEOC) controlled by its largest shareholders;

n.      although Growth Partners had agreed to serve as a lender to the B-7 Transaction on a dollar-for-dollar basis for each dollar of notes repurchased by CEOC, no part of the $1.75 billion provided through the B-7 term loan came from Growth Partners;

o.      CEOC incurred $219.1 million of fees and expenses in connection with the B-7 Transaction, almost all of which was unnecessary;

p.      Nearly $129 million of those fees was paid to GSO and BlackRock for a backstop financing facility, which was taken solely to benefit CEC in its efforts to amend the First Lien Credit Agreement to change the terms of CEC's Bank Guarantee from a guarantee of payment to a guarantee of collection;

q.      over $795 million of the $1.75 billion raised through the B-7 Transaction was used to roll over existing B-1, B-3, B-4, B-5, and B-6 terms loans, only $29.1 million of which was due within the next year;

r.      the interest rate on the new B-7 term loan was materially higher than the interest rate on the existing B-1, B-3, B-4, B-5, and B-6 terms loans;

s.      the B-7 Transaction did not actually provide CEOC with any additional liquidity, but instead required CEOC to spend $315 million of its own cash as part of the transaction; and

t.      at the same time the Sponsors and CEC were representing that the purpose of the B-7 Transaction was to provide liquidity to CEOC and extend its runway, they were demanding that CEOC pay CEC the outstanding amounts on the Intercompany Revolver.

618.    The payments and transfers made in connection with the B-7 Transaction are avoidable and recoverable, and CEC, Growth Partners, and Chatham are liable for constructive and actual fraudulent transfers in connection with the B-7 Transaction.

**Breaches Of Fiduciary Duty By CEC And CEC's Directors**

619.    At all relevant times, Growth Partners was an indirect subsidiary and affiliate of CEC.  Thus, the payments CEC required CEOC to make in the B-7 Transaction were payments to third parties for the benefit of CEC and therefore were self-dealing transactions.

620.    In addition, the B-7 Transaction was a waste of corporate assets because it required CEOC to borrow $1.75 billion and spend $315 million of its scarce cash to refinance bank loans, redeem notes, and pay commitment fees that did not benefit CEOC and instead were intended to benefit CEC.  The amounts CEOC paid to third parties in the course of the B-7 Transaction far exceeded any benefit CEOC received.

621.    In addition, CEC knew that the additional debt and additional exhaustions of CEOC's cash reserves would make it even more difficult for CEOC to pay its debts and would hasten CEOC's bankruptcy.

622.    The process by which CEC initiated, structured, negotiated and disclosed the B-7 Transaction was not entirely fair to CEOC.  CEOC was given no say in deciding whether to engage in the transaction, whether it needed the backstop financing from GSO and BlackRock, how the transaction should be structured, what bank loans were to be repaid, and whether and at what price the 2015 Notes would be redeemed.  CEOC had no role in the negotiation of the transaction, and was not even represented in the negotiations.  Instead, the entire process was dominated by CEC and the Sponsors.

623.    Notwithstanding the fact that the B-7 Transaction required CEOC to increase the overall amount of its indebtedness, materially increase the interest rate it paid on its first lien bank debt, and spend $315 million of its scarce cash, CEOC failed to adhere to even the most rudimentary processes.  CEOC had no independent directors or financial advisors to review the

B-7 Transaction.  Its legal counsel, Paul Weiss, was the same law firm representing CEC, which had conflicting interests.

624.    CEC breached its fiduciary duties to CEOC.

625.    The CEC Conflicted Directors and individual directors, who individually owed fiduciary duties to CEOC, breached those fiduciary duties.

### Breaches Of Fiduciary Duty By CEOC's Directors

626.    At the time of the B-7 Transaction, CEOC's board consisted of Loveman and Hession.  Neither was independent and both had interests adverse to CEOC's.  Loveman was CEC's Chairman and Chief Executive Officer, Hession was CEC's Chief Financial Officer, and both Loveman and Hession owned stock in CAC, which benefited from CEOC's redemption of Growth Partners' 2015 Notes.

627.    The CEOC board gave the transaction no meaningful review.  It held no face-to-face meeting but instead approved the transaction in a standard written consent.  In failing to reach an informed opinion, in ignoring basic principles of governance, and in voting to approve the B-7 Transaction while they had disqualifying conflicts of interest, Loveman breached his fiduciary duties to CEOC.

### Aiding & Abetting Breach Of Fiduciary Duty

628.    The CEC Conflicted Directors and individual directors, the Sponsors, and the Sponsors' officers and agents knew that CEC, as CEOC's controlling stockholder, and the boards of CEC and CEOC owed fiduciary duties to CEOC.  The CEC Conflicted Directors, the Sponsors, and the Sponsors' officers and agents knew or should have known that CEC and the boards of CEC and CEOC breached those fiduciary duties by compelling CEOC to enter into transactions that were against CEOC's interests, benefited CEC at CEOC's expense, did not provide a fair price to CEOC, and did not result from a fair process.

629.    The CEC Conflicted Directors, the Sponsors, and the Sponsors' officers and

agents knowingly participated in those breaches of fiduciary duty in the following ways:

a.    by virtue of their power to appoint the entire board of CEC and the fact that a majority of the directors of CEC's board were officers of Apollo and TPG, the Sponsors dominated and controlled the actions of CEC's board and CEOC's board;

b.    the CEC Conflicted Directors, the Sponsors, and the Sponsors' officers negotiated and implemented the transaction, even though it was not in CEOC's best interests;

c.    Apollo conceived, designed, and structured the B-7 Transaction, including the details of the amendment of CEOC's bank loans, the modification of CEC's Bank Guarantee, the redemption of the 2015 Notes, and the timing, structure, pricing and implementation of the transaction;

d.    Apollo decided to redeem the 2015 Notes at a premium, despite the fact that the notes were selling at a substantial discount in the marketplace;

e.    Apollo determined or agreed to the fees associated with the B-7 Transaction;

f.    Apollo arranged for CEC to sell 5% of the equity of CEOC to Scoggin, Chatham, and Paulson, which Apollo claimed was a necessary condition to close the B-7 Transaction;

g.    Apollo made a side deal with Chatham under which the Sponsors would cause CEOC to redeem Chatham's 2015 Notes at par plus a premium in exchange for Chatham's agreement to assist the Sponsors and CEC in their efforts to release the Bond Guarantees by purchasing worthless CEOC stock;

h.    Apollo utilized the B-7 Transaction to justify its intentions and actions in attempting to release the Bond Guarantees, contending that the B-7 lenders had insisted on a release of the Bond Guarantees as a condition of the financing;

i.    although the Sponsors believed that the B-7 transaction would result in a release of the Bond Guarantees and planned to have CEOC redeem the notes held by Growth Partners at a substantial premium, they failed to implement procedures to ensure that the process used to approve the transaction was entirely fair to CEOC; and

j.    despite their knowledge that CEC and CEOC had divergent interests, the Sponsors exploited the conflicts of interest of CEOC board members who sat on CEC's board or were officers of CEC.

630.    The Conflicted Directors and individual directors and the Sponsors are liable for
aiding and abetting breaches of fiduciary duty in connection with the B-7 Transaction.

**Civil Conspiracy**

631.    Starting in mid-2012, the Conflicted Directors agreed and conspired to commit
unlawful acts, including to fraudulently transfer CEOC's valuable assets, breach fiduciary duties
owed to CEOC, engage CEOC in damaging financial transactions, and otherwise delay, hinder,
and defraud CEOC and its creditors.  Each of the conspirators intentionally participated in this
scheme.  The B-7 Transaction constitutes an overt act taken in furtherance of the conspirators'
unlawful scheme.  The conspirators' actions in creating, structuring, negotiating, evaluating, and
approving the transaction, as more fully detailed herein, constitute further overt acts taken in
furtherance of their unlawful scheme.

632.    With respect to the B-7 Transaction and the release of the CEC Bond Guarantees,
the conspirators also agreed and conspired among themselves and with others to devise and
implement a set of interrelated financial transactions that served to damage CEOC and hinder,
delay, and defraud creditors.  As part of the scheme, the Sponsors agreed to cause CEOC to
redeem Chatham's 2015 Notes at par plus a premium in connection with the B-7 Transaction in
exchange for its agreement to assist the Sponsors in releasing the Bond Guarantees by
purchasing worthless CEOC stock.

633.    The B-7 Transaction, the conspirators' overt acts in furtherance of that
transaction, and the conspirators' overall scheme and agreement to fraudulently transfer CEOC's
valuable assets, breach fiduciary duties owed to CEOC, engage CEOC in damaging financial
transactions, and otherwise delay, hinder, and defraud CEOC and its creditors caused damages to
CEOC in an amount to be determined.

<u>CLAIM XVI</u>

**PURPORTED RELEASE OF CEC'S BOND GUARANTEES**
(Waste of Corporate Assets, Breach Of Fiduciary Duty, Aiding &
Abetting Breach Of Fiduciary Duty, Civil Conspiracy)

***CEC, Sponsors, CEC Conflicted Directors, Loveman, Rowan, Sambur***

634.    Plaintiffs repeat and reallege paragraphs 1 through 633.

**Breaches Of Fiduciary Duty By CEC And CEC's Directors**

635.    At all relevant times, CEOC was insolvent and CEC, as CEOC's controlling

stockholder, and CEC's Directors, through their domination of CEOC's board, owed fiduciary

duties to CEOC.

636.    On May 5, 2014, CEC sold 5% of the equity in CEOC to Scoggin, Chatham, and

Paulson in privately negotiated transactions.  CEC received a total of $6.15 million.  That same

day, CEC announced that the sale of CEOC stock had served to release CEC from its Bond

Guarantees.  On June 2, 2014, CEC caused CEOC's CFO Donald Colvin to deliver to the

indenture trustee for the 2009 bond indenture a certificate stating that CEOC "elects to

automatically release the Parent Guarantee pursuant to the last paragraph of Section 12.02(c) of

the 2009 Indenture."  On information and belief, similar certificates were delivered to the

indenture trustees for the other indentures governing the Second Priority Notes.

637.    The transactions that CEC used to purportedly release its Bond Guarantees were

self-dealing transactions and were not entirely fair to CEOC.

638.    Among other things, the Bond Guarantees served to disincentivize CEC from

stripping CEOC of assets, since the guarantees kept CEC on the hook for the repayment of

CEOC's debts.  In addition, certain of the methods for removal of the Bond Guarantees required

consent from CEOC.  Accordingly, the Bond Guarantees and CEOC's purported right to elect to

release the Bond Guarantees had substantial value to CEC, as evidenced by the fact that CEC's

stock price rose materially after the announcement that the Bond Guarantees had been purportedly released, while the value of CEOC's notes plummeted.  Despite the substantial value of the Bond Guarantees to CEC, CEOC received no benefit and no consideration in return for delivering these certificates and purportedly releasing its legal rights.

639.    The process by which CEC initiated, structured, negotiated and disclosed the purported release of the Bond Guarantees was not entirely fair to CEOC.  CEOC was given no say in deciding whether to engage in the transaction and whether and to what extent it should receive consideration "electing" to release the Bond Guarantees.  CEOC had no role in the negotiations of the transaction, and was not even represented in the negotiations.  Instead, the entire process was dominated by CEC and the Sponsors.  CEOC had no independent directors or financial advisors to review the purported release of the Bond Guarantees.

640.    CEC breached its fiduciary duties to CEOC.

641.    The CEC Conflicted Directors, who individually owed fiduciary duties to CEOC, breached those fiduciary duties.

**Breaches Of Fiduciary Duty By CEOC's Directors**

642.    At the time that CEC purportedly was released from the Bond Guarantees, CEOC's board consisted of Loveman and Hession.  Neither was independent and both had interests adverse to CEOC's.  Loveman was CEC's Chairman and Chief Executive Officer, Hession was CEC's Chief Financial Officer, and both Loveman and Hession owned stock in CAC, which benefited from the purported release of the Bond Guarantees.

643.    The CEOC board gave no meaningful review to the purported release of CEC's Bond Guarantee.

**Aiding & Abetting Breach Of Fiduciary Duty**

644.    The CEC Conflicted Directors, the Sponsors, and the Sponsors' officers and

agents knew that CEC, as CEOC's controlling stockholder, and the boards of CEC and CEOC

owed fiduciary duties to CEOC.  The CEC Conflicted Directors, the Sponsors, and the Sponsors'

officers and agents knew or should have known that CEC and the boards of CEC and CEOC

breached those fiduciary duties by compelling CEOC to enter into transactions that were against

CEOC's interests, benefited CEC at CEOC's expense, did not provide a fair price to CEOC, and

did not result from a fair process.

645.    The CEC Conflicted Directors, the Sponsors, and the Sponsors' officers and

agents knowingly participated in those breaches of fiduciary in the following ways:

> k.    the CEC Conflicted Directors, the Sponsors, and the Sponsors' officers and agents negotiated and implemented the transaction purportedly releasing the Bond Guarantees for no consideration, even though it was not in CEOC's best interests;

> l.    Apollo formulated, planned and implemented the steps taken purportedly to release the Bond Guarantees;

> m.    Apollo arranged the sale of CEOC's stock to Scoggin, Chatham, and Paulson;

> n.    Apollo made a side deal with Chatham under which the Sponsors would cause CEOC to redeem Chatham's 2015 Notes at a premium in connection with the B-7 Transaction in exchange for Chatham's agreement to assist the Sponsors in their efforts to release the Bond Guarantees by purchasing worthless CEOC stock;

> o.    although the Sponsors understood that the transaction would result in a release of an asset of CEOC, they failed to implement procedures to ensure that the process used to approve the transaction was entirely fair to CEOC; and

> p.    despite their knowledge that CEC and CEOC had divergent interests, the Sponsors exploited the conflicts of interest of CEOC board members who sat on CEC's board or were officers of CEC.

646.    The CEC Conflicted Directors, the Sponsors, and the Sponsors' officers are liable for aiding and abetting breaches of fiduciary duty in connection with the purported release of the Bond Guarantees.

**Civil Conspiracy**

647.    Starting in mid-2012, the Conflicted Directors agreed and conspired to commit unlawful acts, including to breach fiduciary duties owed to CEOC, and engage CEOC in damaging financial transactions.  Each of the conspirators intentionally participated in this scheme.  The purported release of the Bond Guarantees constitutes an overt act taken in furtherance of the conspirators' unlawful scheme.  The conspirators' actions in creating, structuring, negotiating, evaluating, and approving the purported release of the Bond Guarantees, as more fully detailed herein, constitute further overt acts taken in furtherance of their unlawful scheme.

648.    With respect to the B-7 Transaction and the purported release of the Bond Guarantees, the conspirators also agreed and conspired among themselves and with others to devise and implement a set of interrelated financial transactions that served to damage CEOC and its creditors.  As part of the scheme, the Sponsors agreed to cause CEOC to redeem Chatham's 2015 Notes at par plus a premium in connection with the B-7 Transaction in exchange for its agreement to assist the Sponsors in releasing the Bond Guarantees by purchasing worthless CEOC stock.

649.    The purported release of the Bond Guarantees, the conspirators' overt acts in furtherance of that transaction, and the conspirators' overall scheme and agreement to breach fiduciary duties owed to CEOC, and engage CEOC in damaging financial transactions, caused damages to CEOC in an amount to be determined.

<u>**CLAIM XVII**</u>

**REPAYMENT OF INTERCOMPANY REVOLVER**
(11 U.S.C. §§ 544, 547, 548(a)(1)(A),(B), 550),
Nev. Rev. Stat. §§ 112.180, 112.190, 112.210, 6 Del. C. §§ 1304, 1305, 1307)
(Preference, Fraudulent Transfer)

***CEC***

650.    Plaintiffs repeat and reallege paragraphs 1 through 649.

**Preference**

651.    From 2008 onwards, CEC and CEOC had agreed upon an unsecured credit facility ("the Intercompany Revolver") pursuant to which CEOC could borrow money from CEC.  By the fourth quarter of 2012, CEOC had borrowed $644.2 million under the Intercompany Revolver.

652.    Throughout the relevant period, CEOC was entirely or almost entirely owned by CEC, and CEC controlled and dominated CEOC.  CEC thus was an insider with respect to CEOC.

653.    CEOC voluntarily filed for bankruptcy on January 15, 2015, and was the subject of an involuntary petition filed on January 12, 2015.  Under either petition date, in the twelve months preceding CEOC's bankruptcy filing, CEOC repaid $289 million under the Intercompany Revolver.

**Fraudulent Transfer**

654.    In the four years preceding CEOC's bankruptcy filing, CEOC paid CEC $662.5 million, including interest, with respect to the Intercompany Revolver.

187

655.    These payments to CEC were actual fraudulent transfers because the purpose and effect of the transfer was to hinder or delay CEOC's creditors by placing critical and valuable assets beyond their reach.  Evidence of fraudulent intent includes the facts that:

a.    the transfers were to CEC;

b.    the shareholders of CEC retained control of the property after the transfers;

c.    CEOC was insolvent on and after the date of each transfer;

d.    the repayments were made before the maturity date and there was no independent process at CEOC to decide whether it was appropriate to do so;

e.    the repayments were made beginning in 2012 around the time that the terms of the Intercompany Revolver were changed so that CEC would no longer be required to re-lend the money, and it never did so despite CEOC's liquidity needs and the fact that the interest rate on the Intercompany Revolver was lower than on CEOC's other available credit;

f.    CEOC's liquidity needs were one of the purported rationales for the creation of Growth and sale of the Planet Hollywood and Baltimore casinos, but that liquidity could have been secured by not prepaying the Intercompany Revolver, thereby preserving the ongoing EBITDA from these properties to pay creditors; and

g.    there was no legitimate purpose for the June 2014 repayment.

656.    Although the Intercompany Revolver was an agreement between CEC and CEOC, officers of the Sponsors took an active role in monitoring CEOC's use of the Intercompany Revolver and undertook years before CEOC entered bankruptcy to have CEOC repay the loan.  In fact, one reason CEC and the Sponsors forced CEOC to sell assets in 2013 and 2014 and to engage in the B-7 Transaction was to raise money to repay the Intercompany Revolver.

657.    The payments of the Intercompany Revolver are avoidable and recoverable, and CEC is liable for the constructive and actual fraudulent transfers resulting of the payments made

under the Intercompany Revolver during the four year period preceding the petition date of

CEOC's bankruptcy case.

## CLAIM XVIII

### REDEMPTION OF PIK NOTES
(Waste of Corporate Assets, Breach Of Fiduciary Duty)

### *CEC, Davis, Loveman, Rowan*

658.     Plaintiffs repeat and reallege paragraphs 1 through 657.

659.     On October 2, 2014, the Executive Committee of CEOC's board voted to redeem

CEOC's so-called PIK Notes at 103.583% of par.  The notes were not due to mature until 2018

and were trading at a substantial discount to their face amount.

660.     CEC was a holder of $4.3 million in face amount of PIK Notes and had other

reasons to have the notes redeemed.  Therefore, redemption of the notes was a self-dealing

transaction.

661.     Although CEOC had, by then, two outside directors on its board and had

constituted the Special Governance Committee to address self-dealing transactions, the two

outside directors and the SGC were not consulted about the decision to have CEOC redeem the

notes.  Instead, the decision was made by Rowan, Davis and Loveman, each of whom was a

director of CEC.  Loveman also was CEC's board chairman and CEO.

662.     Redemption of the notes was not in CEOC's interest and it was running out of

cash.

663.     The purpose of having CEOC redeem the PIK notes was to protect CEC from

claims that its guarantee of CEOC's bank debt would revert to a guarantee of payment, instead of

a guarantee of collection, in the event the PIK notes went into default.  To protect CEC, Rowan,

Davis and Loveman decided to have CEOC redeem the notes.

664.     Redemption of the notes was a windfall to investors.  By some calculations, the notes were redeemed at a premium of 627% to their market price.

665.     CEC itself received $4.7 million for the PIK notes that it held.

666.     Having CEOC redeem the PIK notes at a premium to their market price was a waste of corporate assets, especially in view of the fact that the notes were not due until 2018 and it was public knowledge that CEOC soon would be entering bankruptcy.

667.     In addition, it was a breach of fiduciary duty for Rowan, Davis and Loveman to have CEOC redeem the PIK notes because the redemption was not in CEOC's interest.

668.     In addition, the transaction was not fair to CEOC.  The price of the transaction was not fair because CEOC paid far more for the notes than they were worth.  The process was unfair because Rowan, Davis and Loveman deliberately circumvented the by-laws of the CEOC board governing self-dealing transactions and reached their decision in an arbitrary manner.

669.     CEOC has been injured in an amount to be determined.

## CLAIM XIX

## COSTS OF TOTAL REWARDS CREDITS
(Unjust Enrichment)

### *CEC, CERP, CAC, Growth Partners*

670.     Plaintiffs repeat and reallege paragraphs 1 through 669.

671.     As described above, CEOC has been injured by CEC's requirement that it use an unfair method to allocate costs when a customer redeems Total Rewards credits.  Requiring that CEOC shoulder the cost of the credits, while receiving little of the benefit of those credits, serves as a *de facto* subsidy from CEOC to CEC, CERP, CAC, and Growth Partners.

672.     CEC, CERP, CAC, and Growth Partners have been unjustly enriched at CEOC's expense as a result of this *de facto* subsidy.

673.    CEC, CERP, CAC, and Growth partners should be ordered pay the cost of the

Total Rewards credits redeemed at their properties.

## CLAIM XX

### ALLOCATION OF CEC COSTS
(Unjust Enrichment)

*CEC, CERP, CAC, Growth Partners, CES*

674.    Plaintiffs repeat and reallege paragraphs 1 through 673.

675.    As described above, subsequent to the closing of the Four Properties Transaction,

CEOC has paid more than its fair share of CES' costs.  The failure to update the cost allocation

methodology to align with the properties' share of revenues has resulted in another *de facto*

subsidy from CEOC to CEC, CERP, CAC, Growth Partners, and CES.

676.    CEC, CERP, CAC, Growth Partners, and CES have been unjustly enriched at

CEOC's expense as a result of this *de facto* subsidy.

677.    CEC, CERP, CAC, and Growth Partners should be ordered pay their fair share of

CES' costs, consistent with the properties' share of revenues, and/or CES should return to CEOC

the extent to which CEOC has been overcharged for its share of CES' costs.

## CLAIM XXI

### BREACH OF CONTRACT

*CEC*

678.    Plaintiffs repeat and reallege paragraphs 1 through 677.

679.    In August 2014, CEOC and CEC entered into a Recovery Agreement in

connection with a transaction involving certain noteholders.  Under the Recovery Agreement,

CEC agreed that "[i]f there is not a comprehensive out of court restructuring of the Company's

debt securities, or a prepackaged or prearranged in-court restructuring with requisite voting

support from each of the first and second lien secured creditor classes, within 18 months of the

Effective Date of the Notes Purchase Agreement, then CEC will pay to CEOC the Recoverable

Amount."  The Recoverable Amount is $35 million.

680.    In February 2016, the Recoverable Amount became due.  On February 18, 2016,

CEOC demanded the payment of the Recoverable Amount of $35 million because it was now

due and payable.  CEOC requested that CEC "remit the payment as soon as possible."   To date,

CEC has not paid it.

681.    CEOC is entitled to payment in full of $35 million (the Recoverable Amount) in

addition to interest at the highest legal rate.

*                    *                    *

WHEREFORE, Plaintiffs request a jury trial on all claims triable by a jury, pray that the

Court enter judgment on each of Plaintiffs' claims in favor of Plaintiffs, and against each of the

Defendants jointly and severally, and further enter an order:

(a)    Awarding money damages to Plaintiffs against the Sponsors, CEC, CIE,

CAC, Growth Partners, CERP, CES, the transferees of fraudulent transfers, individual

defendants, and others in an amount to be determined for fraudulent transfer, breach of

fiduciary duty, usurpation of corporate opportunity, waste of corporate assets, aiding and

abetting breaches of fiduciary duty, civil conspiracy, unjust enrichment, and other causes;

(b)    Avoiding the following transfers (collectively, the "Contested Transfers")

and ordering that all documents, consents, and actions relating to them are rescinded and

of no force and effect:

(1)    Transfer of Caesars' online gaming business to the 2009

Transferees (2009);

(2)     Transfer of CMBS IP to CEC and the CMBS PropCos (2010);

(3)     Granting of easements on undeveloped Las Vegas land to the

Easement Transferees (2011);

(4)     WSOP Transaction to the WSOP Transaction Transferees (2011);

(5)     Transfer of Linq And Octavius to CERP to the Linq/Octavius

Transferees (2013);

(6)     Transfer Of Planet Hollywood and Horseshoe Baltimore Casino to

the 2013 Transferees (2013);

(7)     Transfer of Bally's Las Vegas, The Cromwell, Harrah's

New Orleans and The Quad to the 2014 Transferees (2014);

(8)     Transfer of undeveloped Las Vegas real estate to the 2014

Transferees (2014);

(9)     Transfer of Total Rewards to the Total Rewards Transferees

(2014);

(10)    Transfer of CEOC's property management business to CEC and

CES (2014);

(11)    Transfer of rights to CEOC's intellectual property, tangible

property and services pursuant to 2013 and 2014 Transaction

Agreements, the Services LLC Agreements, and the Management

Services Agreement to the CMBS PropCos and Services

Transferees (2010, 2013, 2014);

(12)    Transfer of money and proceeds of the B-7 Transaction to CEC,

Growth Partners, and Chatham; and

(13)   Transfer of CEOC's rights to release the Bond Guarantees to CEC.

(c)   Enjoining CEC, CAC and Growth Partners to, or to cause those of their affiliates that were the ultimate recipients of the assets transferred in the Contested Transfers to return such assets to the original transferor, free and clear of all liens and other encumbrances, such that each of the transferred assets shall be recovered, owned and controlled by CEOC and its affiliates;

(d)   In the event avoidance or rescission of the Contested Transfers, or any of them, is not practicable, award Plaintiffs monetary damages in an amount sufficient to compensate Plaintiffs for the loss of the transferred assets in an amount equal, as to each asset transfer, to the greater of:  (i) the value of each such asset transferred as of the date of entry of judgment, or (ii) the value of each such asset transferred as of the date of such transfer;

(e)   Enjoining CEC to return to Plaintiffs all amounts Plaintiffs paid to CEC since January 1, 2009 to the filing of CEOC's bankruptcy petition, including all amounts Plaintiffs paid to CEC under the Intercompany Revolver in that period;

(f)   Awarding Plaintiffs money damages as follows:

(1)   against CEC for CEC's failure to remit to Plaintiffs no less than $55.8 million in tax refunds owing to Plaintiffs but wrongfully kept by CEC;

(2)   against the CEC Group for the CEC Groups use of CEOC's NOLs;

(3)   against CEC for its failure to pay interest upon the intercompany loan CEOC made to CEC from 2009 onwards;

(4)    against CEC, CES, CERP, CAC, and Growth Partners for the

allocation to CEOC of an excessive and improper share of the

expenses of CES;

(5)    against CEC, Growth Partners, CERP, and CES for the shifting to

Plaintiffs the cost of redeeming Total Rewards credits in properties

owned or operated by those defendants;

(6)    against CEC for the injury Plaintiffs suffered as a result of the B-7

Transaction, including without limitation the cost of fees paid to

GSO and Blackrock; the added interest expense of the B-7 loans;

and the cost of redeeming the 2015 Notes;

(7)    against CEC, Davis, Loveman, and Rowan for the injury CEC

suffered as a result of the redemption of the PIK notes;

(8)    against CEC for the release of the Bond Guarantees; and

(9)    against Chatham Asset Management for excessive amounts paid to

Chatham in connection with the redemption of the 2015 Notes; and

(10)    against all defendants for their breaches of fiduciary duties, aiding

and abetting breaches of fiduciary duty, conspiratorial acts, and

other wrongdoing, as set forth in this Complaint.

(g)    Awarding money damages to Plaintiffs in the amount of all profits

realized by or accruing to defendants, and any of their affiliates, from the Contested

Transfers during the period of time from the respective dates of each of the Contested

Transfers through and include the date of entry of judgment;

(h)      Imposing a constructive trust and/or equitable lien on the assets transferred

in the Contested Transfers;

(i)      Awarding Plaintiffs punitive damages with respect to all breaches of

fiduciary duties and other intentional torts;

(j)      Awarding Plaintiffs $35 million plus interest at the highest lawful rate for

Plaintiffs' breach of contract claim;

(k)      Awarding Plaintiffs the costs of this action, including attorneys' fees,

together with pre- and post-judgment interest; and

(l)      Awarding Plaintiffs such other relief as the Court deems just and proper.


Dated:  August 9, 2016                    */s/ David J. Zott, P.C.*
Chicago, Illinois                         James H.M. Sprayregen, P.C.
                                          David R. Seligman, P.C.
                                          David J. Zott, P.C.
                                          Jeffrey J. Zeiger, P.C.
                                          **KIRKLAND & ELLIS LLP**
                                          **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                          300 North LaSalle
                                          Chicago, Illinois 60654
                                          Telephone:    (312) 862-2000
                                          Facsimile:    (312) 862-2200

                                                   - and -

                                          Paul M. Basta, P.C.
                                          Nicole L. Greenblatt, P.C.
                                          **KIRKLAND & ELLIS LLP**
                                          **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                          601 Lexington Avenue
                                          New York, New York 10022-4611
                                          Telephone:    (212) 446-4800
                                          Facsimile:    (212) 446-4900

                                          *Counsel to the Debtors and Debtors in Possession*